1  **HENRY TOVMASSIAN, SBN 140388**
   **GEORGE D. CROOK, SBN 60889**
2  LAW OFFICES OF HENRY TOVMASSIAN
   14001 Ventura Boulevard
3  Sherman Oaks, CA 91423
   Telephone: (818) 990-7722
4  Facsimile: (818) 450-3722

5  Attorneys for Plaintiffs
   **MELISSA GORDON** and **ROBERT GORDON**
6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  MELISSA GORDON and ROBERT      ) CASE NO. 2:18-cv-00919-CAS-JC
    GORDON,
12                                 ) **DECLARATION OF HENRY**
                                   ) **TOVMASSIAN IN SUPPORT OF**
13              Plaintiffs,        ) **PLAINTIFFS' MOTION FOR**
                                   ) **ATTORNEYS FEES AND**
14                                 ) **EXPENSES**
                                   )
15    v.                           )
                                   )
16  LOS ANGELES UNIFIED SCHOOL     )
    DISTRICT,                      ) DATE: June 10, 2019
17                                 ) TIME:  10:00 a.m.
                                   ) CRTM: 8D
18                                 )
                Defendant.         )
19  _____      )

20

21

22

23

24

25

26

27

28

_____

**DECLARATION OF HENRY TOVMASSIAN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND EXPENSES**

## DECLARATION OF HENRY TOVMASSIAN

I, HENRY TOVMASSIAN, hereby declare:

1.      I am a member in good standing of the California State Bar.  I am in private practice as the principal of my own law firm, the Law Offices of Henry Tovmassian.  I represent the plaintiffs in this action.  I make this declaration in support of their motion for attorneys' fees and expenses filed herewith.

2.      I graduated from New York University in New York, New York, in 1985, with a bachelor's degree in political science.  I then moved to Los Angeles, California to attend law school at the University of California at Los Angeles ("UCLA").

3.      Between 1985 and 1988, I attended UCLA and graduated with a Juris Doctor degree in 1988.  While at UCLA, I was a member of the Moot Court Honors Society.  I was admitted to the California Bar in or about June of 1989.

4.      Following my graduation from UCLA in 1988, I joined the firm of Wilner, Klein, Siegel and Kehr (most recently known as Wilner, Klein & Siegel) in Beverly Hills, California, where I practiced civil litigation in state and federal courts.

5.      I left that firm in 1993 to join former Wilner partners George D. Crook and Robert L. Kehr in a firm which later became known as Kehr, Crook, Tovmassian & Fox.  While there, I continued to practice civil litigation in state and federal courts, and was involved with Mr. Crook in training and supervising the younger lawyers.  I also handled the firm's civil rights practice, which included discrimination claims in state and federal courts.  I left that firm on April 30, 1998 to start my own firm.

6.      I started representing special education clients in 2000.  At that time, I was introduced to the firm of Newman Aaronson Vanaman ("NAV") by Mr. Crook, who was already at NAV.  I started collaborating with Mr. Crook and other attorneys at NAV on special education cases and rather quickly developed my own

special education practice.  For several years I was of counsel to the NAV firm, and I continue to office in the same suite and collaborate on special education cases with NAV attorneys, including Mr Crook.

7.    During the course of my 30 year career, in addition to my special education practice, I have litigated in both civil and federal courts involving cases in the following areas: personal injury, wrongful death, soil and groundwater contamination, trespass, nuisance, defamation, medical malpractice, legal malpractice, malicious prosecution, business disputes, contract disputes, civil rights, employment discrimination claims, maritime litigation, construction defect litigation, and real estate disputes.  The type of work I performed in all of these fields are the same as the type of work I perform in connection with my special education cases.  They include *inter alia* preparation of complaints, answers and legal briefs, communication with opposing counsel, legal research, participation in mediation, negotiation of settlements, preparation of trial documents and conduct of trials.  The only type of work absent in special education cases is pretrial discovery, for which I am thankful.

8.    Since 2000, my special education practice has grown considerably and presently takes up approximately 85% of my time.  I have been involved in hundreds of due process cases filed pursuant to the Individuals With Disabilities Education Act ("IDEA").  I estimate that over the last 10 years, I have filed an average of about 30-35 due process cases per calendar year against a number of school districts, including defendant Los Angeles Unified School District ("LAUSD"), which is the largest school district in the State of California and within whose jurisdiction most of my clients reside.

9.    Because of the quality of my work in representing my special education clients, I have been able to settle the vast majority of the cases I have filed on terms which were very favorable to my clients.  I have had to conduct the trial of only six IDEA due process case which I had commenced on behalf of my

clients to completion, and prevailed on each of them.  In a seventh case, a school district settled my client's claims very favorably after one day of testimony.  I have also represented several special education clients in litigation in the United States District Court for the Central District of California and the Ninth Circuit Court of Appeals.  For example, I was one of the attorneys for the successful plaintiffs in *McGloin v. Los Angeles Unified School District*, CV 02-5524 AHM (CWx), in which Judge Matz reversed an administrative due process hearing decision against a special education student and her parents.  Further, I was the primary attorney in the successful defense of a school district appeal from an administrative hearing decision in *LAUSD v. California Special Education Hearing Office, et al.,* SACV 03-662-JVS (CTx) and assisted in obtaining reversal of an administrative hearing decision in favor of the school district in *H.B., etc., et al. v. Las Virgenes Unified School District,* CV 04-08572 FMC (Ssx).  Finally, I was the primary attorney in the successful defense of a school district appeal from a successful administrative hearing decision in *Torrance Unified School District v. E.M., et al*, CV07-2164 CAS (RZx), consolidated with CV07-2218 CAS (JTLx).

10.    Both Mr. Crook and I enjoy reputations as excellent special education attorneys, with many placing us at the top of the field.  This is evident, for example, by the declarations of Carol A. Sobel and Marcy J.K. Tiffany.  Further, attached hereto as Exhibit "1" is a true and correct copy of the declaration of Barbara Baum, which I filed in *Banda v. Antelope Valley Union High School District*, CV-13-03358 R (CW).  I hereby request that the Court take judicial notice of it.  In her declaration, Ms. Baum, with whom I negotiated and settled many special education cases over a period of about 10 years, describes my and Mr. Crook's reputations in the inner councils of the District.

11.    Courts have frequently found my requested rates reasonable.  For example, on November 10, 2008, I was awarded fees at my requested rate of $495.00 an hour in the *E.M.* case discussed in paragraph 9 above.  Further, on

September 27, 2010, I was awarded fees at my requested rate of $550.00 an hour in the *H.B.* case discussed in paragraph 9 above.  Finally, on July 28, 2016, I was awarded fees at my requested rate of $575.00 an hour in the *Banda* case discussed in paragraph 10 above. True and correct copies of these orders are attached hereto as Exhibits "2", "3" and "4" respectively.

12.    In connection with this matter, I am requesting fees at the hourly rate of $650.00, which is less than the prevailing market hourly rate for an attorney with my skills and experience in Los Angeles.  Since January 1, 2018, I have billed districts in connection with special education cases which settled at the hourly rate of $650.  No district disputed the reasonableness of that rate during settlement discussions, including the LAUSD.

13.    During 2015, 2016 and 2017, I billed districts in connection with special education cases which settled at the hourly rate of $600.  No district ever disputed the reasonableness of that rate during settlement discussions.  I raised my hourly rate to $650 on January 1, 2018, because I had not raised it at all during the previous three years, and this raise was consistent with the cost of living increases in Los Angeles over the previous three years, as more fully explained in the declaration of Ms. Sobel.

14.    The last case I settled with LAUSD was on February 5, 2019. The District paid close to 86% of my invoice dated February 5, 2019 at the hourly rate of $650.  The remainder was charged to and paid by my clients in that case at the same hourly rate of $650, which is customary.

15.    Attached hereto as Exhibit "5" is a copy of the decision issued in the underlying due process case.

16.    Plaintiffs' main reason for filing the underlying complaint for due process on April 24, 2017 was to obtain an order from the ALJ that their 11 year old son ("Student") was eligible for special education placement and related services pursuant to the IDEA, and to obtain reimbursement of the sum of

**DECLARATION OF HENRY TOVMASSIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND EXPENSES**

$42,990, which they had paid for his attendance at Bridges Academy during the 2016-2017 school year.  Plaintiffs achieved both purposes.  The ALJ determined that the District failed to offer and provide a FAPE because the District (a) violated its "child find" obligations by failing to timely assess Student[1], and (b) failed to find him eligible for special education pursuant to eligibility categories of Emotional Disturbance and Other Health Impairment.[2]  The ALJ ordered that "Student is eligible for special education placement and services, under the eligibility categories of other health impairment and emotional disturbance", and that the "District shall reimburse Parents for the cost of Student's attendance at Bridges Academy for the 2016-2017 school year, in the amount of $42,990."

17.    Besides accomplishing Plaintiffs' main purposes in bringing the underlying suit, the ALJ's Decision will have far reaching impact in the special education field, benefitting many other intelligent children with disabilities.  For many years, LAUSD's policy had been that children were not eligible for special education and related services unless their disabilities negatively effected their academic grades.  All of LAUSD's key witnesses recited the same policy at the trial of the underlying case.  The ALJ's rejection of LAUSD's policy was quite clear.  LAUSD is now on notice that its policy is contrary to law and must be abandoned.  Thus, this case will benefit many other intelligent children with disabilities whose eligibility for special education and related services would otherwise have not been identified.

18.    As a business practice, I regularly keep a record of the hours I spend and the work I complete in representing my clients.  Attached hereto as Exhibit "6" is the firm's invoice accurately showing the hours Mr. Crook and I expended

---

[1]See page 34, ¶32- page 35, ¶36 of ALJ's Decision, a copy of which is attached hereto as Exhibit "5".

[2]See page 35, ¶37- page 37, ¶46  of ALJ's Decision, a copy of which is hereto as Exhibit "5".

**DECLARATION OF HENRY TOVMASSIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND EXPENSES**

1  and the work we performed in connection with the underlying due process case,

2  with the exception of those unbilled hours we have eliminated in the exercise of

3  our billing judgment.  The balance of the invoice for the work performed in

4  connection with the underlying due process case is **$218,745.00.**

5      19.    Further, attached hereto as Exhibit "7" is a firm invoice showing the

6  hours Mr. Crook and I have expended and the work we have performed, as well as

7  the costs incurred to date, in connection with this action.  The balance of the

8  invoice for the perform performed in connection with this action to date is

9  **$57,682.50.**

10      20.    In my professional judgment, all of the time I spent in connection

11  with my representation of plaintiffs both in the underlying due process proceeding

12  and before this Court was necessary and not excessive.  Special education trials

13  are very difficult to win for students and their parents.  Based on my review of the

14  publicly available data from OAH, I know that school districts win approximately

15  75 - 80 percent of cases that are tried.  School districts' win percentage is even

16  higher on eligibility cases, such as this case.  I do not believe that we would have

17  achieved the results we did achieve had either Mr. Crook or I spent less time on

18  the various tasks involved.

19      21.    To avoid unnecessary duplication, I did not ask Mr. Crook to become

20  involved in the case until shortly before commencement of the trial in the

21  underlying due process case.  At trial, Mr. Crook analyzed witness testimony and

22  the hearing officer's comments and questions, shared his views with me on how

23  the testimony was going and what seemed to matter to the hearing officer more,

24  assisted me with the development of new questions and avenues of examination,

25  and with my daily preparation for the testimony of our witnesses and the cross-

26  examination of the District's witnesses.  I consider his work during the trial

27  critical to my ability to best represent my clients.

28

22.    During and after the trial of the underlying due process case, I asked Mr. Crook to conducted some of the necessary research, to draft portions of the closing brief, which I revised, and we communicated regarding this work. Then, after plaintiffs filed this action, Mr. Crook appeared several times before the Court at scheduling and status conferences, participated in the mediation on January 7, 2019, communicated with me on various issues involving the case, conducted some of the necessary research and was involved in the preparation of several of the documents filed in connection with the plaintiffs' motion for attorneys fees. Mr. Crook and I made every effort to avoid duplicative or unnecessary work and I believe that if there was any overlap or duplication, it was necessary to ensure that we provide plaintiffs the best representation possible.

23.    All of the claims advanced and adjudicated in the underlying due process case involved a common core of facts and were based on related legal theories. There was not a single claim which was wholly distinct from the others, with its own set of facts and unrelated applicable law. Further, all of the facts developed, witness testimony and exhibits were related to each other and to all of the claims, especially the key claims on which plaintiffs prevailed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of March, 2019, at Burbank, California.

Henry Tovmassian

**DECLARATION OF HENRY TOVMASSIAN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND EXPENSES**

# EXHIBIT "1"

T - 009

1  **HENRY TOVMASSIAN, SBN 140388**
   tovmassian@att.net
2  LAW OFFICES OF HENRY TOVMASSIAN
   14001 Ventura Boulevard
3  Sherman Oaks, CA 91423
   Telephone: (818) 990-7722
4  Facsimile: (818) 450-3722

5  **GEORGE D. CROOK, SBN 060889**
   latrobonus@gmail.com; gcrook@navlaw.net
6  **NEWMAN AARONSON VANAMAN**
   14001 Ventura Boulevard
7  Sherman Oaks, CA 91423
   Telephone: (818) 990-7722
8  Facsimile: (818) 501-1306

9  Attorneys for Plaintiffs

10

11                  UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13

14  JOSÉ BANDA, MANUEL BANDA          ) **CASE NO. 2:13-cv-03358-R-CW**
    and LORENA BANDA,                 )
15                                    ) **DECLARATION OF BARBARA**
                                      ) **BAUM IN SUPPORT OF**
16                 Plaintiffs,        ) **PLAINTIFFS' REPLY TO**
                                      ) **DEFENDANT'S OPPOSITION TO**
17  v.                                ) **MOTION FOR ATTORNEYS'**
                                      ) **FEES AND EXPENSES**
18  ANTELOPE VALLEY UNION HIGH        )
    SCHOOL DISTRICT,                  )
19                                    )
                   Defendant.         )
20  _____  ) DATE:    February 24, 2014
                                      ) TIME:    10:00 a.m.
21                                      CTRM:    8

22  I, BARBARA BAUM, declare:

23          1.    I make this declaration in support of the reply of Plaintiffs in this action

24  to the Opposition of the Antelope Valley Union High School District to Plaintiffs'

25  Motion for Attorneys' Fees and Expenses.

26          2.    I was employed by the Los Angeles Unified School District

27  ("LAUSD") between 1978 and 2012. I am presently an educational consultant with

28

                                        1
DECLARATION OF BARBARA BAUM IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES AND EXPENSES

T - 010

1    an emphasis on special education.  A true and correct copy of my resume, which is
2    accurate in all respects, is attached hereto as Exhibit "A".

3        3.    Between 1999 and 2012, I was a Due Process Specialist for the
4    LAUSD.  My responsibilities included representing the LAUSD at mediations
5    between the LAUSD and parents of special education children under the Individuals
6    With Disabilities Education Act.  I typically handled between three and six cases a
7    week.  If a case assigned to me did not settle through the mediation process, I was
8    also responsible for attending the subsequent due process hearing between the
9    child's family and the LAUSD.  In that context I functioned both as the
10   representative of the LAUSD regarding matters that would arise during the hearing
11   and as a resource with professional expertise and knowledge in special education.

12       4.    During this time I worked with dozens of attorneys representing the
13   claimants against the LAUSD and became quite familiar with their individual styles
14   and their reputations among my fellow due process specialists.  George Crook and
15   Henry Tovmassian, both of whom were associated with the offices of Valerie
16   Vanaman, were two of the attorneys in the special education community.  They are
17   both among the most knowledgeable and capable attorneys in this field and because
18   of these qualities, our due process department was able to successfully work with
19   them in achieving amicable results without the necessity of proceeding to a due
20   process hearing.

21       5.    The sole exceptions were the two cases that went to hearing and
22   resulted in decisions, true and correct copies of which are attached hereto as
23   Exhibits "B" and "C".  Mr. Crook was the attorney primarily representing the family
24   in the decision attached as Ex. "B", and Mr. Tovmassian was the primary attorney
25   representing the family in the decision attached as Ex. "C".  The LAUSD regarded
26   each of these cases as significant defeats, and each of them precedent setting cases
27   speaking to the expertise of first Mr. Crook and then Mr. Tovmassian that the
28   LAUSD was thereafter more reluctant to proceed to hearing in matters in which they

2

DECLARATION OF BARBARA BAUM IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES AND EXPENSES

T - 011

1  represented special education children than was the case with the great majority of

2  other attorneys practicing in the field.

3       I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct.

5       Executed on the 8th day of February, 2014, at Los Angeles, California.

6

7

8                                        Barbara Baum

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF BARBARA BAUM IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES AND EXPENSES

T - 012

EXHIBIT A

# B A R B A R A   B A U M ,   B . A . , M . S .

*23015 Dolarosa Street, Woodland Hills, California   91367*
*Telephone (818) 884-0966*

## EDUCATION

2013  California Administrative Education Credential
Tiers 1 and 2
1979  California Lutheran University, Thousand Oaks, CA
M.S. Education
1974  California Education Credentials Secondary and Special
Education - Lifetime
1971  California State University, Northridge
B.A. American History and Minor in Special Education

## PROFESSIONAL EXPERIENCE AND TRAINING

2012 – Present      Educational Consultant (Special Education)

1999–2012           Due Process Specialist - LAUSD
Responsible for dispute resolution in Mediations
and Hearings. Three to six cases per week with
a high resolution rate.

1996-1998           Provided Case Management training for schools
in LAUSD

1990-1998           Program Specialist with direct responsibility for
teacher and support staff training for both Special
Education and Regular Education.

1986-1990           Active participation in faculty associations as
head of the faculty professional association.
Faculty liaison with Parent Teacher Association.

1978-1990           Classroom teacher for both Regular Education
and Special Education (ages Pre-School to 22)

T - 014

Case 2:13-cv-00919-CAS-JC   Document 25-2   Filed 03/13/12   Page 15 of 165   Page
Case 2:13-cv-05939-R-CW   Document 19-6   Filed 02/10/14   Page 6 of 71   Page ID #:384
ID #:123

EXHIBIT B

103 LRP 28876

**Los Angeles Unified School District**

**California State Educational Agency**

SN02-01807

**May 30, 2003**

**Judge / Administrative Officer**

**VAN T. VU, Hearing Officer**

**Full Text**

**Appearances:**

APPEARANCES:

Petitioner Los Angeles Unified School District (Petitioner or District) was represented at hearing by attorneys Cynthia Floyd and Katrina Campbell and the District's coordinating specialist for due process, Charlotte Sewell. Respondent STUDENT (Respondent or STUDENT) was represented at hearing by attorneys George Crook and Valerie Vanaman and paralegal John Chan. STUDENT'S parents, PARENTS, were also present on his behalf. Additionally, Respondent requested that the hearing be open to the public, and the hearing was observed by friends of the STUDENT'S family.

The Petitioner called the following witnesses: Paula Calvert, assistant principal at Hale Middle School (Hale); Margaruite Newman, special education teacher at Hale; Terri Veasman, school psychologist; David Fehte, assistant principal at El Camino High School (El Camino); David Hussey, assistant principal of secondary counseling services at El Camino; Michelle Hatfield, transition resource teacher; Jane Cohen, resource specialist teacher at El Camino; Dr. Ivor Weiner, assistant professor of special education; Charlotte Sewell, coordinating specialist for due process; Susan Tandberg, coordinator with instructional services; Lyne Rednick, assistive technology specialist; and Ruth Adatto, occupational therapist.

Respondent called the following witnesses: Dr. Sandra Kaler, licensed clinical psychologist; Sherry Minkowski, dean of students at Bridges Academy

(Bridges); MOTHER, STUDENT'S mother; and George Crook, STUDENT'S attorney.

### Amended Decision[1]

This matter was heard before Van T. Vu, Hearing Officer of the California State Special Education Hearing Office (Hearing Office), McGeorge School of Law, University of the Pacific, in Encino, California, on February 13, 14, 17-19, 2003.

Oral and documentary evidence was received. Respondent's written closing brief was received by the Hearing Office by fax on March 11, 2003, and the District's closing brief was received by mail on March 14, 2003. The record was then closed, and the matter was submitted for decision.

### Issue[2]

Was the District's May 7, 2002 IEP an offer of a free appropriate public education (FAPE) for STUDENT?

### Contentions of the Parties

As discussed below, the District filed this case seeking a determination that it offered Respondent STUDENT a FAPE. The District contends that its May 7, 2002 offer of placement and services was appropriate and was an offer of FAPE. With regard to the main area of contention between the parties, the District contends that STUDENT docs not require a private school placement and could be appropriately placed at El Camino High School. According to the District, STUDENT'S academic and emotional needs can appropriately be addressed at El Camino with support services such as an individual aide and an "RSP hub," where STUDENT can go when he becomes anxious in his regular education classes or to seek individualized attention from the resource specialist teacher. The District further contends that it offered STUDENT appropriate goals and objectives and opportunity to gradually transition from Bridges to El Camino. The District asserts that STUDENT could have appropriately transitioned from his small private school to El Camino High School prior to the fall of 2002 by attending a writing class during the

Copyright © 2014 LRP Publications

extended school year of 2002, when he would have been able to familiarize himself with the campus and school staff. Moreover, the District contends that it is not obligated to offer STUDENT occupational therapy services because STUDENT does not have sensory processing issues that require those services.

Respondent STUDENT disagrees that District's May 7, 2002 offer was an offer of FAPE. Specifically, Respondent contends that the IEP offer of placement at El Camino was not designed to meet his needs because his social/emotional and behavioral problems would impede his ability to function in the environment of a large campus. Additionally, Respondent argues that the District's goals and objectives cannot be realized in the timeframes indicated, and the IEP lacked a plan to transition him from Bridges to El Camino. Furthermore, Respondent asserts that he has significant sensory processing deficits that require that he be provided occupational therapy services.

### Factual and Procedural Background

Respondent STUDENT is a fourteen-year-old ninth-grader who is currently qualified for special education and related services as a student with a specific learning disability and an "other health impairment."[3] Cognitively, STUDENT is in the superior range, but he has a visual motor integration deficit that translates to difficulty with written language. Additionally, he has been diagnosed with a nonverbal learning disability (NLD) that impacts, among other things, his ability to generate written material and to interpret and comprehend social conventions and nuances.[4] He has also been diagnosed with Tourette's Syndrome, obsessive compulsive disorder (OCD), and attention deficit hyperactive disorder (ADHD), all for which he takes medication. STUDENT lives at home with his parents and siblings and attends school at Bridges Academy (Bridges), a small private school located in Sherman Oaks, California.

STUDENT was initially placed at Bridges in April 1999 during his fifth grade year pursuant to a

mediation agreement between his parents and the District. His placement at Bridges continued through the sixth, seventh, and eighth grade as a result of subsequent mediation agreements between the parties, and continues currently in the ninth grade pursuant to stay put. STUDENT'S ninth grade class at Bridges consists of approximately twelve students and he generally has no more than approximately three other students in each of his classes. The most recent mediation agreement that continued STUDENT'S placement at Bridges was entered into between the parties on March 5, 2002. In addition to resolving issues pertaining to STUDENT'S educational placement and services at Bridges through the end of the 2002 extended school year, the mediation agreement required the District to conduct his triennial evaluation and to convene an IEP meeting to discuss those assessments by May 15, 2002. The IEP meeting was actually held on May 7, 2002.

At STUDENT'S May 7, 2002 IEP meeting, the team reviewed the results of STUDENT'S assessments and the District offered to change STUDENT'S placement from Bridges to a general education placement with resource specialist support at his home public school, El Camino High School. According to District witnesses, El Camino is a comprehensive high school with approximately 3500 students and is located on a large campus. Additionally, the District offered STUDENT one class period per day of adapted physical education services, one hour per week of counseling services, one hour per month of mental health services, accommodations for written language and behavior, assistive technology in the form of a laptop computer and software to address STUDENT'S issues with written language and motor functioning, a behavior support plan, extra time during physical education to dress, a temporary support assistant (TSA) for four to six hours per day, and compensatory occupational therapy services to make up for therapy not provided under his prior IEP. The District also indicated that STUDENT'S 2002 extended school year (ESY) services would be governed by the March 5, 2002

Copyright © 2014 LRP Publications

T - 017

mediation agreement that provided for ESY services at Bridges Academy.

At the end of the IEP meeting, MOTHER stated that she believed Bridges was the appropriate placement for STUDENT and not El Camino. She also indicated on the IEP that she did not consent to the District's offer of placement and services, that she intended to request a due process hearing to resolve issues regarding the District's offer, and that she was invoking STUDENT'S stay put right to remain at Bridges pending the due process procedures.

On or about May 31, 2002, the District sent the PARENTS a letter to "supplement and clarify the Los Angeles Unified School District's... offer of placement and services for STUDENT for the 2002-2003 school year." (Dist. Exh. 36, emphasis added.) Specifically, the District reiterated its educational offer and further clarified the type of classes STUDENT would be enrolled in, the expected class size of each of his courses, the type of curriculum to be implemented, the types of modifications or accommodations that would be provided to assist him with written language and behavior, and the role of the TSA. On June 20, 2002, the District again wrote the PARENTS regarding its educational offer for the "2002-2003 school year." In that letter, the District offered STUDENT six weeks of services in a general education English class with aide support at El Camino High School for the 2002 extended school year.[5]

What complicates the facts of this case is the confusion surrounding the implementation date of the May 7, 2002 IEP. As noted above, the March 5, 2002 mediation agreement had already resolved issues pertaining to STUDENT'S educational placement and services through the end of the 2002 ESY in August 2002. However, the Hearing Officer notes that the IEP and Charlotte Sewell's testimony indicate that the District was offering STUDENT an educational program for the time period from May 7, 2002 (i.e., the date of the IEP meeting), through May 7, 2003. If the IEP term was to begin on May 7, 2002, as the District asserts, the IEP offer would overlap by

approximately four months with the placement and program agreed to by the parties in mediation, and the PARENTS' agreement to the IEP would have resulted in their losing the rights and obligations pertaining to STUDENT'S education that they negotiated and obtained through mediation.[6] There is no evidence that the PARENTS intended for the IEP offer to supercede the mediation agreement. Moreover, a review of the tapes of the IEP meeting and subsequent letters from the District to "clarify" its offer indicates that the District's offer was to be implemented in the fall of 2002 rather than from the May 7, 2002 date specified on the IEP.[7] Ultimately, because the PARENTS refused consent to the IEP, the existing mediation agreement governed STUDENT'S placement through the end of the 2002 ESY. Therefore, in light of all of the above, the Hearing Officer concludes that the effective start date of the District's IEP offer could not have been any sooner than the beginning of the 2002-2003 school year.[8]

Despite the District's letters clarifying and supplementing the District's May 7, 2002 IEP offer, the PARENTS continued to refuse consent to implement the IEP. On August 2, 2002, before the PARENTS had filed a request for due process, the District requested of the Hearing Office a hearing to determine whether its May 7, 2002 IEP offer was an offer of FAPE.[9]

## Findings of Fact and Conclusions of Law

Was the District's May 7, 2002 IEP an offer of a free appropriate public education (FAPE) for STUDENT?

Under both State law and the federal Individuals with Disabilities Education Act (IDEA), students with disabilities have the right to a free appropriate public education (FAPE). 20 U.S.C. § 1400; Education Code § 56000. The term "free appropriate public education" means special education and related services that are available to the student at no charge to the parent or guardian, that meet the State educational standards, and that conform to the student's individualized educational program (IEP). 20 U.S.C. § 1401(a)(8).

Copyright © 2014 LRP Publications                                                                    3

An IEP is a written statement that must be developed, reviewed, and revised for each student with a disability. The IEP must include a statement of the goals and objectives, of the special education and related services, and of the program modifications or supports for school personnel that are to be provided to enable the student to be involved in and progress in the general curriculum, and to be educated and participate with disabled and nondisabled peers in extracurricular and other nonacademic activities. 20 U.S.C. § 1414(d)(l)(A); 34 C.F.R. § 300.347; Cal. Educ. Code §§ 56343 and 56345. "Special education" is defined as specially designed instruction to meet the unique needs of the student, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings. 20 U.S.C. § 1401(a)(16). The term "related services," which is also referred to in California as "designated instruction and services" (DIS), includes developmental, corrective, and supportive services that may be required to assist a child with a disability to benefit from special education. 20 U.S.C. § 1401(22); Cal. Educ. Code § 56363.

To determine whether the District provided STUDENT a free appropriate public education, one must focus on the adequacy of the District's offered and proposed programs. *Gregory K. v. Longview School District,* 811 F. 2d 1307, 1314 (9th Cir. 1987). In *Board of Education of the Hendrick Hudson Central School District, et al. v. Rowley,* 458 U.S. 176 (1982), the United States Supreme Court determined that the student's individualized educational program (IEP) must be reasonably calculated to provide the student with some educational benefit. The Court in *Rowley* concluded that the IDEA does not require school districts to provide special education students with the best education available or to provide instruction or services that maximize the student's abilities. The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services, which are individually designed to provide educational benefit to the student. *Rowley,*

458 at 207-208. De minimis benefit or only trivial advancement, however, is insufficient to satisfy the *Rowley* standard of "some" benefit. *Walczak v. Florida Union Free School District,* 142 F.3d at 130 (2d Cir. 1998). A child's academic progress must be viewed in light of the limitations imposed by his or her disability and must be gauged in relation to the child's potential. *Mrs. B. v. Milford Board of Education,* 103 F.3d 1114, 1121 (2d Cir. 1997).

Additionally, special education law requires that a student be educated in the least restrictive environment (LRE). 20 U.S.C. § 1412(a)(5)(A) specifically provides:

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aides and services cannot be achieved satisfactorily.

The requirement that disabled children be educated to the maximum extent appropriate with nondisabled children is often referred to as "mainstreaming," or education in the "least restrictive environment" (LRE). The law demonstrates a "strong preference for 'mainstreaming' which rises to the level of a rebuttable presumption." *Daniel R. v. State Board of Education,* 874 F.2d 1036, 1044-45 (5th Cir. 1989).

To summarize, under the IDEA and *Rowley,* the District's proposed program must have met the following four substantive requirements in order to have constituted an appropriate educational program: (1) been designed to meet STUDENT'S unique needs, (2) been reasonably calculated to provide him with some educational benefit, (3) comported with his IEP, and (4) been provided in the least restrictive environment.

**I. STUDENT'S Unique and Individual**

Copyright © 2014 LRP Publications

4

T - 019

**SpecialEdConnection® Case Report**

### Needs

To determine if the District's offer was designed to meet STUDENT's needs, it is first necessary to determine what his educational needs are. The parties are in general agreement as to STUDENT'S deficits and areas of need. As was discussed above, STUDENT is cognitively in the superior range but he has a visual motor integration deficit. STUDENT has also been diagnosed with a nonverbal learning disability, obsessive-compulsive disorder, Tourette's Syndrome, and attention deficit hyperactive disorder.[10] The parties also agree that, as a result of his deficits, STUDENT has difficulty with the mechanical act of handwriting and with organizing and integrating thoughts and ideas to compose paragraphs. Hence, to address STUDENT'S handwriting and written language deficits, it is undisputed that he needs a laptop for word processing and adult assistance to learn to develop a "structure for writing" to enable him to organize his thoughts into written paragraphs.

The parties also agree that STUDENT currently has social/emotional and behavior difficulties. At hearing, clinical psychologist Dr. Sandra Kaler, who has assessed STUDENT three times since 1997, explained how many of STUDENT'S behavioral and social difficulties were related to his nonverbal learning disability. According to Dr. Kaler, persons with a nonverbal learning disability have difficulty integrating and assigning meaning to what they see, and this causes them anxiety that further affects the integration of information. This often results in their misperceiving what they see or their seeing the whole and not the parts or vice versa. To compensate for their deficit, they tend to talk things through aloud as an avoidance technique to calm themselves down and to organize their thoughts to give meaning to what they see. If the situation is something that they know well, they are less anxious, they pick up more information from the environment, and they can sort the visual information better. For STUDENT, his NLD is exhibited in school by his asking questions constantly about what is required of him and calling

out frequently to talk things through. At hearing, Dr. Kaler described STUDENT as "hyperverbal" and as having an unmodulated loud voice. STUDENT'S talking aloud serves to increase the speed in which he processes information. Sometimes, STUDENT will over-focus on one aspect of a task and not see the "tree for the forest" or vice versa. Additionally, Dr. Kaler testified that STUDENT continues to be anxious and has a "profound lack of understanding of social conventions," despite being in the small, safe environment of Bridges. Dr. Kaler testified that in new settings, even when he is provided individualized attention, STUDENT becomes very anxious. Moreover, STUDENT'S ability to complete written tasks is hindered by the significant stress he experiences when asked to complete written assignments.

Dr. Kaler's descriptions of STUDENT'S anxiety and difficulty with transitions, staying on task, and understanding social cues and nuances were corroborated by the testimony and reports of STUDENT'S assessors and service providers. Sherri Minkowski, the administrator at Bridges who monitors STUDENT'S progress, testified that STUDENT exhibits anxiety and tearful frustration called "melt downs."[11] For example, Ms. Minkowski explained that when STUDENT was placed in a history class with a teacher with whom he was unfamiliar, STUDENT became paralyzed with anxiety, he was resistant to tasks, he demanded a great amount of attention, and he often disrupted the class. Additionally, his showed his stress by shaking, crying, and expressing feelings of frustration at being a failure. According to Ms. Minkowski, STUDENT was sometimes unable to overcome his stress in time to make it to his next class. School psychologist Terri Veasman described in her September 2001 class observation report that STUDENT demonstrated disruptive behaviors by shouting out when needing assistance or by randomly talking or changing the topic of conversation with peers. Additionally, special education teacher Margaruite Newman wrote in her May 2002 report that, although STUDENT had made

---

Copyright © 2014 LRP Publications                                                                 5

T - 020

significant gains in social/emotional area, he continues to need support in this area. Similarly, Dr. Theresa Rattray, STUDENT'S psychotherapist since September 1997, wrote in her May 2002 letter that STUDENT continues to struggle to control his anxiety and is inconsistent with his social skills goal. Dr. Rattray concluded that STUDENT requires continued therapy and behavior support to teach him new methods to reduce his anxiety regarding new tasks and to improve his ability to understand social cues. In light of STUDENT'S social/emotional and behavioral deficits, it is undisputed that he needs intensive adult attention, feedback, and reassurance.

Although the witnesses of both parties generally agree and testified consistently about the nature and extent of STUDENT'S social/emotional and behavioral deficits, their opinions and testimony diverge regarding what type of educational environment STUDENT requires to meet those deficits. The District, focusing on STUDENT'S difficulties with peer relations, contends that STUDENT requires placement at El Camino's large school campus so that he would have opportunities to improve his social skills. It is the District's position that STUDENT has the cognitive ability to function at a large comprehensive high school campus. In support of the District's position, school psychologist Terri Veasman testified that she recommends a larger school environment for STUDENT because he is cognitively strong but has weak peer-relations skills. Ms. Veasman stated that at El Camino STUDENT could improve his social skills in a setting with many opportunities for peer relations. Similarly, special education teacher Margaruite Newman testified that STUDENT requires a more "normalized" setting with more students for him to learn social skills.[12]

The Respondent, on the other hand, focuses on his anxiety and behavioral difficulties as the basis for his assertion that he requires a small, structured educational environment. Specifically, Respondent contends that STUDENT requires a small, supportive environment like the one he has at Bridges where he will not be overwhelmed by his environment and

where he can progress academically. In support of Respondent's contention, Dr. Kaler recommends that STUDENT be placed in a small, protected environment where the teachers are flexible with dealing with atypical behaviors and who do not mind being constantly interrupted. According to Dr. Kaler, because of STUDENT'S difficulty with anxiety and with integrating and assigning meaning to what he sees, STUDENT'S environment must have minimal visual clutter and must be manipulated so as to reduce stressors. As discussed above, when STUDENT'S environment is familiar, controlled, and uncluttered, he is better able to pick up and sort information from his surroundings. Ms. Minkowski agreed with Dr. Kaler's recommendation for a small, protected environment for STUDENT. At hearing, Ms. Minkowski testified that STUDENT would be "emotionally lost" in a large environment and his behaviors would interfere with his ability to function there. Hence, Ms. Minkowski also testified that STUDENT needs a small, nurturing environment where his frustrations and anxiety are reduced.

The Hearing Officer finds the testimony and recommendations of Dr. Kaler and Ms. Minkowski more persuasive than the testimony of Ms. Newman and Ms. Veasman regarding what type of educational environment STUDENT requires. First, Ms. Newman's and Ms. Veasman's recommendation for the large high school environment to improve his social skills disregards STUDENT'S significant difficulties with anxiety, transitions, and attention. Rather, in making their recommendation, they appear to assume that STUDENT'S high intellect would enable him to compensate for any anxiety and behavioral difficulties that he would experience in the larger educational environment. However, there is no significant evidence or support that STUDENT'S cognitive ability would enable him to overcome or control his emotional and behavioral problems. While no one disputes that STUDENT requires improvement of his social skills, those difficulties do not significantly impact his ability to function academically, as do his anxiety and related emotional

T - 021

and behavioral problems. Hence, STUDENT'S emotional and behavioral difficulties must be considered in determining his educational placement.

Additionally, Ms. Newman and Ms. Veasman made their recommendation for placement at El Camino with only limited current and first-hand knowledge of how he performs in the classroom with other students. Ms. Newman observed STUDENT at Bridges in the spring of 2002 for only approximately one hour. Ms. Veasman's only observation of STUDENT in the classroom with other students was in 2001. In comparison, Ms. Minkowski was STUDENT'S teacher for an entire school year and she continues to closely monitor his progress as an administrator at Bridges. Thus, she has worked with STUDENT directly for an extensive period of time and has a better understanding than Ms. Veasman and Ms. Newman of how he actually functions at school. Because the Hearing Officer finds Dr. Kaler and Ms. Minkowski more persuasive, she also found that STUDENT'S needs require that he be placed in a small, protective school environment with teachers accepting of his need to talk aloud to process information and with minimal visual clutter so that he is better able to accord meaning to what he sees.

Lastly, the parties disagree whether STUDENT has sensory processing deficits that require him to receive occupational therapy services to benefit from his education. In support of Respondent's position that he has significant sensory issues that must be addressed in his educational program, MOTHER testified that STUDENT does not wear pants because he does not like the feel of the pants on his legs and he is particular about the food that he eats. MOTHER also testified that STUDENT is sensitive to heat and he will not wear certain clothes that he thinks will make him feel hot. Ms. Minkowski agrees that STUDENT does not like the heat and added that STUDENT is also aversive to being wet. Even assuming that STUDENT

has the sensory issues related to heat and wetness that MOTHER and Ms. Minkowski testified about, there is no evidence that those issues interfere with

his ability to function at school or that he needs OT services at school for him to benefit from his education. On the contrary, Ruth Adatto, STUDENT'S OT therapist during the 2000-2001 school year and the therapist who assessed him in 2002, testified that STUDENT previously received OT services to address his fine motor needs and issues pertaining to his self-regulation, but he made "wonderful gains" and does not need continued occupational therapy in the school environment. Furthermore, Ms. Addatto testified that she had not noticed during any time that she worked with STUDENT that he had any issues with temperature regulation, texture, or food. In light of Ms. Adatto's professional recommendation as an OT therapist that STUDENT does not require continued OT services, and the lack of any information as to how his tactile and sensory issues adversely impact his education, the Hearing Officer finds that STUDENT no longer requires OT therapy to benefit from his education.

In summary, STUDENT has deficits in the areas of fine motor functioning, written language, and social/emotional behavior. STUDENT has difficulty with handwriting and with organizing and integrating thoughts to compose paragraphs. Hence, he requires individualized attention to walk him through the composition process and to reduce his anxiety related to writing. STUDENT'S main difficulties are in the area of social/emotional and behavioral functioning. STUDENT becomes easily distracted, has difficulty with transitions and novel situations, has difficulty understanding social cues and nuances, is disruptive in class, talks aloud to process information, and tends to be easily frustrated. He also experiences periods of tearful frustration called "melt-downs" a few times a week. Thus, to reduce his anxiety and to enable him to progress academically, he requires a small, structured educational environment where he can talk aloud to process information and that has minimal visual clutter. He also needs continued therapy and behavior support to teach him methods to reduce his anxiety and to improve his ability to understand social cues. Additionally, he requires prompting and

Copyright © 2014 LRP Publications

T - 022

redirection to stay on task, and adult support, encouragement, feedback, and guidance to reduce his anxiety. Although Respondent contends that he has sensory issues that require him to receive occupational therapy, the evidence does not support this contention.

## II. Whether the District's Offer is Designed to Meet STUDENT'S Needs

To address STUDENT'S needs, the District offered to change STUDENT'S placement from Bridges to a general education placement with resource specialist support at his home public school, El Camino High School. Additionally, the District offered STUDENT one class period per day of adapted physical education services, one hour per week of counseling services, one hour per month of mental health services, accommodations for written language and behavior, assistive technology in the form of a laptop computer and software to address STUDENT'S issues with written language and motor functioning, a behavior support plan, extra time during physical education to dress, a one-to-one aide for four to six hours per day, and compensatory occupational therapy services to make up for therapy not provided under his prior IEP. Pursuant to the District's June 2002 letter to the PARENTS, it also offered to place STUDENT in an English class at El Camino during the 2002 ESY to work on his written language goals.

As discussed above, the parties' dispute centers on whether the District's offer of placement at El Camino is appropriate to meet Respondent's needs. The Respondent also challenges the District's goals and objectives and lack of a transition plan. Because a determination regarding the appropriateness of the District's offer of placement would affect the determination of the appropriateness of other parts of the District's program (such as whether the District offered Respondent an appropriate transition plan from Bridges to El Camino), the Hearing Officer turns first to whether the offer of El Camino was designed to meet Respondent's needs.

## A. Placement at El Camino

El Camino is a comprehensive high school of 3500 students that is located on a large campus. At El Camino, STUDENT would be placed in all regular education classes with a student to teacher ratio of up to 39 to 1. The classrooms at El Camino are housed in multiple buildings separated by distances of up to a couple hundred yards. STUDENT would also have the assistance of a one-to-one aide to keep him on task and to assist him with social skills, the support of a behavior support plan, and access to the RSP hub for emotional or academic support. In comparison, STUDENT'S current school, Bridges Academy, is housed in one building of approximately 5000 square feet. There are 81 students at Bridges and the classrooms are no more than approximately 50 feet apart. When Ms. Newman observed STUDENT at Bridges, she noted that he attended class with approximately two to three other students.

As noted above, to reduce his anxiety and to enable him to progress academically, STUDENT needs to be educated in a small, protective environment that is accepting of his need to talk aloud and that has minimal visual clutter. The Hearing Officer finds that El Camino's size and student population cannot be considered to be a small, protective environment. Rather, the sheer expansiveness of El Camino and the size of its student body indicate that it is an environment filled with activity and visual stimuli. Such an environment would, according to Dr. Kaler and Ms. Minkowski, overwhelm STUDENT and cause him great anxiety and frustration, which would result in his shutting down emotionally and would inhibit his ability to function academically. The Hearing Officer finds it striking that even small changes to a very familiar and controlled environment like Bridges, as Ms. Minkowski described, has caused STUDENT enormous and prolonged distress. By all accounts, although he has matured and made progress towards controlling his anxiety, he currently does not have sufficient coping strategies to deal with limited changes even in his familiar environment and routine.

Copyright © 2014 LRP Publications

8

T - 023

The District claims that it offered STUDENT services that would address his social/emotional and behavioral difficulties and that would support his attendance at El Camino. To explain, the District offered STUDENT the assistance of a one-to-one aide to help with his social skills and anxiety control, an RSP hub where he could go to decompress from stresses in his classrooms, and a behavior support plan. Regarding the aide, the evidence establishes that STUDENT does benefit from individualized attention and instruction and that he needs this individualized attention to assist him in part with his social skills and behavior. However, the evidence does not support the District's contention that the assistance of the aide would enable STUDENT to tolerate attendance at El Camino. By all accounts, STUDENT receives a great amount of individualized attention at Bridges Academy. STUDENT attends each of his classes with only approximately two or three other students. Despite the individualized attention he receives at Bridges, STUDENT continues to have behavioral difficulties and "melt downs" that impact his ability to progress at school. Hence, there is no significant evidence how the one-to-one aide would enable to STUDENT to attend school in a considerably larger campus with many more students and more visual clutter in his environment. While the aide may assist STUDENT to navigate around El Camino and to keep organized, there is no significant evidence to explain how the aide would assist STUDENT to filter the increased amount of visual stimuli he would encounter at El Camino or to meaningfully reduce the anxiety he would experience from the unpredictability of the larger school environment.[13]

Moreover, the RSP hub that the District offered is intended to provide STUDENT a place to go if he becomes overwhelmed in his regular education classes or if he requires additional academic support. The RSP hub does not provide STUDENT proactive support to learn to deal with his behaviors before they become an issue. Additionally, to benefit from the RSP hub, STUDENT would need to remove himself from his regular education classes where his classmates are receiving instruction. Finally, the behavior support plan developed by the District does not meaningfully address STUDENT'S meltdowns or anxiety. Instead, the behavior support plan solely targets STUDENT'S verbal outbursts, picking scabs, and biting fingernails. To address these target behaviors, the plan calls for his teacher to redirect him when he picks at his scabs or bites his fingernails, and it calls for STUDENT to use appropriate language to express his needs, wait patiently for teacher assistance, and use appropriate words to express frustration or displeasure. Except for providing STUDENT the option of taking small-group breaks from class, the plan is devoid of any strategy to deal with STUDENT'S stress. Therefore, the RSP hub and the behavior support plan would not significantly address STUDENT'S behavioral and academic needs and are insufficient to enable STUDENT to attend and progress at El Camino.

In summary, the District's offer of placement at El Camino is not the small, protective environment that STUDENT requires. Even with the supports the District proposes, El Camino is not designed to meet STUDENT'S unique and individual needs or reasonably calculated to provide him with educational benefit. While STUDENT may someday be ready to attend El Camino, it is not appropriate to so dramatically change his placement from a small private school to such a large campus and busy environment, without more graduated steps and additional behavioral supports.

## B. Plan to Transition from Bridges to El Camino

Because it is found above that El Camino is not designed to meet STUDENT'S needs, it is not necessary to determine whether the District offered an appropriate plan to transition STUDENT from Bridges to El Camino. However, assuming that El Camino was appropriate for STUDENT, the evidence establishes that the District failed to offer STUDENT a transition plan to meet STUDENT'S needs.

The District asserts that it offered Respondent

---

Copyright © 2014 LRP Publications

T - 024

**SpecialEdConnection® Case Report**

(as stated in its June 2002 letter to the PARENTS) the opportunity to transition to El Camino during the 2002 extended school year, when he could familiarize himself with the campus layout and schedule. According to the District, the 2002 ESY would have provided STUDENT with an appropriate transition from Bridges to El Camino. The Respondent argues that the District's offer fails to address his behavioral needs related to handling transitions and novel situations because it lacks a plan to transition him from Bridges to El Camino.

The evidence supports Respondent's contention. First, STUDENT could not have transitioned during the 2002 ESY because, as determined above, the District's offered placement could not have been implemented prior to the fall of 2002 since the parties' mediation agreement governed STUDENT'S placement and services at Bridges through the end of the 2002 ESY. Second, assuming out of an abundance of caution that the offer could have been implemented in May 2002 as the District asserts, the May 2002 IEP lacks any reference to how STUDENT would transition from Bridges to El Camino. Third, although the District claims its June 2002 letter offered STUDENT 2002 extended school year services at El Camino, that offer was never discussed at any IEP meeting by STUDENT'S IEP team. Accordingly, the District's June 2002 letter administratively amended the May IEP offer rather than clarified an offer that was made as part of the IEP process. Regardless, the June 2002 offer of ESY services at El Camino also did not elaborate on how STUDENT would be transitioned if he attended the ESY services at El Camino. Thus, because an offer of ESY services is not the same as an offer of transitional services, the District's June 2002 letter cannot be determined to be a written offer of transitional services.

Finally, even if the June 2002 offer of ESY services at El Camino can be determined to be a written offer of transitional services, that offer would not have been appropriate to meet STUDENT'S needs. As described above, Ms. Minkowski testified as to the nature and extent of STUDENT'S anxiety

surrounding transitions and novel situations. She described that during the fall of 2002, STUDENT experienced paralyzing anxiety and exhibited melt-downs when he was enrolled in a history class with a teacher that he was not familiar with, even though his class was at Bridges where he had attended school for three years. According to Ms. Minkowski, STUDENT'S difficulties were compounded by the fact that the history class required him to do extensive writing, which also causes him significant stress. The District's proposed transition plan involves placing him at a new school with an unfamiliar teacher in an English class where he would be working on written language. While the District also offered STUDENT the assistance of an individual aide to assist him at school, that aide would not have been known to STUDENT if he had started school during the 2002 ESY. Thus, although STUDENT becomes anxious when faced with novel situations, the District proposed a transition at El Camino where everything would be new to him. Additionally, although written language tasks are known to cause STUDENT significant anxiety, the District proposed to place STUDENT in an English class where his written language goals would be worked on. Because the District's transition plan involves a combination of situations and factors that are known to cause STUDENT'S anxiety, STUDENT is likely going to be overwhelmed by the very placement that is meant to be his transition.

In conclusion, the Hearing Officer finds the determination above that El Camino was not designed to meet STUDENT'S social/emotional needs renders this issue regarding the existence of an appropriate transition from Bridges to El Camino moot. Regardless, even if a transition were needed, the District failed to offer STUDENT in writing a plan to assist with his transition from Bridges to El Camino. Even if, by some stretch of the imagination, the District's June 2002 offer of ESY services can be determined to be a written offer of services, that placement would not have been appropriate to assist STUDENT with his transition to El Camino.

---

Copyright © 2014 LRP Publications

T - 025

**SpecialEdConnection® Case Report**

### C. Projected Achievement Dates for Goals and Objectives

The Respondent contends also that the goals and objectives proposed by the District cannot be realized in the timeframes specified in the IEP. Specifically, Respondent does not dispute the substantive content of the goals and objectives, but contends that the dates by which the goals and objectives should be accomplished are inconsistent and incomprehensible. The District acknowledges that some of the dates of the goals and objectives are inconsistent, but contends that the inappropriate dates are typos and can be easily corrected on the IEP.

California Education Code section 56345(a)(2) and Title 34 of the Code of Federal Regulations section 300.347(a)(2) require that IEPs include annual goals and objectives. Annual goals are "statements that describe what a child with a disability can reasonably be expected to accomplish within a twelve month period in the child's special education program. Short-term instructional objectives (i.e., IEP objectives) are measurable, intermediate steps between the child's present levels of educational performance and the annual goals that are established for the child." 34 C.F.R. Pt. 300, App. C, Q. 39 (1996). The objectives should be developed based on a logical breakdown of the major components of the annual goals and should be projected to be accomplished over an extended period of time, such as a school quarter or semester. *Id.* IEP objectives are necessary in order to provide general benchmarks for measuring the student's progress toward meeting the annual goals and otherwise gauging the efficacy of the services provided. *Id.; see also Cleveland Heights-University Heights City Sch. Dist. v. Boss,* 44 F.3d 391, 399 (6th Cir. 1998) (holding that omission of appropriate objective criteria in IEP was significant violation that "went to the heart of the substance of the plan ").

In the May 2002 IEP, the District proposed nine annual goals, each broken down into two incremental objectives. The nine annual goals address STUDENT'S gross motor, vocational,

social/emotional, counseling, occupational therapy, and written language needs. The face of the IEP indicates that its term is to commence on May 7, 2002, and to end on May 7, 2003. According to District witnesses, annual goals covering a twelve-month period are typically broken down into two incremental objectives that are projected to be accomplished four months apart. Thus, in this case, STUDENT'S annual goals are to commence on May 7, 2002, the first incremental objectives are to be achieved in September 2002, the second incremental objectives are to be achieved in January 2003, and the annual goals are expected to be met by May 7, 2003.

As described above, the record is filled with inconsistencies regarding the intended implementation date of the May 2002 IEP. Additionally, the Hearing Officer found above that the May 2002 IEP could not have been implemented earlier than the beginning of the 2002-2003 school year. Even though District members of the IEP team assured MOTHER at the May IEP meeting that the IEP would not be implemented until the fall of 2002, the implementation date for all but one of the annual goals was May 2002. Although the one gross motor goal did have an appropriate September 2002 implementation date, that goal also lists a termination date of July 2003, two months after the expiration of the IEP. Similarly, one of the two vocational education goals includes a second incremental objective achievement date of July 2003, a date also falling two months after the expiration of the IEP. The second vocational education goal does not include projected achievement dates for either of the two incremental objectives. Thus, there is no benchmark date for that annual goal for which Respondent can gauge the efficacy of the IEP services.

The same type of problem can also be found with the counseling goals. The first counseling goal states that the first incremental objective is to be accomplished by "0/02." Additionally, the projected achievement date for the second incremental objective of the second counseling goal is September 2003, which is a date four months after the expiration of the

---

Copyright © 2014 LRP Publications

T - 026

**SpecialEdConnection® Case Report**

IEP. In summary, five of the nine annual goals and objectives set forth projected commencement or achievement dates that were either illogical or outside of the term period of the IEP. Although minor discrepancies regarding projected achievement dates for IEP goal and objectives may be harmless errors that are easily corrected, more than half of the District's offered goals and objectives contained errors. Hence, the number and nature of the discrepancies in this case render the goals and objectives unmeasureable and meaningless. Therefore, the Hearing Officer finds that the District's May 2002 offer did not include appropriate goals and objectives.

### D. Occupational Therapy Services

Respondent contends that he has sensory processing deficits which require him to receive occupational therapy services beyond the compensatory education OT services provided for in the May 2002 IEP. As was discussed above, the evidence does not establish that Respondent has a need for OT services to benefit from his education. Therefore, the District's offer cannot be inappropriate because it does not include such services.

...

In conclusion, the District's offer was not designed to meet STUDENT'S unique and individual needs or reasonably calculated to provide him with educational benefit and, therefore, was not an offer of FAPE. Specifically, STUDENT'S social and behavioral deficits related to his nonverbal learning disability render the District's offer of placement at El Camino inappropriate. Additionally, the District's offer ignored STUDENT'S significant difficulty with transitions and novel situations when it failed to include a transition plan to transition him from Bridges to El Camino. Moreover, the District's goals and objectives were unmeasureable and the projected dates to accomplish the goals and objectives were incomprehensible.

### Order

The District's request for a determination that its

May 7, 2002 offer was appropriate is denied.

### Prevailing Party

Pursuant to Education Code § 56507(d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following findings are made in accordance with this statute: Respondent STUDENT prevailed on the issue decided.

### Right to Appeal this Decision

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within ninety (90) days of receipt of this Decision. Education Code § 56505(i).

[1]This Amended Decision reflects a typographical correction to Respondent's name as it appears on page 2.

[2]The issue here differs in wording and number from that noticed by the Petitioner before hearing. The issue was restated to reflect the issue clarification by the parties on the first day of hearing.

[3]At the May 7, 2003 IEP meeting, the District determined that STUDENT was no longer eligible for special education as a student with a specific learning disability, but acknowledged that he continues to be eligible as a student with an other health impairment. As discussed below, MOTHER did not consent to that IEP and it is now the subject of this due process hearing.

[4]Dr. Sandra Kaler testified that a nonverbal learning disorder is a disorder where a person has difficulty integrating material and simultaneously processing information. Persons with NLD tend to use language as a compensatory strategy wherein they attempt to talk through their thinking process.

[5]The Hearing Officer notes that the letter actually states that the District was offering summer school services for the "2002-2003 school year" (i.e., the 2003 ESY). Hence, the District's offer of services for the 2002-2003 extended school year appears to reach beyond the expiration of the IEP on May 7,

---

Copyright © 2014 LRP Publications

T - 027

2003. To explain the discrepancy, Ms. Sewell testified that the District was in fact offering ESY services for the summer of 2002 and not /he summer of 2003, and that the timeframe referenced in the letter was a result of a clerical error.

[6]The Hearing Officer makes no judgment about whether the District's making an offer of placement and services through the IEP process after already resolving issues regarding the same time period through mediation was appropriate.

[7]While the District's position at hearing was that the effective start date for the IEP was May 7, 2002, the record in this case is clearly riddled with inconsistencies that show the District's confusion regarding the term of its offer. For example, the IEP goals and objectives contain some goals that begin in May 2002 and one goal that begins in September 2002. Additionally, although the District's June letter indicates that the District's offer was for the 2002-2003 school year, it also clarified that the offer included extended school year services for the 2002 ESY, which would occur prior to the start of the 2002-2003 school year. And to add to the confusion, if in fact the offer was to be implemented in May 2002, STUDENT would have been placed in the ninth grade for the remainder of the 200 J-2002 school year, although he was in the eighth grade at the time.

[8]Furthermore, any disagreement pertaining to the May 2002 IEP regarding the time period from May 7, 2002, through the end of August 2002 was resolved by the parties through the mediation agreement and is outside the jurisdiction of the Hearing Office.

[9]In California, local educational agencies must obtain written parental consent for all or part of an IEP before a child is "required to participate in all or part of any special education program." Cal. Educ. Code § 56346(a). In situations where a parent refuses consent for all or part of a program, such as in this case, California law requires local educational agencies to take steps to ensure that the child receives a free appropriate public education. Cal. Educ. Code § 56346(b). If the local educational agency determines that the portions of the program to which the parent

did not consent, or all of the program, if the parent did not consent to any part of the IEP, is necessary to provide the child with a free appropriate public education, the local educational agency is required to initiate due process hearing procedures to override the parent's refusal of consent. *Id.* This is what the District did in this case.

[10]The parties do not dispute that Respondent qualifies for special education and related services as a student who is "other health impaired" and is entitled to receive educational services to address his unique and individual needs. The Respondent contends that he is also eligible under the category of "specific learning disability, " that he was determined in the past to have a specific learning disability, and that the District inappropriately dropped "specific learning disability " as an eligibility category during the May 7, 2003 IEP meeting. The Hearing Officer notes that the District's decision to remove "specific learning disability" as an eligibility category for Respondent, who is otherwise eligible under another category, in and of itself does not result in a substantive denial of FAPE. The Code of Federal Regulations at Title 34 Section 300.300 states that "services and placement needed by each child with a disability to receive FAPE must be based on the child's unique needs and not on the child's disability. " Therefore, once a child is found eligible for special education and related services, the child's needs must be addressed regardless of the eligibility category. Here, the parties disagree whether STUDENT qualifies for special education under a particular eligibility category and not whether STUDENT is in fact eligible for special education. Although the parties do not agree whether STUDENT'S deficits in written language are a result of a specific learning disability or his other diagnoses, they do not dispute the nature and severity of his deficits in written language. Moreover, Respondent has not alleged that the District has inappropriately determined his present levels of performance or failed to specifically address his written language deficits. Thus, the Respondent raised a technical challenge to the IEP that has no

Copyright © 2014 LRP Publications

T - 028

**SpecialEdConnection® Case Report**

substantive effect on the appropriateness of the IEP.

[11]Ms. Minkowski estimated that during his eighth grade year, STUDENT had about two meltdowns per week, each lasting from five minutes to a half hour.

[12]Although the District's other witnesses testified that they agreed with the recommendation for placement at El Camino, none testified specifically regarding what educational environment STUDENT requires in light of his needs.

[13]As noted above, the District also offered STUDENT one hour per week each of counseling services and one hour per month of mental health services. There was also no significant evidence presented regarding whether the nature or intensity of these services was modified or increased to address his ability to tolerate the larger El Camino school environment.

Copyright © 2014 LRP Publications

14

T - 029

EXHIBIT C

106 LRP 2365

## Los Angeles Unified School District
## California State Educational Agency

SN04-02074

SN04-02398

### November 18, 2005

**Judge / Administrative Officer**

Deborah M. Cooke, Hearing Officer

## Full Text
## Appearances:

### Decision

This matter was heard before Deborah M. Cooke, Hearing Officer for the California Special Education Hearing Office (Hearing Office), University of the Pacific's McGeorge School of Law, in Los Angeles, California, on June 14, 15, 16, 17, 21, 22, 28, 29, 30, and July 6, 2005.

STUDENT (hereafter STUDENT or Student) was represented at the hearing by attorney Henry Tovmassian. Also present on behalf of Student was attorney George Crook and STUDENT's mother, MOTHER. The Los Angeles Unified School District (hereafter LAUSD or District) was represented at the hearing by attorney Diane Willis of the Lozano Smith law firm. Also present on behalf of the District on various days were Harriet Watson and Susan Glickman, due process specialists for the District.

The following witnesses were called by the Student: Matthew Mowry, dean of students at Birmingham High School; Robert Patterson, private psychologist; MOTHER; Lillian Baskerville, STUDENT's home hospital instruction teacher; Doris Lasiter, principal at Birmingham High School; Margaret Keyser, District school psychologist; Margaret Hall, disciplinary consultant for the District; Deborah Smith, District behavior specialist; STUDENT; Constance Dunn, principal of Kirk Douglas High School in the District; Ambre Low, Lindamood Bell Learning Processes Westwood Center director; and Henry Tovmassian.

The following witnesses were called by the District: Julianne Gwin, director of education at North Hills Prep School; Rouben Djavakhian, District special education teacher; Ruthann Rutalj, District special education teacher; Patricia Dwyer, District special education coordinator; Teri Gallus, District itinerant adaptive physical education teacher; Norman Thomas, District special education teacher; Lori Urbanec, District school nurse for Birmingham High School; Rosario Aguirre, District special education teacher; and Dr. Jose Gonzalez, due process specialist for the District and private neuropsychologist.

Oral and documentary evidence was received and the record was left open for the submission of the parties' written closing arguments, which were timely postmarked. Following receipt of the parties' closing arguments, the matter was submitted for decision.

### Issues[1]

I. During the 2001-2002 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments, and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

II. During the 2002-2003 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments, and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

III. During the 2003-2004 school year, did the

Copyright © 2014 LRP Publications

1

T - 031

District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments,

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment and specific learning disability, and

C. procedurally and substantively deny STUDENT a free appropriate public education (FAPE) in the least restrictive environment with respect to its offers in the individualized educational programs (IEPs) dated November 19, 2003, March 24, 2004, April 19, 2004, May 24, 2004, and June 15, 2004?

IV. During the 2004-2005 school year, did the District

A. fail to conduct psychoeducational and assistive technology assessments,

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment and specific learning disability, and

C. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

V. If the District denied STUDENT a FAPE from September 2001 to the date of hearing, is he entitled to compensatory education?

VI. If the District denied STUDENT a FAPE, is his parent entitled to reimbursement for educational and sports-related services and merchandise she obtained for STUDENT?

VII. In order to be provided a FAPE for the 2005-2006 school year, does STUDENT require a program that includes placement in a general education classroom at Chatsworth High School, with pull-out resource specialist program (RSP) support in math and English and other specified services?

## Contentions of the Parties

Student contends that the District improperly failed to conduct a psychoeducational assessment between October 2000 and November 2003. Additionally, Student contends that the District never assessed his assistive technology needs during the applicable time periods, and did not assess his adaptive physical education skills until May 2004.

Student also argues that from the 2001-2002 school year to the present, the District failed to offer or provide him a FAPE both procedurally and substantively. With respect to procedural violations, Student contends that the District retaliated against him and his mother, thereby infringing on his mother's opportunity and ability to participate in the IEP formulation process. Specifically, Student argues that the District threatened to expel him from school after the manifestation determination IEP meeting on March 24, 2004, and intimidated his mother at the April 19, 2004 IEP meeting into accepting a placement other than what was already offered at the March 24, 2004 IEP meeting. Student also argues that the District failed to have his special education and general education teachers or an individual knowledgeable about his needs present at the April 19, 2004 IEP meeting. Additionally, Student contends that the District failed to provide him a formal, specific written offer of placement and services in the April 19, 2004, and June 15, 2004 IEPs. Lastly, Student asserts that during the April 19, 2004 and June 15, 2004 IEP meetings, the District refused to disclose to his parent information regarding "safety issues" allegedly preventing his placement on "any public campus" and requiring his placement at a nonpublic school.

Substantively, Student contends that his IEPs did not contain goals and objectives designed to effectively address all of his needs. Student also contends that he required very specific supports, services, and accommodations as identified by Dr. Robert Patterson in his January 2005 (revised March

2005) assessment report. Student contends that his program for the 2003-2004 school year did not comport with his March and April 2004 IEPs in several respects. Specifically, Student contends that he was not provided with counseling services as stated in his IEPs and he was not placed at Kirk Douglas continuation school as stated in his March 2004 IEP, or subsequently back at Birmingham High School. Additionally, Student contends that for all relevant time periods, he should have been placed in the least restrictive environment, which he contends was a regular education classroom with pull-out RSP support in math and English, not in a special day class (SDC), which he attended until March of 2004, not home schooling in which he was placed since April 2004, and not the nonpublic school that was offered in the June 15, 2004 IEP.

Student asserts that he is entitled to compensatory education, including, but not limited to, 800 hours of educational therapy over the next three years, 150 hours of psychological counseling, social skills training, enrollment in LMB Touch Math and On Cloud Nine programs, specific accommodations in the classroom to address his inattention, impulsivity, distractibility and other ADHD symptoms, and a computer with printer.

Lastly, Student contends that his parent should be reimbursed for the educational and sports-related services and equipment she obtained at the suggestion of his home instruction teacher. According to the Student, his mother purchased a used computer and computer products to use to complete his homework and because the assistive technology previously provided by the District had malfunctioned and were not replaced. Additionally, Student contends that his home instruction teacher suggested that his mother rent or purchase sports equipment to assist with his socialization skills.

The District contends that it offered and provided STUDENT a FAPE in the least restrictive environment for all the school years at issue.[2] The District asserts that Student based his case entirely on Dr. Patterson's evaluation conducted in December

2004 and that report has no bearing on Student's needs during the 2001-2002, 2002-2003, and 2003-2004 school years and the first half of the 2004-2005 school year. The District argues in its closing brief that the 2001-2002, 2002-2003, and 2003-2004 school years should be dismissed as issues because Student failed to provide any evidence to support his claims that the District did not offer a FAPE for these school years. Because this claim by the District was not timely raised, the Hearing Officer denies the District's motion to dismiss any issues related to the 2001-2002 through 2003-2004 school years.

## Background Facts

As of October 11, 2005, STUDENT turned eighteen years old. He is a twelfth-grade student who currently qualifies for special education and related services under the primary disability category of other health impaired (OHI), specifically due to attention deficit hyperactivity disorder (ADHD). He also has been reported to have a history of diagnoses of anxiety, depression, Tourettes, and severe asthma.[3] STUDENT lives with his mother in an apartment, within the jurisdiction of the District, and his natural father lives in Philadelphia and does not maintain contact with him. At the time of the hearing, STUDENT continued to be placed in a home instruction program through the District. Previous psychoeducational reports indicate that STUDENT's mother has revealed that STUDENT was physically abused by his grandmother, from one year to six years of age, and was traumatized by being locked away, forced to eat, and by having witnessed abuse toward his mother by the grandmother as well.

STUDENT first enrolled in the District in the fifth grade at Parthenia St. School with an active IEP for special education services with an eligibility of language and speech disorder and OHI due to ADHD. At that time, he was placed in a resource specialist program (RSP). He began attending Holmes Middle School in the District in September 1998, and for sixth grade and the fall semester of the seventh grade he was placed in RSP for three periods and three

regular education classes. During sixth and seventh grades, STUDENT continued to exhibit problems with attention, disruption in class, incomplete assignments, and other behaviors such as arguing, spitting, stealing, fighting, and regularly acting out.

In October 1999, the IEP team found that STUDENT no longer needed language and speech services and therefore removed those services from his IEP. In December 1999, the IEP team recommended that STUDENT's placement be changed to an SDC, where he would be with fewer students and receive more academic support. STUDENT was placed in a special day class for five periods and received one period of physical education. STUDENT transferred to Lawrence Middle School in the District and at his triennial IEP on October 25, 2000, an additional eligibility of specific learning disability (SLD) was added to his current eligibility of OHI. STUDENT's mother declined the IEP team's suggestion that STUDENT be moved back to the RSP program with classroom support, and STUDENT was placed on a shortened day with only four periods of instruction due to health concerns of asthma, fatigue, and inability to attend the entire academic program. His grades for the eighth grade were mostly Bs and Cs and he had one "U" in cooperation and another in work habits.

Although STUDENT resides in the District's Local District A and his school of residence is Monroe High School, at the beginning of the 2001-2002 school year, he matriculated to Birmingham High School (Birmingham) on an open enrollment permit. STUDENT continued his half-day schedule while at Birmingham with only four periods of classes. He passed all eight of his classes his first year, earning one A, one B, three Cs, and two Ds.

There was no IEP meeting held again until January 8, 2002. STUDENT continued to remain eligible for special education services under the categories of OHI and SLD. His placement in the SDC for math, science, and English was continued and he remained on a shortened day because his mother preferred that he stay on a four-period-a-day

program and postpone his receipt of a high school diploma until he earned his credits. The IEP document also indicates that STUDENT had only 40 percent capacity in each of his lungs and that he needed to rest often because he became tired from his activities.

STUDENT's January 8, 2002 IEP was still in effect through the 2002-2003 school year and the first two months of the 2003-2004 school year. A triennial psychoeducational assessment of STUDENT was conducted on November 17, 2003, and the assessment team determined that STUDENT's primary disabling condition was a result of his moderate to severe ADHD medical disorder and that, overall, his weaknesses appeared to be related to his health impairment, specifically his asthma, fatigue, and attention deficit disorder. The assessors therefore concluded that OHI seemed the most suitable and encompassing qualification for special education services. School psychologist Margie Keyser recommended that STUDENT participate in a longer school day or that he take some classes at the local occupational school or community college so that he could earn additional high school credits and have the opportunity to "appropriately differentiate from his mother, establish different interests, explore friendships, and develop discipline and responsibility." Ms. Keyser also recommended that the IEP team consider referring STUDENT to School Mental Health to address internal stressors, interpersonal relationships, and family dynamics.

STUDENT's three-year-review IEP meeting was held on November 19, 2003. STUDENT's primary disability was identified as OHI due to ADHD, asthma, and chronic fatigue. STUDENT was not found eligible under SLD because his medical conditions were the predominant disability. Extended school year services were also offered, but no designated instruction and services were included in the IEP. STUDENT's placement in a special day class was continued and he remained on a four-period-per-day class schedule.

On or about March 12, 2004, STUDENT and a

Copyright © 2014 LRP Publications

4

T - 034

friend accompanied STUDENT's mother to a gun store to inquire about purchasing a gun for protection since their home had recently been burglarized. At that time, MOTHER put a gun on layaway and was expected to pick up the gun in two months after full payment had been made. MOTHER also needed to first pass the background check and obtain a permit, which would take approximately ten days, so she only purchased some bullets for the gun and targets on that day.

On March 15, 2004, during nutrition, STUDENT was speaking with his friend and classmate and the topic of MOTHER's gun purchase came up in conversation. When asked what he was going to do with the gun when his mother picked it up, STUDENT told his friend that he might want to stay home because he (STUDENT) might bring the gun and shoot up the school. Another student overheard this conversation between STUDENT and the friend and reported it to his parents. The police were informed of the statement and later that night, at approximately 1:00 a.m., the Los Angeles Police Department (LAPD) arrived at the FAMILY residence and arrested STUDENT. STUDENT was held at Juvenile Hall until March 18, 2004, when he was released and placed on home detention until April 2, 2004, by the Juvenile Court judge. The judge issued a home detention order that included a "no school" order until April 2, 2004.

On March 24, 2004, the District convened a pre-expulsion IEP meeting and annual review. The IEP team determined that STUDENT's statement was "impulsive" and a manifestation of his ADHD, and that, therefore, he could not be expelled for the misconduct. The IEP team also concluded that at the time of the misconduct, STUDENT's IEP was not appropriate because it did not address his behavior or reflect the need for behavioral supports in spite of his documented needs. Additionally, the team found that the IEP did not include supports for impulsivity, assistive technology, and for adaptive physical education. Having concern for STUDENT's social/academic well being and the possible negative

ramifications if he stayed at Birmingham, the District offered STUDENT placement at Kirk Douglas Continuation High School (Kirk Douglas). DIS counseling services were added to his IEP and an assessment for APE was recommended. Extended school year services (ESY) were also offered. MOTHER signed the IEP in agreement.

On or about April 13, 2004, MOTHER met with the principal at Kirk Douglas, Constance Dunn, to enroll STUDENT in school. However, Ms. Dunn told MOTHER that no one had contacted her about STUDENT's enrollment at Kirk Douglas and that she had no space for him until September 2004. Ms. Dunn recommended that MOTHER enroll STUDENT in the home schooling program. MOTHER then went to Birmingham to meet with Mr. Mowry, the dean of students, who stated he would look into the matter.

On April 19, 2004, STUDENT and MOTHER met with Birmingham principal Doris Lasiter, at which time STUDENT was asked to explain the incident. After STUDENT finished his comments about what happened on March 15, 2004, Dr. Lasiter handed STUDENT and his mother a pupil suspension notice.

Immediately following this conference, Dr. Lasiter left and an IEP team meeting was convened for STUDENT. The District explained to MOTHER that the previous March 2004 IEP offer of placement at Kirk Douglas could not be implemented and needed to be changed. According to the District, repercussions of the March 15, 2004 incident presented too much of a safety risk to place STUDENT on any public campus. Moreover, the District believed that Kirk Douglas could not now provide STUDENT adequate monitoring and support and that a nonpublic school would best meet his academic and instructional needs at that time.

The District therefore offered STUDENT an interim home placement on a temporary basis through Carlson Home-Hospital for sixty days or until a nonpublic school (NPS) placement could be secured. MOTHER testified that she requested the disclosure of the information which the District purportedly

Copyright © 2014 LRP Publications

T - 035

**SpecialEdConnection® Case Report**

obtained after the March 24, 2004 IEP meeting regarding this "potential safety issue," but none of the IEP team participants would disclose this purported information to her.

According to MOTHER, she did not want to sign the IEP, but she was forced to agree because the District team members told her if she did not agree to a placement, she would "get in trouble for withholding education from STUDENT." MOTHER wrote on the IEP document that she disagreed with the offer to place STUDENT on a nonpublic school campus because she believed it would not best provide for STUDENT's academic and social needs. MOTHER believed that STUDENT should have been placed on a regular or continuation school campus and also stated that it was improper to have one IEP team meet and decide one thing and then another team, with mostly different members than before, meet to change the placement. MOTHER agreed to the home instruction placement on a temporary basis and consented to the implementation of the behavioral supports, specific instruction and services, and assessment, and the eligibility designation.

STUDENT enrolled in the Carlson home program on April 26, 2004. On May 11, 2004, the District conducted its APE assessment of STUDENT, and on May 24, 2004, the IEP team met to amend STUDENT's March 2004 IEP, find STUDENT eligible to receive APE services, and make an offer accordingly. The committee also requested that MOTHER obtain a medical update from STUDENT's private physician. MOTHER refused to sign the IEP in agreement.

On June 15, 2004, the District convened another IEP meeting, at which time it designated North Hills Preparatory School (North Hills) as its NPS placement offer. MOTHER did not consent to the IEP and noted on the IEP document the fact that STUDENT was previously offered placement at Kirk Douglas, but the District had withdrawn that offer on April 19, 2004.

The District set an expulsion review hearing for STUDENT the next day on June 16, 2004. However,

the expulsion review committee decided to halt the proceedings because there was insufficient evidence that STUDENT had made a "terroristic threat against school officials and school property" and because the March 24, 2004 IEP team had previously determined that STUDENT's behavior was a manifestation of his disability and that he therefore could not be expelled from the District.

On August 16, 2004, the Hearing Office received the District's request for a due process hearing, seeking a determination of whether it had offered STUDENT a FAPE during the 2003-2004 and 2004-2005 school years and whether it had adhered to required suspension and expulsion procedures. As previously discussed, on the first day of hearing, the District withdrew its issues with respect to the 2003-2004 school year.

On September 28, 2004, the Hearing Office received STUDENT's request for a due process hearing and his motion to consolidate his and the District's case. The Student's case raised issues of the appropriateness of placement and services for the 2001-2002 through 2004-2005 school years and extended school years, and sought reimbursement for expenditures made by STUDENT's mother and compensatory education. The motion to consolidate was unopposed, and on October 18, 2004, the two matters were consolidated by order of the Hearing Office.

In December 2004, Dr. Robert Patterson conducted an independent educational assessment of STUDENT, and on March 9, 2005, the District convened STUDENT's annual IEP meeting and reviewed his progress. MOTHER was in attendance, accompanied by attorney Henry Tovmassian. The team determined that it did not have sufficient information available at the meeting to develop appropriate goals and objectives and believed it was necessary to recess the meeting and reconvene at a later date when the home school instructor could generate appropriate new goals and after Dr. Patterson had completed his report and made it available.

The IEP team reconvened on May 16, 2005;

Copyright © 2014 LRP Publications

6

T - 036

however, only the parent had received a copy of Dr. Patterson's evaluation report. Mr. Tovmassian did not bring a copy of Dr. Patterson's report to the IEP meeting.[4] At that meeting, the District offered STUDENT placement at Chatsworth High School (Chatsworth), a District nonresident school, in a combination of special day program and general education classes for the remainder of the 2004-2005 school year, 2005 ESY, and through March 26, 2006.

The consolidated matter proceeded to hearing on June 14, 2005. STUDENT remained in home schooling receiving instruction from his teacher Lillian Baskerville through June 26, 2005.

### Findings of Fact and Conclusions of Law

I. During the 2001-2002 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

### A. Assessment

For an educational agency's assessment to be appropriate, the testing and other assessment materials must be validated for the purpose for which they are used, administered by trained personnel in conformance with test instructions, and tailored to assess specific areas of need. (Cal. Educ. Code § 56320(b) and (c).) In addition, Subsection 56320(f) requires that a student be assessed in all areas related to the suspected disability. The assessment must be conducted by a person knowledgeable of the student's disability and competent to perform the assessment. (Cal. Educ. Code §§ 56320(g), 56322.) A credentialed school psychologist must perform all psychological assessments. (Cal. Educ. Code § 56324.) The purpose of the assessment is to gather all relevant information

that will assist the IEP team in identifying the student as a child with a disability and providing the team with the information it will need to develop an appropriate IEP. (20 U.S.C. § 1414(b)(2)(A).) Both the IDEA and State law require that a student with a disability be reassessed at least every three years, but more frequently if conditions warrant, or if requested by the student's parent or teacher. (20 U.S.C. § 1414(a)(2)(A); Cal Educ. Code § 56381.)

Student contends that the District failed to assess him in all areas of suspected disability, which he required in order to identify the full range of his needs. According to Student, there were no interim annual assessments conducted between his 2000 and 2003 triennial evaluations. Student argues that during the 2001-2002 school year, the District failed to conduct a psychoeducational assessment and also failed to assess his adaptive physical education and assistive technology needs.

The District argues that on October 17, 2000, it conducted a full psychoeducational assessment, which included testing STUDENT's academic achievement, cognitive ability, visual perceptual skills, auditory perceptual skills, visual-motor integration, language functioning, and social-emotional functioning. According to the District, STUDENT's next triennial assessment was therefore not due until October 25, 2003. The District further argues that conditions did not warrant a reassessment and there was no evidence of requests from the parent or teachers for any psychoeducational, APE, or assistive technology assessment.

Based on the District's October 17, 2000 triennial psychoeducational assessment, STUDENT functioned within the average range of cognitive development. (Dist.'s Exh. 33.) There was no dispute between the parties that STUDENT had needs in the areas of math, reading, written expression, and vocational education and the evidence demonstrates these needs were assessed in the District's October 2000 psychoeducational evaluation. The evidence indicates that shortly before the January 8, 2002 IEP meeting, the District conducted standardized

academic achievement testing and obtained information about STUDENT's performance levels through classroom and parent reporting. STUDENT's Birmingham special education teacher and case carrier, Ruthann Rutalj, testified that shortly before the January 8, 2002 IEP meeting, she administered to STUDENT the Kaufman Test of Academic Achievement (KTEA), she gathered reports from his academic teachers, and completed a draft IEP that included his present levels of performance and draft goals.[5] (Dist.'s Exh. 7, pgs 168-169.) According to Ms. Rutalj, except for math application and math computation, all of STUDENT's standard scores from her administration of the KTEA were in the average range. Moreover, STUDENT's academic history and assessment results revealed a primary deficit in math, with some weaknesses in written expression and reading. Ms. Rutalj testified that she received no reports from any of STUDENT's teachers regarding problem behaviors or inappropriate actions in preparation for the January 2002 IEP.

Given that a triennial psychoeducational assessment had been conducted in October 2000, the District was not required to conduct a reassessment of STUDENT for another three years. Therefore, a reassessment was not required until October 2003, unless conditions warranted a reassessment sooner, or the parent or teacher requested reassessment and a new IEP. (20 U.S.C. § 1414(a)(2)(A); Cal Educ. Code § 56381.) There was no evidence that conditions warranted a reassessment or that either the parent or teacher requested reassessment and a new IEP during the 2001-2002 year. The Hearing Officer therefore finds that the District was not required to conduct a psychoeducational assessment during the 2001-2002 school year.

With respect to assessing STUDENT's APE needs, Student asserts that because his pediatrician, Dr. Hugh Carmichael, had excused him from physical education due to his asthma, he had a need for APE services from the time he started attending Birmingham. Student argues that he was not provided any physical education classes since he started high

school and, consequently, he is behind twenty credits in physical education.

According to documentary evidence, in 1999, Dr. Carmichael excused STUDENT from contact sports and strenuous physical testing (running) and indicated that he required amended/adaptive physical education due to his asthma. (Pet.'s Exh. 58.) The doctor's restriction was to extend for thirty days only beginning September 8, 1999. STUDENT's October 25, 2000 IEP indicates that he was to have no physical education due to his health impairment; however, there is no evidence of any doctor's note or parent report to substantiate the determination not to assess STUDENT's need for adaptive physical education. (Dist.'s Exh. 8, pg. 172.) In addition, there is no evidence of any doctor's recommended limitation or restriction on physical education for STUDENT during the 2001-2002 school year. The January 2002 IEP indicates that STUDENT is to have no physical education, but does not provide an explanation for that determination or an indication as to whether he can be placed in APE. The only notation in the IEP regarding STUDENT's health is the parent's report that he had asthma and 40 percent capacity in each of his lungs that required him to rest often because of fatigue. (Dist.'s Exh. 8, pg. 166.)

Thus, having prior knowledge of certain restrictions previously being placed on STUDENT's physical abilities and having the January 8, 2002 report by his mother about his lung capacity and need for rest due to fatigue, at the very least, the District should have further investigated the status of STUDENT's health to determine his ability to participate in any type of physical education and whether or not an APE assessment was warranted.

With respect to assessing STUDENT's AT needs, the January 2002 IEP meeting notes indicate that MOTHER informed the IEP team that STUDENT had an Alpha Smart Pro typewriter in elementary school but that she believed providing STUDENT with assistive technology at the time of the January 2002 IEP might make him decline in progress. (Dist.'s Exh. 7, pg. 176.) Ms. Rutalj testified

Copyright © 2014 LRP Publications

8

T - 038

**SpecialEdConnection® Case Report**

that the rest of the IEP team agreed with MOTHER's concern with STUDENT relying too much on AT to write. Ms. Rutalj stated that it was best to have a child use his own capabilities as much as possible and since STUDENT's writing was good enough for her to be able to read and correct, the IEP team did not see a need for AT. According to Ms. Rutalj, all of the high school classes had computers available to the students; therefore, use of an Alpha Smart Pro was no longer necessary. The Hearing Officer therefore finds that the evidence did not support Student's contention that he required an AT assessment.

In summary, the Hearing Officer concludes there was no persuasive evidence that STUDENT required a psychoeducational reassessment during the 2001-2002 school year. Additionally, Student presented no persuasive evidence that his mother or any of his teachers requested such an assessment that was refused by the District. The District had conducted its triennial evaluation in October 2000, and therefore, another assessment was not required until October 2003. The Hearing Officer is convinced, however, that the District failed to assess STUDENT's need for APE given evidence of prior restrictions/limitations placed by his doctor on his physical activity and parent reports during the January 2002 IEP meeting regarding his health. Lastly, the Hearing Officer is not persuaded that there was a need to conduct an assessment of STUDENT's AT needs during the 2001-2002 school year as the IEP team had determined that STUDENT's writing was progressing at an appropriate pace without the use of any AT devices.

## B. FAPE

Under both State law and the federal Individuals with Disabilities Education Act (IDEA), students with disabilities have the right to a free appropriate public education (FAPE). (20 U.S.C. § 1400; Cal. Educ. Code § 56000.) The term "free appropriate public education" means special education and related services that are available to the student at no charge to the parent or guardian, that meet the State educational standards, and that conform to the

student's individualized educational program (IEP). (20 U.S.C. § 1401(8).)[6]

In *Board of Education of the Hendrick Hudson Central School District v. Rowley,* (1982) 458 U.S. 176, 102 S.Ct. 3034, the United States Supreme Court addressed the level of instruction and services that must be provided to a student with disabilities to satisfy the requirements of the IDEA. The Court determined that a student's IEP must be reasonably calculated to provide the student with some educational benefit. *(Id.* at 200.) According to *Rowley,* the IDEA does not require school districts to provide special education students with the best education available, or to provide instruction or services that maximize a student's abilities. *(Id.* at 198-200.) The Court stated that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services that are individually designed to provide educational benefit to the student. *(Id.* at 201.)

To determine whether the District provided STUDENT a FAPE, one must focus on the adequacy of the District's program. *(Gregory K. v. Longview School District,* 811 F.2d 1307, 1314 (9th Cir. 1987).) If the District's program was designed to meet STUDENT's needs, provide some benefit, and comport with his IEP, the District offered a FAPE, even if the parents preferred another program and even if the parents' preferred program would have resulted in greater educational benefit. *(Rowley, supra,* 458 U.S. at 207-208; *Gregory K.,* 811 F.2d at 1314.) Special education law also requires that STUDENT be educated in the least restrictive environment, which means ensuring that STUDENT's education is provided in a manner that promotes his maximum interaction with children or youth who are not disabled, and which is appropriate to the needs of both. (20 U.S.C. §§ 1412(a)(5)(A), 1414(d)(1)(A)(iii)(III); Cal. Educ. Code § 56031.)

To summarize, under the IDEA and *Rowley,* the District's proposed program must have met the following requirements to have constituted a

Copyright © 2014 LRP Publications

9

T - 039

substantively appropriate educational program: (1) been designed to meet STUDENT's unique needs, (2) been reasonably calculated to provide him with some educational benefit, and (3) comported with his IEP. Additionally, it must have been provided in the least restrictive environment.

## Beginning of the 2001-2002 School Year to January 7, 2002

An IEP team meeting was not convened during the 2001-2002 school year until January 8, 2002. Therefore, the Hearing Officer will first analyze the appropriateness of the program that was provided to STUDENT from the beginning of the 2001-2002 school year to January 7, 2002, and then analyze the appropriateness of the program offered in the IEP dated January 8, 2002.

To determine the appropriateness of STUDENT's program at the beginning of the 2001-2002 school year, it is first necessary to determine STUDENT's needs at that time. The parties did not dispute that STUDENT qualified for special education services dually under the categories of OHI and SLD and that he had needs in the areas of math, reading, written language, vocational education, and behavior/social-emotional. They also did not dispute that STUDENT had a learning disability based on a severe discrepancy between his ability and achievement in reading comprehension, math calculation, and math reasoning, which resulted from a psychological processing disorder in the area of attention. (Dist.'s Exh. 8, pg. 202.)

There were two IEPs in effect for STUDENT during the 2001-2002 school year-one dated October 25, 2000, and the other dated January 8, 2002. The Ninth Circuit Court of Appeal has endorsed the "snapshot" rule, which holds that the actions of the school cannot "be judged exclusively in hindsight ... an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *(Adams v. State of Oregon,* 195 F.3d 1141,1149 (1999), *citing Fuhrman v. East Hanover Bd. of*

*Education,* 993 F.2d 1031, 1041 (3rd Cir. 1993).) However, the "snapshot" rule does not eliminate a school district's obligation to revise a student's educational program if it becomes apparent over the course of the school year that the student is not receiving any educational benefit. Pursuant to the "snapshot" rule, the Hearing Officer must examine the IEP at the time it was developed to determine its appropriateness.

Here, the October 2000 IEP was in effect at the start of the 2001-2002 school year.[7] The statute of limitations precludes this Hearing Officer from considering the appropriateness of that IEP at the time it was developed.[8] Student presented no argument as to why he believed the Hearing Officer could extend her analysis to a time prior to the beginning of the 2001-2002 school year. Thus, the Hearing Officer will not address the appropriateness of the October 2000 IEP at the time it was drafted. The Hearing Officer can address arguments regarding the implementation of the October 2000 IEP during the 2001-2002 school year and questions as to whether the District had an obligation to modify STUDENT's IEP because of a change in his circumstances or needs. However, Student made no arguments that the October 2000 was not implemented or that his needs or circumstances changed between the October 2000 and January 8, 2002 IEP meetings to such an extent that a revision to his IEP was necessary.

Finally, a brief review of STUDENT's program from the beginning of the 2001-2002 school year until January 7, 2002, leads the Hearing Officer to conclude that STUDENT's program during this time frame focused on his identified areas of need. For instance, the October 2000 IEP contains goals and related objectives designed to address his math computation skills, his ability to write a paragraph using correct English mechanics (capitalization, spelling, grammar, and punctuation), task completion, and his deficits in reading. In addition, a behavior support plan was developed and included in STUDENT's IEP to address his difficulty with starting tasks and his behavior towards other students.

Copyright © 2014 LRP Publications

T - 040

(Dist.'s Exh. 8.)

The Hearing Officer further finds that the services were provided in an educational environment that was conducive to addressing STUDENT's needs and one in which his goals could be implemented. The evidence did not support Student's contention that the appropriate placement for him given his needs was a general education classroom with pull-out RSP support in math and English. Ms. Rutalj credibly testified that the IEP team decided that based on STUDENT's ability level and his identified health issues, it was appropriate to continue his placement in the special day class with a shortened-day schedule. Given STUDENT's behavior issues and his academic deficits, the Hearing Officer concludes that the special day class provided STUDENT the additional attention and specialized instruction he required to meet his needs.

### January 8, 2002, to the End of the 2001-2002 School Year, Including ESY

An IEP meeting was convened on January 8, 2002, at which time the District made another offer for placement, program, and services. STUDENT continued to be found eligible dually under the categories of OHI and SLD. (Dist.'s Exh. 7.) MOTHER consented to the IEP and it was subsequently implemented. The Hearing Officer next considers the appropriateness of the District's offer contained in the January 2002 IEP. To determine whether the January 2002 IEP constituted a FAPE, it is first necessary to identify STUDENT's unique educational needs as of January 8, 2002, at the time the offer was made.

### What Were STUDENT's Unique Needs?

At the time of the January 8, 2002 IEP meeting, the IEP team had reviewed the assessment results from the KTEA academic achievement testing conducted by District personnel, teacher and parent reports, and STUDENT's junior high school IEP. (Testimony of R. Rultaj; Dist.'s Exh. 7.) The evidence from the assessment established there was no significant change in STUDENT's areas of need since

the October 2000 IEP; however, additional information was available to the IEP team upon which to make its program and placement recommendations.

The educational members of the IEP team found that STUDENT's oral participation and peer relations were very strong; he was engaged in class, had good participation, and appeared to get along with other students and to have friends at school. (Testimony of R. Rutalj; Dist.'s Exh. 7, pg. 176.) Ms. Rutalj testified that she saw STUDENT interacting appropriately with many other students and that she had received no reports of problem behaviors or inappropriate actions from his teachers. It was also reported that STUDENT had adjusted well to his teachers and peers, but that he had difficulty concentrating on tasks. (Dist.'s Exh. 7, pg. 165.) The Hearing Officer therefore concludes that STUDENT had no behavioral concerns at that time that needed to be addressed in his IEP. Although Student argues that he had behavioral needs, the evidence establishes that STUDENT got along well with his peers and teachers and demonstrated appropriate behaviors and actions.

Former school psychologist/current District due process specialist Jose Gonzalez testified that he reviewed and analyzed STUDENT's IEPs, assessments, and school records.[9] According to Dr. Gonzalez, an analysis of STUDENT's records revealed that as of January 2002, STUDENT had no need for a behavior goal in his IEP because the behavior difficulties that he had demonstrated in the past were not evident.

There were no reports by teachers or anyone else that he had social skills needs and Student provided no convincing evidence that he required goals in that area. He had friends at school and, according to Ms. Rutalj, he enjoyed working with the general education peers in his computer class. After MOTHER informed the IEP team that an upcoming court case regarding child support and paternity may have emotional repercussions on STUDENT, the IEP team, in particular, Ms. Rutalj, recommended STUDENT participate in the IMPACT club to address his concerns and to increase his positive peer contact. Ms.

**SpecialEdConnection® Case Report**

Rutalj testified that IMPACT is a student support group in which students can discuss ways to make healthy choices, set goals, and learn coping mechanisms. Moreover, the evidence indicated that STUDENT had acclimated well to the SDC placement for his English, math, and science classes and that he did not demonstrate any behavior problems in class warranting a behavior support plan.

The District's achievement testing revealed that STUDENT had below average standard scores in math application (SS=78) and math computation (SS=86), and average standard scores in reading decoding (SS=107), spelling (SS=101), and reading comprehension (SS=96)[10] (Dist.'s Exh. 7, pg. 165.) In math, STUDENT had difficulty with computation and math application and needed to strengthen number operation skills. His teachers reported that he rushed through his written work and did not always correct it. His writing had greatly improved, but he needed to work on his punctuation and other mechanics such as capitalization.

Lastly, there was sufficient evidence that STUDENT's doctor previously had placed restrictions on his physical abilities. Moreover, the IEP team was provided current information about STUDENT's limited lung capacity and his need for rest due to fatigue. STUDENT therefore required some type of accommodation in his physical education program to address these health needs. However, the District failed to assess STUDENT's need for APE and thus the IEP team still needed to know the nature of APE services that he required.

In sum, results of the District's academic assessment, teachers' reports, and reports from the parent indicated that STUDENT's intellectual functioning was within the average range with deficits in the areas of math, and task completion, and minor weaknesses in written language with respect to mechanics. In addition, he had difficulty keeping his attention focused on his class work. As a result of these deficits, and his ADHD, Alex required the special instruction, structure, and small student-to-teacher ratio that a special day classroom would provide. Based on a statement made by MOTHER, that STUDENT continued to have health needs related to asthma and fatigue, he required accommodations to address these health needs.

Considering STUDENT's unique needs, the Hearing Officer must next determine whether the program, placement, and services offered and provided by the District in the IEP dated January 8, 2002, were designed to meet STUDENT's needs at that time.

## Designed to Meet STUDENT's Unique Needs?

Student's arguments remained the same for this entire school year. He contends that the January 8, 2002 IEP was not appropriate in that it either did not include any goals or included haphazard and unworkable goals and objectives addressing his academic needs, his specific learning disability, social skills, behavior, and his social/emotional needs. Student also argues that he was put on a shortened four-period day without the District's having obtained a medical opinion and basis for doing so, and that his placement in the special day class was not the LRE.

The District argues it correctly identified STUDENT's needs in math, reading, written language, and vocational education and designed goals that appropriately met his areas of need. The District also contends that STUDENT required a shortened day schedule given MOTHER's report of STUDENT's continued health-related issues. It also contends that he required placement in the special day classroom for four periods each day to receive proper support.

In the January 8, 2002 IEP, the IEP team determined that STUDENT was eligible for special education and related services under the category OHI and SLD. The District again offered STUDENT placement in a special day class (SDC) at Birmingham with a four-period day. He was placed in the SDC for math, science, and English, and in general education for his elective, craft. (Dist.'s Exh. 68, pg. 391.) STUDENT remained eligible for

Copyright © 2014 LRP Publications

T - 042

extended school year services. No designated instruction and services were offered. However, instructional accommodations were offered to help STUDENT progress in the general education curriculum, including repetition of instructions orally when necessary, allowing STUDENT to print his written work, and allowing him additional time to complete his work and use of a computer. (Dist.'s Exh. 7, pg. 170.) New goals and objectives were developed based on the achievement testing, and recommendations from his teachers and his parent.

The evidence does not support Student's claim that the IEP failed to include goals that would address his identified areas of need. Rather, the evidence persuasively supports a finding that the District developed goals and objectives that were appropriately designed to meet STUDENT's unique educational needs. In fact, the January 8, 2002 IEP includes goals and related objectives designed to address STUDENT's identified areas of deficit in math, including improvement of his computation skills so he could compute word problems correctly and complete basic algebraic equations and basic math skills; goals related to his language arts skills, such as using correct writing mechanics, grammar, spelling, and syntax; goals related to his vocational education skills, including task completion and compliance with classroom rules; and goals related to reading, including comprehension and drawing inferences and conclusions. (Dist.'s Exh. 7, pgs. 168-169.)

Ms. Rutalj testified that since STUDENT was enrolled in algebra, his math goal was written to address algebraic equations; however, the related math objectives addressed his need to work on basic computations so that he could do algebraic equations. Ms. Rutalj also stated that the language arts goal was designed to strengthen STUDENT's writing ability and the reading goal focused on his need to read at least thirty minutes daily to improve his reading skills.

The Hearing Officer is persuaded by the testimony of STUDENT's 2001-2002 case carrier,

Ruthann Rutalj, that after reviewing STUDENT's status on his prior IEP goals and his progress in class, the January 8, 2002 IEP goals and objectives were appropriately designed to address STUDENT's identified needs.

Student argued that his program failed to address his social skills and failed to include a behavior support plan. However, as discussed above regarding STUDENT's needs, the Hearing Officer is not persuaded that STUDENT had social skills deficits necessitating any specialized training. The Hearing Officer finds that STUDENT did not require goals and objectives in the area of social skills or a behavior support plan because, as stated above, this was not an area of need for him at the time the IEP was developed.

The evidence also did not show that STUDENT required placement in general education with RSP pull-out for math and written expression and four hours of educational therapy each week. Rather, STUDENT needed to remain in an SDC for math, English, and science in order to receive proper support since he exhibited an inability to focus on class work and complete his assignments. STUDENT participated and was supported with accommodations in general education for his elective classes.

Ms. Rutalj persuasively testified about how the IEP team decided to continue STUDENT's placement in an SDC because of his learning disability as well as his health impairment. According to Ms. Rutalj, STUDENT had average cognitive abilities, but in some academic areas, he was not performing to his ability. Additionally, because of his ADHD, he needed the added support of smaller classes, closer supervision, and one-to-one instruction that could be provided in the SDCs.

Ms. Rutalj also stated that the January 2002 IEP team discussed the four-period school schedule and informed MOTHER that maintaining a four-period school day would delay STUDENT's graduation. Ms. Rutalj opined that it was appropriate to continue STUDENT on a four-period school day given MOTHER's request and STUDENT's health issues as

Copyright © 2014 LRP Publications

T - 043

**SpecialEdConnection® Case Report**

reported by MOTHER. According to Ms. Rutalj, the IEP team had no reason to disbelieve STUDENT's health issues as reported by MOTHER.

MOTHER, however, had a different recollection of the IEP team's discussion about the four-period school day. Although the IEP meeting notes state that MOTHER "would prefer that STUDENT stays on 4 period day ...," according to MOTHER, District personnel told her that STUDENT had to be on a shortened day schedule due to his fatigue and other health concerns. (Dist.'s Exh. 7, pg. 176.) MOTHER stated that she was informed that the RSP would be a six-period day, which was too long for STUDENT given his stress/health issues and therefore needed to stay on a four-period day schedule in order to succeed. She stated that she was made aware that a four-period schedule would take STUDENT longer to graduate but that he could complete it.

The evidence was not clear as to who initiated the four-period a day schedule. However, it is clear that both parties agreed to the schedule and that it was devised based on information the IEP team received from the parent regarding STUDENT's health and his capacity to attend to a six-period day. The Hearing Officer finds that a four-period school schedule was appropriate for STUDENT at this time considering his health concerns such as fatigue, anxiety, depression, and the level of medications that he was taking.

What the January 2002 IEP did lack, however, was inclusion of either adaptive physical education or regular physical education. The IEP simply states that "none" would be provided, and does not indicate the basis for this determination. (Dist.'s Exh. 7, pg. 172.) There was no doctor documentation relevant to the 2001-2002 school year indicating which would be appropriate for STUDENT-APE or physical education or none. As found above, having failed to conduct an APE assessment, the District was unable to identify whether STUDENT had APE needs. Accordingly, the IEP was inappropriate with respect to addressing his potential physical education needs.

The evidence establishes that appropriate goals

and objectives were drafted to address STUDENT's specific needs. Although a BSP was not developed in his January 2002 IEP, there was no convincing evidence when he started his ninth-grade year that he continued to exhibit the same behaviors as he had demonstrated in middle school (i.e., difficulty starting on task, irritating other students, instigating trouble, and teasing peers.) In fact, it was reported that his oral participation and peer relationships were very strong. He made progress in his placement, and the LRE was the SDC, which was necessary to address his off-task behavior, inability to complete assignments, and the fact that he was functioning below his cognitive ability in math and language arts.

The Hearing Officer therefore concludes that the placement, program, and services identified in the IEP of January 8, 2002, were appropriate to address STUDENT's unique needs, except with respect to his APE or physical education needs.

### Reasonably Calculated to Provide Educational Benefit?

To be appropriate under the IDEA, the District's proposed program must have been reasonably calculated to provide STUDENT with some educational benefit. *(Rowley,* 458 U.S. at 200.) While this requires a school district to provide a disabled child with meaningful access to education, it does not mean that the school district is required to guarantee totally successful results. *(Walkman v. Florida Union Free School District,* 142 F.3d 119,133 (2d Cir. 1998).) De minimus benefit or only trivial advancement, however, is insufficient to satisfy the *Rowley* standard of "some" benefit. *(Id.,* 142 F.3d at 130; *M.C. v. Central Regional School District,* 81 F.3d 389, 393 (3d Cir. 1996).) Of course, a child's academic progress must be viewed in light of the limitations imposed by his/her disability and must be gaged in relation to the child's potential. *(Mrs. B. v. Milford Board of Education,* 103 F.3d 1114, 1121 (2d Cir. 1997); *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 185 (3d Cir. 1988).)

Ms. Rutalj credibly testified that Birmingham's

Copyright © 2014 LRP Publications

14

T - 044

SDC was an appropriate placement for STUDENT. The evidence demonstrated that Birmingham was equipped with the knowledge, staff, and services necessary to adequately provide the proposed IEP in a coordinated and collaborated manner. It was established above that this program was designed to meet his needs, with the exception of APE or physical education.

The Hearing Officer finds that STUDENT's placement in the SDC for his academic subjects, his four-period school day, and the supports and accommodations provided in the January 8, 2002 IEP were reasonably calculated to provide him educational benefit. Moreover, the evidence showed that STUDENT did benefit as shown by his academic progress of receiving all passing grades, his promotion to the next grade, and his maintenance of steady progress on standardized academic tests. (Dist.'s Exh. 68, pg. 391.)

### Comported with His IEP

Student did not raise any specific arguments with respect to his program comporting with his IEP during the 2001-2002 school year.

### Least Restrictive Environment

Student argues that the LRE for him was placement in regular education with RSP pull-out support for math and English. The evidence, however, demonstrated that STUDENT's specific needs could be addressed in the SDC classrooms at Birmingham and that his placement there allowed him to interact with nondisabled students. Ms. Rutalj testified that at the time of the January 8, 2002 IEP, there was no collaborative resource program that would have allowed STUDENT to be placed in regular education and pulled out of class for math and English. Therefore, had STUDENT been placed in separate resource math and English classes, he could not have been placed in a science SDC. Since STUDENT had a four-period day, the SDC was the most appropriate placement because he could continue to take his science course in an SDC setting, which he required.11 (Testimony of R. Rutalj.)

The evidence demonstrated that based on his ability and performance levels and his health issues, STUDENT required more intensive instruction, attention, and direction. STUDENT's program and placement in an SDC therefore provided him with structure, smaller class sizes, and also met his need to have meaningful access to nondisabled children as required under the law regarding the LRE. (Cal. Educ. Code § 56031.)

### Conclusion

The Hearing Officer finds that with the exception of addressing his APE needs, the program, placement and services offered in the January 8, 2002 IEP were designed to meet STUDENT's needs, were reasonably calculated to provide him educational benefit, and conformed to the IEP. Therefore, the Hearing Officer concludes that the District provided STUDENT a FAPE and provided it in the LRE.

II. During the 2002-2003 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, and that was in the least restrictive environment?

### A. Assessment

There were no assessments conducted during the 2002-2003 school year and Student's claims regarding assessments are the same for this time frame as they were for the 2001-2002 school year. There was no evidence presented indicating that STUDENT's needs changed during this time frame to such an extent that he required another psychoeducational assessment or an assistive technology assessment. There also was no evidence that either the parent or any of STUDENT's teachers had requested any kind of assessment. (20 U.S.C. § 1414(a)(2)(A); Cal Educ. Code § 56381.) However, as discussed below, the Hearing Officer

Copyright © 2014 LRP Publications

T - 045

finds that conditions did warrant an assessment of STUDENT's need for APE services.

On September 13, 2002, STUDENT's pediatrician, Hugh Carmichael, M.D., signed a certification of medical impairment indicating that STUDENT was not to participate in any sports from the date of the order through the twelfth grade. The certificate also stated that STUDENT was to have "No Physical Education Classes." (Dist.'s Exh. 59.) The Hearing Officer finds that this certification of medical impairment was enough to put the District on notice that STUDENT would need to be assessed for APE services. The Hearing Officer therefore concludes that the District failed to assess STUDENT's need for APE services during the 2002-2003 school year.

## B. FAPE

STUDENT's January 8, 2002 IEP remained in effect through the end of the 2001-2002 school year and the entire 2002-2003 school year.[12] He continued to be placed in the special day program at Birmingham, but only for two academic classes-algebra and English. He had two elective courses for which he remained in general education-Introduction to Business Careers and Digital Imagery 1A during the fall semester, and Life Skills for the 21st Century and Digital Imagery IB for the spring semester. He remained on a four-period-per-day schedule and was found eligible for ESY services. (Dist.'s Exh. 68, pg. 392.)

Ms. Rutalj testified that STUDENT was in her English class during the 2002-2003 fall semester and received a grade of "D" and a citizenship grade of "U" for unsatisfactory work habits and not completing his work assignments. According to Ms. Rutalj, STUDENT's poor academic and citizenship marks were not a reflection of an attendance or tardiness problem. Rather, STUDENT had difficulties with task completion, wandering in and out of class, and seeming lethargy, which caused him to not participate as well as before. Ms. Rutalj stated that during the 2002-2003 spring semester, STUDENT was not in her

class and she was no longer his case carrier.

There was persuasive evidence that by the beginning of the spring semester of the 2002-2003 school year, STUDENT's progress had substantially declined. The Hearing Officer notes that although STUDENT's grades were all passing and he was promoted to the next grade at the end of the school year, his grades were lower than those of the previous year. (Dist.'s Exh. 68, pgs. 391-392, Exh. 7, and Exh. 31.) He received Ds in both his English and algebra classes during the fall and spring semesters, a B and a C in his electives in the fall, and two Cs in his electives in the spring. (Dist.'s Exh. 68, pg. 392.)

In its closing brief, the District acknowledged that "[b]y the second semester, a spiraling downward trend in [STUDENT's] academic performance was evident ..." and that by default, STUDENT's placement in the home instruction program later in April 2004 was a good solution to his academic problems at the time. (Dist.'s closing brief, pg. 31.) However, the Hearing Officer finds that the District's actions in modifying STUDENT's educational program to be untimely. Although STUDENT's grades did improve during the following school year after his placement in the home instruction program, the Hearing Officer finds that the District failed to convene an IEP meeting sooner, during the spring semester of the 2002-2003 school year, when it was evident that STUDENT's educational program required some modification to allow him to succeed academically. The Hearing Officer finds that by the end of the fall 2002-2003 semester, there was sufficient evidence to put the District on notice that an IEP team meeting needed to be convened to review STUDENT's progress, or lack thereof, and discuss possible modifications to his educational program.

Moreover, the Hearing Officer was provided no explanation as to how or whether the January 8, 2002 IEP supports and instructional accommodations were implemented during the 2002-2003 school year. The general rule is that at the administrative hearing, districts have the burden of proof (burden of persuasion) to show their compliance with the

[13]*(Clyde K. v. Puyallup School District No. 3,* 35 F.3d 1396, 1398 (9th Cir. 1994); *Seattle School District No. 1 v. B.S., et al.,* (9th Cir. 1996) 82 F.3d 1493.) In the instant matter, the District failed to show that the January 8, 2002 IEP continued to be designed to address STUDENT's identified needs and provide him with educational benefit.

In light of the above, the Hearing Officer concludes that as of the end of the fall semester of the 2002-2003 school year, the program, placement and services offered in the January 8, 2002 IEP no longer constituted a FAPE for STUDENT.

During the 2003-2004 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education and assistive technology assessments,

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment and specific learning disability, and

C. procedurally and substantively deny STUDENT a free appropriate public education (FAPE) in the least restrictive environment with respect to its offers in the individualized educational programs (IEPs) dated November 19, 2003, March 24, 2004, April 19, 2004, May 24, 2004, and June 15, 2004?

### A. Assessment

Student again argues that the District failed to conduct psychoeducational, APE, and assistive technology assessments of him during the 2003-2004 school year. However, since the District did conduct a triennial psychoeducational assessment of STUDENT in November 2003, in reviewing the appropriateness of that assessment, the Hearing Officer will focus on Student's specific contention that the District failed to assess his written expression needs. The District argues it conducted a comprehensive psychoeducational assessment of his cognitive ability, social emotional level, adaptive behavior skills, auditory perceptual skills, visual-motor integration,

visual perceptual skills, and speech/language. The District also contends that STUDENT's academic levels were assessed using the KTEA-NU Comprehensive form.

A review of the evidence indicates that as part of the November 2003 triennial evaluation, the District assessed STUDENT's academic levels. District SDC English teacher Rosario Aguirre testified that STUDENT was one of the students on her caseload and that she assessed him before the November 19, 2003 IEP meeting using the KTEA. According to Ms. Aguirre, to assess STUDENT's written language skills, she used the spelling subtest score from the KTEA, which represents an aspect of his writing abilities. His spelling score was in the average range. She also reviewed examples of his writing on quizzes and received comments from his teachers regarding his writing ability. (Dist.'s Exh. 81, pgs. 514-518.) Ms. Aguirre opined that given the format of his papers, STUDENT's writing was at the ninth-grade level based on the California Standards for written expression. He wrote in short sentences and had difficulty with organization, cohesiveness, sentence mechanics, and using his own words in his papers. (Dist.'s Exh. 6, pg. 146.) Based on her assessment, Ms. Aguirre concluded that STUDENT had academic needs in the area of writing and therefore wrote a goal and objectives to address those needs. In light of the above, the Hearing Officer finds that the District properly evaluated STUDENT's written expression needs.

With respect to APE and assistive technology assessments, there was no evidence that the District conducted assessments in either area; however, the evidence demonstrated that such assessments were warranted. The District acknowledged this fact when it conducted the expulsion analysis at the March 24, 2004 IEP meeting. In reviewing the appropriateness of the November 19, 2003 IEP, the March 2004 IEP team concluded that the November 2003 IEP was not appropriate because it did not address STUDENT's APE and assistive technology needs.[14] (Dist.'s Exh. 5, pg. 136.)

Copyright © 2014 LRP Publications

T - 047

The Hearing Officer concludes that during the 2003-2004 school year, the District failed to assess STUDENT's assistive technology needs to determine the extent of his need for services, and failed to assess his APE needs until May 11, 2004.

## B. Eligibility Category

To be eligible for special education, a student must have a disability as defined by federal law and, because of the disability, the student requires instruction, services, or both, which cannot be provided with modification of the regular school program. (Cal. Educ. Code § 56026(a) and (b).) Once a student is found eligible for special education and related services, he is entitled to an educational program that addresses all of his unique needs and not just those specifically related to his eligibility designation. *(Capistrano Unified School District v. Wartenberg,* 59 F.3d 884 (9th Cir. 1995).) A district must therefore develop a program that includes goals and objectives that address all of a student's identified educational needs. (20 U.S.C. § 1414(a)(d)(1)(A)(ii); Cal. Educ. Code § 56345.)

There is no dispute that STUDENT is eligible for special education. The parties also do not dispute that STUDENT meets the eligibility criteria for OHI. The dispute involves whether STUDENT should continue to be found eligible dually under the categories of OHI and SLD. Since his October 2000 IEP, STUDENT had been found eligible for special education services dually under the categories of OHI and SLD. However, as part of the November 17, 2003 psychoeducational assessment, school psychologist Margie Keyser determined that STUDENT's primary disabling condition was a result of his moderate to severe ADHD medical disorder and that, overall, his weaknesses appeared to be related to his health impairment, specifically his asthma, fatigue, and attention deficit disorder. She therefore concluded that the eligibility category of OHI was the most suitable and encompassing qualification for special education services. (Dist.'s Exh. 28, pgs. 294.) The November 19, 2003 IEP team thus dropped STUDENT's eligibility of SLD and listed OHI as his

sole qualifying disabling condition. (Dist.'s Exh. 6, pg. 148.)

Ms. Keyser testified that the District's psychological services department asks District staff to narrow a student's qualifying disabling condition down to the greatest area of overall impairment and since STUDENT's primary impairment was his ADHD, asthma, and fatigue, she recommended that OHI be the sole eligibility category listed on his IEP.

Student has not presented any persuasive reason why the Hearing Officer should make a determination that he is eligible under a different or more than one eligibility category. The Hearing Officer therefore concludes that identifying OHI as STUDENT's sole disabling condition in his November 2003 IEP was appropriate in that it adequately reflected his primary disabling conditions of ADHD, asthma, and fatigue. The Hearing Officer further concludes that dropping SLD as STUDENT's additional disabling condition from his November 2003 IEP did not prevent the District from developing a program that would address all of his educational needs.

## C. FAPE

As stated above, the standard for evaluating the substantive appropriateness of the District's offer involves three factors: whether the program, placement, and services were designed to address STUDENT's unique needs, whether they were calculated to provide him with educational benefit, and whether they conformed to his IEP. Additionally, the program, placement, and services must have been provided in the least restrictive environment. (20 U.S.C. § 1400 et seq.; *Rowley, supra,* 458 U.S. 176.)

The analysis of whether a student has been provided a FAPE in this case is twofold, requiring the Hearing Officer to decide whether procedural steps have been followed and whether the proposed program and placement are substantively appropriate. *(Rowley,* 458 U.S. 176, 206-207.)

Parents of children with disabilities are provided procedural protections under the IDEA and federal regulations implementing the IDEA. (20 U.S.C. §

Copyright © 2014 LRP Publications

T - 048

1400 et seq.; 34 C.F.R. § 300 et seq.) Federal special education law requires states to establish and maintain certain procedural safeguards to ensure that each student with a disability receives the appropriate public education to which he/she is entitled and that parents are involved in the formulation of the student's educational program. *(W.G. v. Board of Trustees of Target Range School District No. 23,* 960 F.2d 1479, 1483 (9th Cir. 1992).) The Supreme Court noted in *Board of Education of the Hendrick Hudson Central School District v. Rowley,* (1982) 458 U.S. 176, 205-206, 102 S.Ct. 3034, that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation" at every step "as it did upon the measurement of the resulting IEP." Procedural flaws, however, do not automatically require a finding of a denial of a FAPE. *(W.G., supra,* 960 F.2d at 1484.) Procedural violations which result in a "loss of educational opportunity" or which "seriously infringe the parents' opportunity to participate in the IEP formulation process clearly result in the denial of a FAPE." *(Id.)*

There was no IEP meeting during the prior school year to discuss STUDENT's declining grades and Ms. Rutalj's report of STUDENT's difficulty completing assignments, unsatisfactory work habits, his wandering in and out of class, and declining participation. (Dist.'s Exh. 68, pg. 392; see also testimony of R. Rutalj.) The behavioral problems that STUDENT began to demonstrate during the 2002-2003 school year escalated during the 2003-2004 school year, ultimately resulting in the March 15, 2004 disciplinary incident at school in which STUDENT was involved.

### 1. November 19, 2003 IEP

The November 19, 2003 IEP was a three-year review that was developed after the District's November 17, 2003 triennial psychoeducational evaluation. (Dist.'s Exh. 28.) As discussed above, at this IEP meeting, the District dropped STUDENT's eligibility of specific learning disability, but continued to find him eligible for special education

services under the category of OHI, which the Hearing Officer found above to be an appropriate designation. The IEP team developed goals and objectives to address STUDENT's needs in reading comprehension/decoding, written language, math application and computation, and vocational education. STUDENT was offered placement in a special day class at Birmingham for his academic classes (75%) and general education for his electives. Extended school year services were offered and STUDENT's shortened-day schedule was continued due to his medical condition. (Dist.'s Exh. 6, pg. 159.) No assistive technology, APE, DIS, or transportation were offered. MOTHER signed the IEP indicating her agreement with the District's offer.

The Hearing Officer finds that an analysis of the procedural and substantive appropriateness of the November 2003 IEP is not necessary in this matter because the District has, in its March 24, 2004 IEP meeting, already acknowledged the extent to which the November 2003 IEP, including the special education, supplementary aids and/or services, was not appropriate. As part of the expulsion analysis conducted during the March 24, 2004 IEP meeting, the IEP team determined that the November 2003 IEP was not appropriate because it did not address STUDENT's need for behavioral supports in spite of his documented needs, and also did not provide support for his impulsivity, assistive technology, or APE needs. (Dist.'s Exh. 5, pg. 136.)

Thus, by its own admission, the District has already determined that the November 19, 2003 IEP was fatally flawed. Therefore, on the basis of that admission, the Hearing Officer finds that the District failed to offer and provide STUDENT a FAPE with respect to the November 19, 2003 IEP.

### 2. March 24, 2004 IEP

As discussed above, the March 24, 2004 IEP was a preexpulsion IEP held subsequent to the March 15, 2004 disciplinary incident at school in which STUDENT was accused of making a threat that he was going to bring the gun his mother had purchased

Copyright © 2014 LRP Publications

T - 049

to school and "shoot up the school." On March 16, 2004, STUDENT was arrested and later formally charged for making the statement and was released to his mother under house detention. An IEP meeting was subsequently held on March 24, 2004, to determine whether the alleged misconduct was a manifestation of his disability and whether he was appropriately placed at the time of the alleged misconduct.

The March 2004 IEP team found that STUDENT's disability impaired his ability to understand the impact and consequences of the alleged misconduct and impaired his ability to control the behavior involved in the alleged misconduct. The IEP team also found that at the time the misconduct occurred, although STUDENT's placement was appropriate, the IEP did not properly address STUDENT's behavior, impulsivity, assistive technology, or APE needs. Accordingly, the IEP team concluded that no expulsion proceedings could continue. (Dist.'s Exh. 5, pg. 136.)

The team agreed that if STUDENT were to remain at Birmingham, it would have serious negative ramifications and could adversely affect his academic and social well-being. Therefore, the team members, including MOTHER, agreed that STUDENT would be placed at Kirk Douglas Continuation High School (Kirk Douglas). The District also offered to provide him DIS counseling services, an assessment in APE, and extended school year services. (Dist.'s Exh. 5.) A behavior support plan was developed to address STUDENT's sleeping, off-task, and disruptive behavior in class, his failure to complete assignments, and his wandering and being out of class.[15] (Id. at pg. 137.) In addition, during the IEP meeting, Ms. Keyser reviewed eligibility and recommended continuing STUDENT's eligibility under OHI. MOTHER signed the IEP in agreement with the determinations and the offer made therein.

After the March 24, 2004 IEP meeting, MOTHER arranged to meet with Constance Dunn, the principal at Kirk Douglas, and did so on April 13, 2004. At the meeting, Ms. Dunn told MOTHER that

she had not been contacted by anyone from the District regarding STUDENT's placement at Kirk Douglas and that she had no space available for STUDENT to attend Kirk Douglas until approximately September 2004.

Consequently, the Hearing Officer also finds it unnecessary to analyze the substantive appropriateness of the March 24, 2004 IEP because the District essentially offered STUDENT a program that could not be implemented and which was, therefore, fatally flawed on its face. Accordingly, the Hearing Officer concludes that the District failed to offer STUDENT a FAPE in the March 24, 2004 IEP because the program could not be, and in fact was not, implemented in the placement that was offered.

### 3. April 19, 2004 IEP

The Student made numerous allegations of procedural violations with respect to the April 19, 2004 IEP. The Student contends that the District: failed to have his special education and general education teachers or an individual knowledgeable about his needs present at the April 19, 2004 IEP meeting; threatened to expel him after the manifestation determination IEP meeting on March 24, 2004; failed to disclose to his parent at the April 19, 2004 IEP meeting information regarding alleged "safety issues" preventing his placement on "any public campus"; intimidated his mother into accepting a placement other than what had previously been offered at the March 24, 2004 IEP meeting; pressured his parent to sign the April 19, 2004 IEP document; and failed to make a formal, specific offer of placement and services at the April 19, 2004 IEP meeting. Student also contends that the District failed to conduct a functional analysis assessment (FAA) before changing his placement to a nonpublic school.

The District denies each of the above allegations and contends that it did not commit any procedural violations during the 2003-2004 school year.

### IEP Team Participants

Student contends that none of the District attendees at the April 2004 IEP meeting had any

Copyright © 2014 LRP Publications

T - 050

knowledge of his educational needs. Student argues that the IEP team did not include one of his regular education teachers or his special education teachers. The District contends that Debbie Smith is a credentialed special education teacher and was present at the April 2004 IEP meeting. It also argued that Matt Mowry is an experienced and credentialed general education teacher and was present at the April 2004 IEP meeting.

State law requires that an IEP team include a student's present teacher, or if no teacher is available, a regular classroom referring teacher or a special education teacher qualified to teach a student of his/her age. (Cal. Educ. Code § 56341(b).) Additionally, in *W.G. v. Target Range School District No. 23* (9th Cir. 1992) 960 F.2d 1479, the Ninth Circuit Court of Appeals found that the IDEA imposes upon a school district the duty to conduct a meaningful IEP meeting with the appropriate parties.

The evidence shows that although STUDENT's present teacher did not participate in the April 2004 IEP meeting, both a general education and special education teacher were present at the April 2004 IEP meeting. Debbie Smith testified that she is a credentialed special education teacher but currently was in her second year working as a behavior specialist. Ms. Smith had substantial knowledge about STUDENT's needs, stating that she reviewed STUDENT's cumulative educational records, the dean's discipline notes and files, and STUDENT's previous IEPs. Additionally, Ms. Smith stated that she had attended the March 24, 2004 IEP meeting, during which she assisted with the pre-expulsion analysis, addressed STUDENT's behavioral issues, helped develop the individual transition plan and behavior support plan, and assisted in determining the appropriate placement for STUDENT pending the outcome of the IEP meeting. Moreover, there was sufficient evidence that Ms. Smith was qualified to teach a student of STUDENT's age.[16]

General education teacher Matt Mowry testified that he was present at the April 2004 IEP meeting, although Mr. Mowry was the dean of students at

Birmingham at that time. Nevertheless, the presence of the general education teacher was not necessary because STUDENT was not participating in the general education program at that time, nor was it anticipated that he would pursuant to the April 2004 IEP.

The Hearing Officer finds that were individuals present at the April 2004 IEP meeting who had knowledge about STUDENT's needs and a special education teacher who was qualified to teach a student of STUDENT's age. The April 2004 IEP team therefore included the proper participants and thus, there was no procedural violation in this regard.

### Conduct During April 19, 2004 Suspension and IEP Meetings and Written Offer

As briefly discussed above in the background facts, on or about April 13, 2004, MOTHER met with the principal at Kirk Douglas, Constance Dunn, to enroll STUDENT in school pursuant to his March 24, 2004 IEP. However, Ms. Dunn told MOTHER that no one had contacted her about STUDENT's enrollment at Kirk Douglas and that she had no space for him until September 2004. Ms. Dunn recommended to MOTHER that she enroll STUDENT in the home schooling program. MOTHER then went to Birmingham to meet with Mr. Mowry, the dean of students, who stated he would look into the matter.

On April 19, 2004, STUDENT and MOTHER met with Birmingham principal Doris Lasiter, at which time STUDENT was asked to explain the incident. After STUDENT finished his comments about what happened on March 15, 2004, Dr. Lasiter handed STUDENT and his mother a pupil suspension notice, suspending STUDENT from school for five days for violating California Education Code section 48900.7 -- making "terroristic threats against school officials or school property, or both" and "threatening to shoot up the school." (Stud.'s Exh. 41, pg. 374.) Dr. Lasiter further advised STUDENT and his mother that she was considering recommending STUDENT's expulsion from the District. MOTHER objected,

stating that the March 2004 IEP team had determined that STUDENT's statements were a manifestation of his disability. According to MOTHER, Dr. Lasiter told her that she did not care about the IEP team's determination and that she could suspend and expel STUDENT regardless of that.

Immediately following the conference with Dr. Lasiter, Dr. Lasiter left and an IEP team meeting was convened for STUDENT. The District explained to MOTHER that the District's previous IEP offer of placement at Kirk Douglas could not be implemented and needed to be changed because the Kirk Douglas principal and Superintendent of District C schools "felt that though STUDENT is not aggressive or inappropriate in the classroom, the possible repercussions of the situation that occurred at Birmingham High School presented too much of a safety risk to place STUDENT on any public campus." (Dist.'s Exh. 4, pg. 105.) The District believed that Kirk Douglas could not now provide STUDENT adequate monitoring and support and that a nonpublic school would best meet his academic and instructional needs at that time.

The District therefore offered STUDENT an interim home placement on a temporary basis through Carlson Home-Hospital for sixty days or until a nonpublic school (NPS) placement could be secured. Psychological counseling services were increased from thirty minutes to sixty minutes per week and the team agreed to reconvene following identification of an appropriate NPS. Six weeks of ESY for the 2003-2004 school year was recommended, with DIS counseling and home to school transportation continuing during the ESY. *(Id.)* MOTHER testified that she requested the disclosure of the information which the District purportedly obtained after the March 24, 2004 IEP meeting regarding this "potential safety issue," but none of the IEP team participants would disclose this purported information to her.

The Hearing Officer finds that the District committed procedural violations that seriously infringed on the parent's opportunity to have meaningful participation in the formulation of STUDENT's IEP. First, STUDENT and his mother were not given prior notice of the purpose of the April 19, 2004 "suspension meeting" with Dr. Lasiter. Thus, when STUDENT and his mother arrived at the District C Office study room for that meeting, they were understandably surprised that, in spite of Dr. Lasiter's admitted knowledge that the March 24, 2004 IEP team had determined that STUDENT could not be expelled, Dr. Lasiter decided to proceed with the suspension/expulsion process. Dr. Lasiter's actions were inconsistent with the manifestation determination made by the March 24, 2004 IEP team.

Moreover, once the meeting with Dr. Lasiter was completed, the District convened an IEP meeting without providing the parent with proper prior notice. (34 C.F.R. § 300.345(b); Cal. Educ. Code § 56341.5.) MOTHER was not informed until after the meeting with Dr. Lasiter that there would be an IEP meeting held that same day. The IEP meeting notes indicate that MOTHER was given the option of waiting to convene an IEP meeting with ten day's notice or waiving her right to receive ten days notice of the IEP meeting. (Dist.'s Exh. 4, pg. 105.) However, the reality of the situation was that STUDENT was not in school and MOTHER was given the choice of waiting another ten days to find a placement for her son or immediately convening an IEP meeting to find out why her son was unable to enroll in the previously offered placement at Kirk Douglas. In addition, Dr. Lasiter's actions subsequently served to force the parent to accept the District's April 19, 2004 IEP offer to temporarily place STUDENT in home schooling because MOTHER believed she had to agree to place STUDENT somewhere, otherwise, she would "get in trouble" for withholding education from her son. (Testimony of MOTHER.)

According to MOTHER, no one disclosed to her why the District believed that a public school campus would be detrimental to STUDENT and/or others, why the District believed home schooling would be appropriate for STUDENT, or what information formed the basis for the District's opinion that STUDENT's placement at Kirk Douglas or "any

T - 052

public campus" now posed a safety risk. Additionally, the District made no specific offer of a nonpublic school in the April 19, 2004 IEP. (Dist.'s Exh. 4.) A school district is required to make a formal offer of placement in writing in order to be in compliance with the IDEA'S procedural requirements. *(Union v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526, *cert. denied* (1994), 115 S.Ct. 428; 20 U.S.C. § (b)(3).)

The confusion created through the inconsistent actions of District personnel, the lack of prior notice of the "suspension" meeting or the IEP meeting, along with the unspecific placement offer, all served to place MOTHER at a disadvantage in the IEP formulation process by precluding her from obtaining information about the basis of the District's decisions. In *W.G. vs. Target Range School District No. 23* (9th Cir. 1992) 960 F.2d 1479, the Ninth Circuit Court of Appeals found that the IDEA imposes upon a school district the duty to conduct a meaningful IEP meeting with the appropriate parties. As the court also found in *W.G. vs. Target Range, supra,* the Hearing Officer finds here that the District failed to fulfill the mandate of meaningful parental participation in the IEP process. Therefore, because the District failed to develop the IEP in accordance with the procedures required by the IDEA and State law, which, consequently, seriously infringed the parent's opportunity to participate in the IEP formulation process, the District did not offer STUDENT a FAPE with respect to the April 19, 2004 IEP. *(Id.)* Additionally, STUDENT lost educational opportunity because his parent was forced to place him in home instruction away from any peers and with limited social interaction.

### Functional Analysis Assessment

Student contends that the District should have conducted an F AA before deciding to change his placement from a public school campus to a nonpublic school. Student did not support his contention and did not allege any facts demonstrating a need to conduct an FAA.

A district is required to conduct an FAA after an IEP team finds that instructional/behavioral approaches specified in a student's IEP have been ineffective. A parent can also request an FAA pursuant to Education Code section 56320 et seq. (5 C.C.R. § 3052(b).)

Ms. Smith convincingly testified about how the IEP team was able to develop a BSP as a first response to the "threat" incident at Birmingham. According to Ms. Smith, conducting an FAA would have been an excessive response to STUDENT's actions because the IEP team had already put into place a BSP that was adequate and they first needed to determine the BSP's impact and/or effectiveness on STUDENT's behavior. Moreover, the effectiveness of an FAA would be limited because STUDENT was not in a school setting and was receiving instruction at home at the time.

The law does not require a district to conduct an FAA prior to recommending that a student be moved to a more restrictive placement. The Hearing Officer is not persuaded that the District had to conduct an FAA prior to its offering to change STUDENT's placement to a nonpublic school. The evidence persuasively demonstrates that a BSP was developed at the March 24, 2004 IEP meeting in response to the disciplinary incident and further reviewed and revised at the April 19, 2004 IEP meeting. Accordingly, the Hearing Officer finds that developing and revising a BSP was the appropriate first response to the incident. (Dist.'s Exh. 5, pgs. 137-138, Exh. 4, pgs. 107-108.) Conducting an FAA would not have been required until the IEP team found the March/April 2004 BSP to have been ineffective or if the parent had requested one be conducted. Neither of these situations had occurred at the time the District proposed placing STUDENT at a nonpublic school. Therefore, the Hearing Officer finds there was no procedural violation with respect to an FAA.

### Conclusion

Because it has been established above that the District's procedural violations resulted in serious infringement on the parent's opportunity to participate

---

Copyright © 2014 LRP Publications

T - 053

in the IEP formulation process, it is not necessary to discuss the substantive appropriateness of STUDENT's offered program pursuant to the April 19, 2004 IEP. Moreover, since the goals and objectives in the April 2004 IEP are generally the same as those offered in the June 15, 2004 IEP, the Hearing Officer will review the appropriateness of those goals and objectives and the entire program and services below in her analysis of the June 2004 IEP.

### 4. May 24, 2004 IEP

On May 11, 2004, the District assessed STUDENT for APE. District APE specialist Teri Gallus subsequently issued a report on May 24, 2004, recommending that STUDENT receive APE services. (Dist.'s Exh. 17.) The May 24, 2004 IEP meeting was convened for the sole purpose of reviewing and discussing the APE assessment and the report. This IEP was an amendment to the March 24, 2004 IEP. The IEP team agreed that STUDENT was eligible to receive APE services, APE goals were developed, and APE services were offered at the rate of five sessions per week for a total of 250 minutes. (Dist.'s Exh. 3.) MOTHER refused to sign the IEP. Student made no specific argument with respect to the appropriateness of the May 2004 IEP. Therefore, the Hearing Officer will not address the appropriateness of this IEP.

### 5. June 15, 2004 IEP Meeting

The April 19, 2004 IEP team meeting was recessed to allow the District to research and locate an appropriate nonpublic school placement for STUDENT and to allow for the completion of the interview/intake process at the selected nonpublic school site. The IEP team reconvened on June 15, 2004, to discuss STUDENT's placement at North Hills and to allow the District to make a formal placement offer.

The analysis of whether a student has been offered a FAPE in this case is twofold, requiring the Hearing Officer to decide whether procedural steps have been followed and whether the proposed program and placement are substantively appropriate. *(Rowley,* 458 U.S. 176, 206-207.)

Under the IDEA and *Board of Education of the Hendrick Hudson Central School District v. Rowley,* (1982) 458 U.S. 176, 102 S.Ct. 3034, the District's proposed program must have met the following requirements to have constituted a substantively appropriate educational program: (1) been designed to meet STUDENT's unique needs, (2) been reasonably calculated to provide him with some educational benefit, and (3) comported with his IEP. Additionally, it must have been provided in the least restrictive environment.

Student expressed both procedural and substantive concerns with respect to the June 15, 2004 IEP. Procedurally, Student contends that the District failed to disclose to him and his mother information that it allegedly received after the March 24, 2004 IEP meeting regarding an issue of safety that would, in the District's view, prevent his placement on "any public campus." Student also contends that the District failed to make a formal, written offer of a specific placement in the June 2004 IEP. According to Student, although the June 2004 IEP identifies North Hills Preparatory School as the offered placement, it fails to provide any specific information about the program he would have received there, including the nature and size of the classroom.

Substantively, Student argues that the District failed to adopt appropriate goals and objectives in the June 15, 2004 IEP to effectively address the full range of his needs and did not include any goals to address his social skills. Student also contends that the District failed to include a behavior support plan (BSP) in his June 2004 IEP. Additionally, he alleges that North Hills was not the LRE for him.

The District contends that MOTHER was well aware of the safety concerns because MOTHER had reported to Kirk Douglas principal Constance Dunn that STUDENT had received threats. The District also contends that MOTHER was told the reasons for the change in placement (i.e., the special education class was overcrowded at Kirk Douglas and he would not be safe on a public school campus). According to the District, the IEP team was concerned about

Copyright © 2014 LRP Publications

STUDENT's emotional and physical well-being. With respect to the specificity of the written offer, the District argues that the IEP document clearly states its offer to place STUDENT at North Hills and details how North Hills would benefit him.

In response to Student's substantive contentions, the District argues that it's offer of placement at North Hills was an offer of a FAPE in the LRE and that it stood ready, willing, and able to implement that program at North Hills if the parent agreed.

## Procedural Allegations

### Disclosure of Safety Issues

With respect to the allegation regarding disclosure of the safety issue, the evidence does not support Student's contention that as of June 15, 2004, his mother still did not have sufficient information regarding a safety issue preventing STUDENT's placement on any public campus. Although MOTHER may not have agreed with the District's concern regarding STUDENT's and others' safety, the evidence indicates that the issue had been disclosed to, and discussed with, MOTHER so as to allow her to make an informed decision about the District's June 15, 2004 IEP offer.

According to the District, MOTHER was aware of the safety concerns because she expressed those concerns to Kirk Douglas principal Constance Dunn. MOTHER testified that Ms. Dunn had asked her why STUDENT had been offered placement at Kirk Douglas, as opposed to Monroe High School, which is his school of residence. MOTHER stated that she told Ms. Dunn that she believed their home had recently been burglarized by kids who attended Monroe and that these kids had threatened STUDENT, telling him that he and his mother should "watch their backs." MOTHER testified that she was concerned about STUDENT's safety if he went to Monroe, but was not concerned about STUDENT attending any other public school campus.

Ms. Dunn testified that she met with MOTHER in April 2004 and after hearing MOTHER's concerns about kids from Monroe threatening her and STUDENT, Ms. Dunn informed MOTHER that there were some students from Monroe that now attended Kirk Douglas. Ms. Dunn stated that she explained to MOTHER that STUDENT needed to be placed at a school where the situation surrounding the "threat" would not be exacerbated. Ms. Dunn also informed MOTHER that there currently was no space at Kirk Douglas for STUDENT to attend, but space would be available in September 2004. Ms. Dunn testified that she and MOTHER also had discussed an Internet web site that is an open forum for kids and how kids were discussing the school "threat" incident on that web site.

The Hearing Officer finds that prior to and during the June 15, 2004 IEP meeting, the evidence demonstrates that MOTHER had sufficient information regarding the District's safety concerns to allow her to participate in the formulation of the June 2004 IEP and determine whether she would accept the District's offer. Not only did MOTHER discuss safety issues with Ms. Dunn during their April 2004 meeting and visit to the school, but these issues were also discussed during the June 2004 IEP meeting.

### Specific Written Offer

Turning next to the specificity of the District's placement offer, Student claims that the District failed to provide any specific information in the June 15, 2004 IEP regarding the program at North Hills that he would receive. A review of the IEP document demonstrates that the document includes a clear record of what placement, services, and assistance were offered to STUDENT. *(Union v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526, *cert. denied* (1994), 115 S.Ct. 428; 20 U.S.C. § (b)(3).)

The IEP document specifically states that the District's offer was to place STUDENT at North Hills Preparatory School. (Dist.'s Exh. 2, pg. 70.) Part of the June 2004 IEP team's discussion about STUDENT's placement was recorded in the IEP meeting notes as follows:

North Hills Prep presented information to the committee describing how the program would benefit

---

Copyright © 2014 LRP Publications

STUDENT. North Hills Prep states the school would be appropriate for STUDENT. ... North Hills Prep is the appropriate offer of FAPE. North Hills Prep is a small, closely monitored school, with small class sizes, DIS counselors, and an enriched academic/elective program. The school can provide a more personal program for STUDENT, supporting him to make appropriate choices. The school has an administrative team and 6 DIS Counselors/Therapists.

Dist.'s Exh. 2, pg. 69.)

Additionally, District behavior specialist Debbie Smith testified that she and MOTHER visited North Hills and spoke with Julianne Gwin, who answered MOTHER's questions about the school and its program and gave MOTHER a tour of the school site. In addition, Ms. Smith testified that Ms. Gwin attended the June 2004 IEP meeting and presented more specific information about the school program and the type of services North Hills could provide to STUDENT. There was no testimony to the contrary.

The District was required under *Union* to make a written offer of placement that was sufficiently clear to satisfy the IDEA, and it did so. In light of the above, the Hearing Officer concludes that the June 15, 2004 IEP adequately specifies the District's placement offer.

## Substantive Allegations

To determine whether the placement and services offered in the June 15, 2004 IEP would have provided STUDENT a FAPE, it is first necessary to identify STUDENT's unique needs at the time the offer was made.

## What Were STUDENT's Unique Needs?

At the time of the June 15, 2004 IEP meeting, the only other assessment that had been conducted since the November 2003 psychoeducational assessment was an APE assessment conducted in May 2004. (Dist.'s Exhs. 17 and 28.) Based on these two assessments and an update from STUDENT's home instruction teacher, Lillian Baskerville, there appeared to be no substantial change in STUDENT's areas of

need since the November 2003 evaluation and the March 2004 IEP annual review. However, the IEP team used this additional information to evaluate STUDENT's needs and develop program and placement recommendations.

The parties did not dispute that the November 2003 testing results estimated STUDENT's cognitive ability to be within the average range, with strengths in pattern completion skills, serial reasoning, visual discrimination skills, immediate visual memory, visual spatial-relationship skills, visual closure skills, and oral language skills. His weaknesses were in attention, auditory memory for sentences, words and directions, auditory word discrimination skills, visual-motor integration skills, and auditory processing of facts and information. District school psychologist Margie Keyser concluded that on less preferred tasks, STUDENT did not sustain much interest or effort and that his weaknesses appeared to be related to his health impairment, specifically his asthma, fatigue, and attention deficit disorder. These weaknesses made it difficult for STUDENT to attend to, retain, and solve orally presented material as well as copy down notes quickly from the board. Thus, when implementing instructional techniques, STUDENT's attention first needed to be elicited; he then needed to receive visually stimulating and interesting materials and presentations, and be engaged verbally in the activity. Use of rhythmic or cadence rehearsal techniques was also helpful in assisting STUDENT in retention. (Dist.'s Exh. 28, pg. 294.)

With respect to STUDENT's social-emotional levels, testing results indicated that STUDENT was not depressed but was socially awkward with peers in his SDC and craved greater peer belonging and acceptance. His impulsive behaviors were highly characteristic of ADHD, combined type, in the range of moderate to severe. *(Id.* at pgs. 291-292.)

The District's achievement testing conducted in October 2003 using the KTEA-NU indicated that STUDENT had average reading comprehension and spelling abilities, and weaknesses in reading decoding

T - 056

skills, math applications, and math computation skills, with subtest scores within the well below average range.[17] (Dist.'s Exhs. 31 and 80, pgs. 514-520.) STUDENT's written expression skills were evaluated using the KTEA spelling subtest score and by analyzing a work sample. (Dist.'s Exh. 18, pgs. 514-518.) Although his spelling score was in the average range, District special education teacher Rose Aguirre testified that his work sample indicated that his writing abilities were at the ninth- to tenth-grade level.

As of June 15, 2004, STUDENT continued to have needs in the areas of reading comprehension, written language, mathematics, vocational education, behavior, and social/emotional. According to the basic achievement skill screening (BASIS) conducted by home instruction teacher Lillian Baskerville before she began instructing STUDENT in April 2004, STUDENT was performing at the 7.7 grade level in math, and at the eleventh-grade level in reading. Ms. Baskerville reported that STUDENT's math skills had since improved. However, the educational members of the IEP team found that STUDENT had difficulty with fractions, decimals, and percentages and had been gaining in his ability to compute algebraic equations. (Dist.'s Exh. 2, pg. 54.)

STUDENT's vocational education levels indicated that with the one-to-one supervision he was receiving through home instruction, he engaged in discussion, offering views and ideas, and was less able to avoid tasks. STUDENT was completing his assignments and homework regularly. *(Id.* at pg. 69.) The health assessment update completed by school nurse Lori Urbanec in March 2004 documented a diagnosis of asthma and ADHD, with medications for both. As of the time of the March 2004 IEP meeting, however, STUDENT had not taken medications for depression and ADHD since November 2003, and was then only taking medication on a daily basis for asthma. (Dist.'s Exh. 5, pg. 115.)

The District members of the June 2004 IEP team concluded that STUDENT needed to have access to age-appropriate peers in order to develop age-appropriate social skills, problem solving, and impulse control. He needed to participate in a full-day program, earning thirty credits per semester so that he could make satisfactory progress towards earning his diploma. Ms. Keyser also reported that STUDENT's enrollment in a school setting was an important aspect of his education. (Dist.'s Exh. 2, pg. 69.)

In light of the above, the Hearing Officer finds that as of June 15, 2004, STUDENT continued to require placement in a special day class designed for students with learning disabilities to address his reading, written language, and math needs. In addition, he required an instructional setting and supports that would address his difficulty with completing assignments within expected timelines, impulsive statements and behaviors, and appropriate expressions of feelings and positive coping skills. As determined by the team at the April 2004 IEP meeting, he continued to need to be served through a visually rich environment, small group, with academic curriculum of a challenging nature that is standards-based. (Dist.'s Exh. 4, pg. 106.) Adaptive physical education services were required given his continued diagnosis and medication for asthma, as well as his reporting of fatigue during the May 2004 APE assessment. (Dist.'s Exh. 2, pg. 7; Exh. 3, pg. 75.)

### Designed to Meet STUDENT's Needs

Student contends that the June 15, 2004 IEP did not include appropriate math, written expression, vocational education, social/emotional, and behavior goals and objectives, and contained no social skills goals. Student also claims that the IEP failed to include a behavior support plan and that the offered placement at North Hills, a nonpublic school, was not the LRE. The District argues that the program offered at North Hills would have met all of STUDENT's therapeutic needs and provided the small campus and small class size that he required.

The District offered to place STUDENT at North Hills for a full-time, all day-program. STUDENT would have been placed in an SDC with a focus on

Copyright © 2014 LRP Publications

T - 057

academic instruction, and not on behavior. STUDENT remained eligible for extended school year services and was offered DIS counseling at a rate of sixty minutes per week and adaptive physical education services. The same academic accommodations that were offered in the April 2004 IEP were continued in the June 2004 IEP and home to school transportation was also offered. (Dist.'s Exh. 2, pgs. 63 and 70; Exh. 5, pg. 127.)

The Hearing Officer first addresses Student's claim that the IEP contained inappropriate goals and objectives. The June 2004 IEP includes three academic goals and related objectives designed to address STUDENT's needs in the areas of a reading comprehension, math, and written expression. There was one vocational education goal to address STUDENT's difficulty in completing assignments, and one behavior goal designed to address his responses to pressure and his making impulsive statements and acting impulsively. There also was one social/emotional goal designed to encourage STUDENT's identification of his strengths, positive coping skills, and appropriate expressions of his feelings.

Regarding social skills, Student contends that his IEP failed to contain social skills goals to address his difficulty with developing appropriate peer relationships. School psychologist Margie Keyser testified that she did not write a goal to address STUDENT's interpersonal skills because those skills were not significantly impairing his academic success. According to Ms. Keyser, at the time of the November 2003 psychoeducational evaluation, STUDENT was making good grades, and completing the credits he attempted and that he had friends and was making new friends. There was nothing in school indicating that he needed social skills counseling to be successful in school. Additionally, after working with STUDENT since April 2004, Ms. Keyser concluded that STUDENT did not strike her as a person who needed social skills training.

The Hearing Officer also notes that STUDENT had been in home instruction since April 2004 and

there was no evidence that he was having difficulty with social skills in that context. Ms. Keyser testified that STUDENT was a typical teen who was funny, had a quick wit, and seemed to prefer socializing with kids who spent time at the Internet cafe playing video games. Nevertheless, the evidence indicated that while at North Hills, STUDENT would have received individual support from teachers and counselors to help him develop appropriate peer relationships, communication, and coping skills necessary to help him feel comfortable in social situations. The Hearing Officer therefore finds that STUDENT did not require social skills goals and objectives to be included in his IEP.

Student also argues that the IEP failed to include a behavior support plan (BSP). In response to this claim, the District contends that the BSP developed in the April 19, 2004 IEP was to be continued in the June 2004 IEP. (Testimonies of D. Smith and M. Keyser.) Ms. Smith testified that she did not recall the IEP team reviewing the BSP during the June 2004 IEP meeting, but STUDENT still needed his behaviors to be addressed since he was going to be placed on a school campus. Ms. Smith opined that since STUDENT had not been on a regular campus for the team to see if the BSP interventions had worked, the IEP team would need to determine whether the BSP was necessary on the nonpublic school campus.

The record is not clear as to whether the District was offering to continue the April 2004 BSP in its June 2004 IEP offer. Although the District members of the June 2004 IEP team may have intended the April 2004 BSP to be included in the June 2004 IEP, the IEP document does not clearly or specifically convey that intent so as to inform the parent of the District's offer. The June 2004 IEP document does not indicate that it was an amendment to the April 2004 IEP; instead, it defines the type of IEP meeting as "Other" and further specifies "Placement/Offer of FAPE" as the purpose of the meeting. (Dist.'s Exh. 2, pg. 52.)

Notwithstanding the District's failure to clearly

Copyright © 2014 LRP Publications

T - 058

state its intention with respect to implementing the April 2004 BSP in the June 2004 IEP, Ms. Gwin persuasively testified as to how the BSP could be implemented at North Hills. Ms. Gwin explained that the behaviors identified in the April 2004 BSP would be addressed therapeutically, by discussing positive reinforcements with STUDENT, discovering what he likes to do, and building on those interests in a positive way. Ms. Gwin also opined that it was likely that the behaviors STUDENT previously displayed would be extinguished at North Hills because many of the behaviors displayed by students on a comprehensive campus often are not displayed in a small, therapeutic environment such as North Hills. According to Ms. Gwin, North Hills had many students who struggled with some of the same behavior issues as STUDENT. However, these behavioral pressures are reduced by the individualized support the students receive, which conveys to the students that the staff care about them and genuinely want to help them succeed.

In addition, Ms. Gwin gave convincing testimony about how STUDENT's goals and objectives would be implemented at North Hills. For instance, STUDENT's written language and reading comprehension goals could have been addressed in the English class. Ms. Gwin stated that teachers often use various literary works from the American Anthology of World Literature, such as selections from Mark Twain and Shakespeare. According to Ms. Gwin, North Hills teachers use various techniques such as graphic organizers to do prewriting exercises and help students initiate writing and develop comprehensive essays.

Ms. Gwin testified that STUDENT's math goal could have been addressed in the algebra class. In addition, during the extended school year, a math review class is available. The class is designed to ensure students know the math basics and can pass the high school exit exam. The materials used are based on the student's individual weaknesses and needs and designed to help students meet their goals.

STUDENT's social/emotional goal would have been addressed with one of the licensed therapists during one of the offered sixty-minute weekly counseling sessions. The therapist would have worked with STUDENT to determine his interests and activities in which he is successful, such as computers, and would help him develop that skill. Ms. Gwin also explained how STUDENT could participate in the computer club and a game club that meets every day at lunch.

With respect to STUDENT's behavior goal, Ms. Gwin testified that STUDENT would work closely with the therapist on site to develop the "stop and think" technique before responding and the goal would also be addressed in the classroom.

Regarding STUDENT's difficulty with task completion, Ms. Gwin testified that STUDENT's vocational education goal could be implemented and his progress tracked through weekly progress reports, which are then given to the therapists so they can be addressed during counseling sessions if necessary. Additionally, if STUDENT was having difficulty completing assignments, Ms. Gwin stated that he would be allowed additional time to complete his work and could utilize teacher tutoring available during the lunch hour.

North Hills is a self-contained, gated campus where faculty and students are in constant contact throughout the day. (Dist.'s Exh. 71, pg. 435.) Ms. Gwin testified that North Hills has approximately 100 students and a majority of the classes have eight to ten students. Each class has a teacher and an aide. She also explained that North Hills is fully accredited by the Western Association of Schools and Colleges and is certified as a nonpublic by the State of California Department of Education. (Dist.'s Exh. 71.) Accordingly, the diplomas received by students at North Hills are the same as those received by students attending accredited public schools.

Ms. Gwin stated that a therapeutic approach is used at North Hills. The school has three full-time licensed therapists who are available to provide counseling to the students at any time throughout the school day. Instead of extensive discipline and

Copyright © 2014 LRP Publications

T - 059

consequences, the clinicians at North Hills become very involved with the classes and students, providing each student with approximately one hour of counseling each day. Students are not permitted to get up and leave whenever they choose and they are unable to wander around campus. (See also Dist.'s Exh. 71.) Ms. Gwin also testified that North Hills became a closed campus during the 2004-2005 school year.

Ms. Gwin described how STUDENT's individual transition plan (ITP) would have been implemented during the hour-long homeroom class each week. According to Ms. Gwin, during homeroom and with the assistance of counselors, students work on specific activities identified in the ITP and learn job skills such as resume writing and communication techniques. Students are also guided through the community college process and receive enrollment assistance. North Hills also uses the "Learn to Earn" curriculum that is identified in STUDENT's ITP. (See also Dist.'s Exh. 4, pgs. 109-111.)

The Hearing Officer finds that all of the goals and objectives and instructional accommodations in the June 15, 2004 IEP were appropriate and that they could have been implemented at North Hills. The evidence establishes that appropriate goals and objectives were drafted to address STUDENT's specific needs. Additionally, interventions in behavior, counseling, task completion, and attention would be carried out each day in the SDC at North Hills, with the assistance of the therapists, teachers, and aides and through DIS counseling. In addition, instructional accommodations such as graphic organizers, outlines, and access to computers, would have been implemented by the North Hills staff in accordance with STUDENT's IEP. (Testimony of J. Gwinn; Dist.'s Exh. 2, pg. 63.) The Hearing Officer therefore concludes that the proposed placement, program, and services identified in the IEP of June 15, 2004, were appropriate to address STUDENT's unique needs.

### Reasonably Calculated to Provide STUDENT with some Educational

### Benefit?

To be appropriate under the IDEA, the District's proposed program must have been reasonably calculated to provide STUDENT with some educational benefit. *(Rowley,* 458 U.S. at 200.) While this requires a school district to provide a disabled child with meaningful access to education, it does not mean that the school district is required to guarantee totally successful results. *(Walkman v. Florida Union Free School District,* 142 F.3d 119, 133 (2d Cir. 1998).) De minimus benefit or only trivial advancement, however, is insufficient to satisfy the *Rowley* standard of "some" benefit. *(Id.,* 142 F.3d at 130; *M.C. v. Central Regional School District,* 81 F.3d 389, 393 (3d Cir. 1996).) Of course, a child's academic progress must be viewed in light of the limitations imposed by his/her disability and must be gaged in relation to the child's potential. *(Mrs. B. v. Milford Board of Education,* 103 F.3d 1114, 1121 (2dCir. 1997); *Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 185 (3d Cir. 1988).)

Although STUDENT did not participate in the District's proposed program, Ms. Gwin and Ms. Keyser credibly testified that North Hills would have been an appropriate placement for STUDENT. The evidence demonstrated that North Hills was equipped with the knowledge, staff, and services necessary to adequately provide the proposed IEP in a coordinated and collaborated manner. Placement at North Hills would have allowed STUDENT to have his IEP implemented at that site and be in a program that emphasized serving the needs of students with needs similar to STUDENT's. Additionally, placement at North Hills would have allowed STUDENT to receive academic supports that would enable him to make educational progress.

The Hearing Officer therefore concludes that the program, placement, and services offered in the June 2004 IEP were reasonably calculated to provide STUDENT with educational benefit.

### Comported with his IEP

---

Copyright © 2014 LRP Publications

T - 060

Although the proposed IEP was not implemented, there was no indication that the program and counseling services offered in the IEP could not be implemented on the placement starting date indicated. However, the evidence did indicate that APE services were not available at North Hills. Ms. Gwin testified that North Hills could not have provided APE to STUDENT, but that the school's physical education classes were fairly individualized. According to Ms. Gwin, there are students at North Hills who need APE and have been accommodated without providing APE services. North Hills does have a yoga class available as an alternative program and it would have been available had STUDENT's participation in yoga been approved by a physician.

STUDENT's physician, Dr. Carmichael, did not provide a release for STUDENT to receive APE services until June 23, 2005, just over one year after the District's IEP offer of June 15, 2004. (Dist.'s Exhs. 77 and 78.) Dr. Carmichael's recommendation as of June 23, 2005 was that STUDENT should not participate in physical education due to asthma and scoliosis. (Dist.'s Exh. 78.) Although Dr. Carmichael provided a release for STUDENT to be assessed for APE, Ms. Gallus testified that it was not clear whether STUDENT had a medical release to actually participate in APE. Moreover, STUDENT had become fatigued during the May 2004 APE assessment; consequently, the IEP team requested that MOTHER provide medical verification of STUDENT's ability to participate in APE. (Dist.'s Exh. 2, pg. 70.) There was no evidence that such verification was provided to the IEP team at the time the June 15, 2004 IEP was offered.

Although the Hearing Officer is not convinced that APE services could have been provided at North Hills, it was also unclear at the time of the June 2004 IEP offer whether STUDENT would have been medically released to participate in APE. The Hearing Officer concludes that further clarification was necessary to determine whether STUDENT was medically able to participate in the APE services offered by the District.[18]

## Least Restrictive Environment

The Hearing Officer next addresses Student's claim that North Hills was not the LRE. According to Student, the LRE for him was and is full-time placement in a general education classroom with pull-out resource specialist program support for math and English. Student also believes he needed four hours per week of educational therapy to address his specific learning disabilities in the areas of calculations, mathematics, and written expression. The evidence does not support Student's contentions in this regard.

Margie Keyser persuasively testified that given STUDENT's past actions involving the "threat" and the nature of that act, he needed to focus on positive coping skills and proper expressions of his feelings. Ms. Keyser opined that once STUDENT developed his own self- management and successfully worked on his social/emotional goal, he would likely be more successful in school. However, in order to do this, Ms. Keyser believed STUDENT needed to be placed in a full-time therapeutic environment at a nonpublic school where he could first prove that he could act appropriately in a full-day program. If STUDENT could appropriately adjust to such a program, he could then be placed elsewhere.

The Hearing Officer was persuaded by Ms. Keyser's testimony that at the time of the June 2004 IEP, a nonpublic school was the appropriate placement for STUDENT. According to Ms. Keyser, North Hills was uniquely geared toward use of a reward system and providing immediate feedback to students on social/emotional issues, which is not usually the case in the public school environment. STUDENT also would have had the opportunity to participate in more group interaction and therapeutic sessions to discuss any pressures he may have in relating to peers.

In light of the above, the Hearing Officer finds that at the time the June 2004 IEP offer was made, North Hills NPS was the LRE for STUDENT because he needed a small educational environment where he could participate in a full-day program with the

Copyright © 2014 LRP Publications

T - 061

support of a therapeutic milieu. The environment, instructional program, and supportive services at North Hills would have promoted STUDENT's social/emotional well-being and addressed his ADHD and academic needs. Moreover, given the nature of the incident in which STUDENT was involved at Birmingham, as well as the threats that STUDENT and his mother had received from other public school students related to that incident, it was in STUDENT's best interest to be placed at North Hills away from the potential repercussions.

## Conclusion

In light of all the above, the Hearing Officer concludes that the District offered STUDENT a FAPE in the LRE in the June 15, 2004 IEP, with the limited exception that it failed to clearly specify that the April 19, 2004 BSP was intended to be included in the June 2004 IEP.

IV. During the 2004-2005 school year, did the District

A. fail to conduct psychoeducational and assistive technology assessments?

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment as well as specific learning disability;

C. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, that conformed to his IEP, and was in the least restrictive environment?

### A. Assessment

For the 2004-2005 school year, Student continues to make the same allegations regarding assessments -- that the District failed to conduct psychoeducational and assistive technology (AT) assessments. No assessments were conducted at the beginning of the 2004-2005 school year and there was no dispute that STUDENT's next triennial psychoeducational assessment was not due until

November 2006. However, the parties did agree to have private psychologist Dr. Robert Patterson conduct an independent psychoeducational assessment of STUDENT, which occurred in December 2004. Dr. Patterson's resulting assessment report was not completed until March 16, 2005, and a copy of the report was not provided to the District until May 25, 2005. (Testimony of R. Patterson; Dist.'s Exh. 16.)

Dr. Patterson's evaluation included assessment of STUDENT's cognitive functioning, achievement functioning (including written expression), psychomotor functioning, processing speed, auditory processing, short/long-term memory, working memory, social-emotional functioning, adaptive functioning, attentional functioning, and a neuropsychological screening. Thus, the evidence does not support Student's allegation that psychoeducational testing was not conducted during the 2004-2005 school year.

With respect to assessing STUDENT's AT needs, there was no evidence that the District conducted an assessment in this area. Although the March 24, 2004 IEP team had previously determined that STUDENT's IEP failed to address his AT needs and that an assessment was warranted, the District had not ordered an AT assessment. (Dist.'s Exh. 5, pg. 136.) The Hearing Officer therefore concludes that during the 2004-2005 school year, the District failed to conduct an AT assessment to determine the extent of STUDENT's needs for AT services.

### B. Eligibility

Student contends that he should have been found eligible dually under OHI and SLD during the 2004-2005 school year. As previously discussed in this Decision, after the District's November 2003 triennial evaluation, school psychologist Margie Keyser correctly concluded that the eligibility category of OHI was the most suitable and encompassing qualification under which STUDENT qualified for special education services. Similarly, for the 2004-2005 school year, Student did not present

Copyright © 2014 LRP Publications

any persuasive reason why the Hearing Officer should make a determination that he should have been found eligible under a different or more than one eligibility category.

Although Dr. Patterson conducted a psychoeducational assessment of STUDENT in December 2004 and concluded that STUDENT had a learning disability in math and written expression, the results of that assessment were not made available to the District until May 2005. Moreover, as will be discussed further below, not identifying SLD as one of STUDENT's disabling conditions did not prevent the District from developing a program to address all of his identified educational needs.

## C. FAPE

At the beginning of the 2004-2005 school year, STUDENT remained in home instruction pursuant to his April 19, 2004 IEP, and the District continued to offer him placement at North Hills (pursuant to the June 15, 2004 IEP) until May 16, 2005, when the District made its final IEP offer.[19] The Hearing Officer determined above the appropriateness of the District's June 15, 2004 IEP offer, with the exception of the BSP. The Hearing Officer finds that the June 2004 IEP continued to be an appropriate offer of a FAPE for STUDENT at the beginning of the 2004-2005 school year as there was no evidence presented to the contrary.

At the May 16, 2005 IEP meeting, the District offered to place STUDENT at Chatsworth High School (Chatsworth) for the remainder of the 2004-2005 school year, the 2005 extended school year, and for the 2005-2006 school year through May 16, 2006. The Hearing Officer next addresses the procedural and substantive appropriateness of the District's offer made in the May 16, 2005 IEP.

Student contends that the May 16, 2005 IEP document states that it is a "Worksheet." Student also contends that the District failed to identify a specific SDC program (i.e., the number of students in the class and the type of disabilities they had) in the IEP and failed to explain why his goals and objectives could

not be addressed in the RSP. Student therefore argues that because of the lack of specificity in the IEP offer, his parent was unable to make a decision whether to consent to the offered program. As to its substantive appropriateness, Student argued that the May 16, 2005 IEP failed to include appropriate goals and objectives to address all of his needs and that the goals that were included were haphazard, very general, and vague. Student contends that the District failed to offer him APE services in the May 2005 IEP and that the offered placement was not the LRE. Although Student agrees with the District's offer to place him at Chatsworth with a full-time class schedule, he disagrees with the District's offer to place him in an SDC.

The District argues that the IEP is a "Worksheet" (or draft) because the parent has not signed and consented to the IEP and it is therefore a "work in progress" until it is signed and consented to. The District also contends that it provided a specific offer of the special day program at Chatsworth for part of his school day and specified in the IEP his placement in general education for the remainder of his day. According to the District, a detailed description of the offered program and placement was provided to MOTHER and discussed at length at the IEP meeting. Substantively, the District contends that it offered STUDENT an individualized placement at Chatsworth, taking into account all of his needs and designed and offered a program that would meet his unique needs in the least restrictive environment.

### Procedural Allegations

The May 16, 2005 IEP states at the top of each page: "Worksheet - Not An Official Document." (Dist.'s Exh. 1.) District special education coordinator Patricia Dwyer attended the March 9, 2005 and May 16, 2005 IEP meetings and was responsible for documenting in writing a portion of the IEP using a computer program called Welligent, which is used by the District to manage IEP documents. According to Ms. Dwyer, the IEP states that it is a "Worksheet" because MOTHER had not signed and consented to the IEP. Ms. Dwyer explained that the Welligent

Copyright © 2014 LRP Publications

33

51

T - 063

computer program used by the District to generate IEP documents automatically places the "Worksheet" identification on the top of the document and will not remove the identification until the document is finalized, which only happens when the parent signs and consents to implementation of the IEP.

There was no evidence that the District's use of the Welligent computer program to develop the IEP document confused MOTHER or misled her in any way regarding the District's IEP offer. Additionally, MOTHER did not testify as to the impact, if any, that labeling the IEP pages as "Worksheet" had on her. Accordingly, the Hearing Officer finds that there was no procedural violation in labeling the IEP document pages with the word "Worksheet."

With respect to Student's claim regarding the lack of specificity of the SDC program offer, the evidence demonstrates that the District adequately specified its offer of the special day program. The IEP clearly states that the District offered to place STUDENT at Chatsworth in the special day program (SDP)[20] because he was reentering a comprehensive setting after being served in a restrictive home teaching setting. Specifically, the IEP states:

The SDP classes will have one teacher, and a minimum of one paraprofessional assistant/trainee, and have approximately 14-16 students. Specific to English instruction, STUDENT will benefit from the smaller learning environment the SDP offers, and will be instructed with standards-based grade level curriculum and materials. The team determined that no English/Written Language goal is necessary because, according to his current teacher, he is at grade level and is capable of accessing grade level curriculum in this subject. STUDENT needs direct special education service in the areas of Developing Reading Skills in the Content Areas, and Sciences. He will receive indirect support through co-planning between a general education and special education teacher in the Government/Economics courses.

Description of Program:

- SDP/English 12 and 12th grade English

Elective.

   - SDP/Biological Science.

   - Special Education Elective Course: Developing Reading Skills in Content Areas.

   - General Education Remedial Intervention Course: Essential Standards Mathematics (to support successful completion of the CAHSEE, due to previous attempt and failure).

   - General Education Economics and Government with co-planning support from special education teacher collaborating with general education teacher.

   - General Education Elective in area of Fine Arts or Technical Arts or both to meet high school diploma requirements.

Intervention: Committee recommends and offers that STUDENT participate in intervention programs offered at Chatsworth, such as before school or after school tutoring, Saturday School, CAHSEE prep, or any other type programs offered through Beyond the Bell at Chatsworth High School.

(Dist.'s Exh. 1, pg. 18.) The IEP document further explains STUDENT's extended school year (ESY) program offer for the 2005 ESY, including the focus of the ESY SDP, the number of students in the ESY SDP classes, duration and frequency of the classes, and the number of credits he could be expected to earn during the ESY. *(Id.* at pg. 19.)

The Hearing Officer finds that the May 2005 IEP very adequately provides a detailed description of the SDP offered and therefore provided MOTHER with sufficient information with which to make an informed decision as to her consent. The Hearing Officer therefore concludes that by making a specific offer of placement in writing, the District fulfilled the mandate to ensure the meaningful parental participation in the IEP process. *(Union v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526, *cert. denied* (1994), 115 S.Ct. 428; 20 U.S.C. § (b)(3).)

## Substantive Allegations

## What Were STUDENT's Needs?

At the time of the May 16, 2005 IEP meeting,

Copyright © 2014 LRP Publications

T - 064

the IEP team had received an update of STUDENT's performance levels and his progress on goals. When the IEP team first convened on March 9, 2005, STUDENT's home instruction teacher, Ms. Baskerville, reported that STUDENT had met all of his academic goals in math, reading, and written language, and that he had met his vocational education goal in the home program setting (e.g., he turned in all of his homework assignments). (Dist.'s Exh. 1, pg. 49, Exh. 75, Exh. 81.)[21] When the IEP team reconvened on May 16, 2005, Ms. Baskerville presented work samples of STUDENT's assignments in history and geometry and reported that STUDENT had difficulty in testing situations because he became agitated and did not perform well on tests. Ms. Baskerville also reported that STUDENT's writing skills were at the eleventh-grade level and that his math skills were at the ninth- to tenth-grade level. She recommended STUDENT be given frequent breaks and rewards for achievement and positive work habits. (Dist.'s Exh. 1, pg. 17.) Although Dr. Patterson had conducted a full psychoeducational assessment of STUDENT in December 2004, the assessment report was not made available to the IEP team at either the March or May 2005 IEP meetings.[22]

Ms. Baskerville reported that STUDENT was at grade level in reading and writing and the team determined STUDENT continued to have needs in the areas of math, social-emotional, vocational education, and motor abilities/adaptive physical education. According to behavioral specialist Debbie Smith, STUDENT's previous behavioral issues were no longer pertinent because STUDENT had been served through the home teaching program. The IEP team believed that at the time of the May 2005 IEP meeting, it was premature to assume that the previous behaviors would persist in a different educational environment. Accordingly, the IEP team decided that at the first progress reporting period after STUDENT's enrollment at Chatsworth, the case-carrying teacher would review his work habits and his cooperation grades, as well as any referrals to the counselor or the dean, to assist in determining the

need for a BSP. (Dist.'s Exh. 1, pg. 17.)

Ms. Smith testified that from an academic perspective only, STUDENT's achievement levels suggested he was an RSP student. However, the IEP team was concerned with STUDENT's overall needs and did not want to target just one need. According to Ms. Smith, there were other issues that had to be taken into consideration, such as STUDENT's social/emotional well being given his reentering school after being on home instruction for one year, making friends and establishing a peer group, integrating into the school program, getting to school on time, and getting up early. Ms. Smith testified that the team also considered the demands of a full schedule, and STUDENT's being able to keep up with the pace of the courses, take notes, and participate in a full-day curriculum, which STUDENT had previously had difficulty doing. Therefore, the District members of the IEP team believed that STUDENT required instruction in the smaller SDC classes for some of his academic courses so that he could work at his own pace and receive more individualized instruction.

The evidence demonstrated that STUDENT required a unique program that gave him as much access to general education peers as possible, while also providing him with substantial support, including immediate feedback, extended time to complete assignments, and frequent breaks. He required smaller classes where he would be better able to work on his goals and objectives at his own pace. He also required counseling services to assist him with identifying his strengths, positive coping skills, and appropriate expressions of his feelings.

In light of the above-referenced unique needs, the Hearing Officer next determines whether the May 16, 2005 IEP offer was designed to meet STUDENT's needs at the time the offer was made.

## Designed to Meet STUDENT's Unique Needs?

Student maintains that the May 16, 2005 IEP failed to include appropriate goals and objectives to address his needs, failed to offer APE services, and

failed to offer placement in the LRE. Student contends that he should have been placed in a general education classroom with resource support for math and English.

The District argues that it properly designed goals to address his areas of need, and determined the LRE would be a combination of special day program classes, general education classes with special education teacher support, a remedial general education class for math, and a general education elective class.

The May 2005 IEP contains a new math goal designed to address STUDENT's skills in geometry. The social-emotional and vocational education goals and related objectives were carried over from the previous IEP, as they had not yet been met. According to reports from Ms. Baskerville, she was unable to track implementation of STUDENT's coping skills and his success with the social-emotional goal because he was not in a school setting. Moreover, his behavior goal could not be addressed because he was not in a school setting. (Dist.'s Exh. 75.) Therefore, there was no behavior goal or BSP included in the May 2005 IEP.

The Hearing Officer was persuaded by Debbie Smith's testimony that a BSP was not necessary at the time of the May 2005 IEP. According to Ms. Smith, STUDENT's behaviors were no longer pertinent, and until STUDENT was in school where he could be observed to see if other behaviors resurfaced, the IEP team would have been writing a BSP "out of thin air." It would have been premature to assume those behaviors would persist in a different educational setting. (Dist.'s Exh. 1, pg. 17.) Ms. Smith stated that the IEP team did acknowledge STUDENT's prior behavioral issues. However, based on Ms. Keyser and Ms. Baskerville's indication that STUDENT had matured and was a "different student," Ms. Smith believed that the IEP team needed to first observe his actions in a school setting.

Dr. Patterson testified that based on his December 2004 testing, STUDENT had needs in the area of written language, thus suggesting that his IEP

should have included a goal to address this need. Dr. Patterson administered the written expression test from the Peabody Achievement Test-Revised (PIAT-R) to assess STUDENT's writing skills and reported that STUDENT performed with a standard score of 75, at the fifth percentile for students his age. Dr. Patterson testified that STUDENT's writing abilities could be greater than what was shown on the PIAT-R because he has testing anxiety, which could have affected his performance on the test. Dr. Patterson's test results were not made available to the IEP team until late May 2005, after the May 16, 2005 IEP meeting.

Ms. Baskerville reported that STUDENT had met his written language goal, which reasonably indicated to the May 16, 2005 IEP team that STUDENT did not need a written language goal in his IEP. To further complicate matters, there was seriously conflicting testimony presented at hearing regarding the legitimacy of the writing work samples produced in evidence.

MOTHER testified at hearing that she was compelled by Ms. Baskerville to forge STUDENT's writing samples and help him prepare work samples to present to the IEP team. Ms. Baskerville was not recalled to testify in rebuttal to these statements. Thus, the Hearing Officer is left with unclear and unusual testimony regarding the mother's actions in allegedly forging documents and not revealing this information to anyone until the issue was raised at hearing.[23] Given Dr. Patterson's belief that STUDENT's testing anxiety may have negatively affected his performance on the writing assessment and the irregularity and unreliability of the writing samples produced at hearing, the Hearing Officer finds that STUDENT's written language skills should be further assessed to determine whether he has needs in this area that should be addressed in his IEP.[24] However, the evidence demonstrates that based on the information available to the IEP team on May 16, 2005, STUDENT did not require a written language goal in his IEP.

In light of the above, the Hearing Officer finds

that the May 16, 2005 IEP included goals and objectives that were designed to address STUDENT's identified areas of needs.

Student argued that the District dropped APE services from his May 16, 2005 IEP when, in fact, he had a need for these services given his doctor's excuse from physical education classes. The evidence indicates that STUDENT's ability to participate in APE is also an area of some ambiguity. On March 22, 2005, Dr. Hugh Carmichael wrote a certification of medical impairment for STUDENT indicating STUDENT could participate in sports with restrictions "to be determined by [STUDENT's] ability to participate." (Stud.'s Exh. 73.) Thereafter, on June 23, 2005, Dr. Carmichael wrote that STUDENT should have "no PE for [the] school year." (Dist.'s Exh. 78.) When asked for further clarification about STUDENT's ability to participate in APE, Dr. Carmichael responded by letter dated July 5, 2005, that STUDENT "may be evaluated for adaptive PE, and if he qualifies, he may attend." (Dist.'s Exh. 94.)

There was no evidence that the District was provided a copy of the March 2005 medical impairment restriction certification from STUDENT's medical doctor, either at the May 2005 IEP meeting or any time prior to the meeting. (Stud.'s Exh. 73.) This document would have provided the District with clarification of STUDENT's ability to participate in APE and would have cleared his existing physical education exemption. (Dist.'s Exh. 64.) Because Student provided no proof of his supplying the District with this medical clearance information, other than through Student's exhibit packet in this matter, the Hearing Officer concludes that the District was not in a position to offer STUDENT APE services at the time of the March or May 2005 IEP meetings.

Turning next to the District's placement offer, the Hearing Officer noted above that the District offered to place STUDENT at Chatsworth, a comprehensive high school campus. Specifically, the District designed the following individualized program for STUDENT's transition back to a comprehensive high school campus: (1) special day

program classes for English composition writing program, English elective (i.e., literature, etc.), and biological science, where he could work on the general curriculum in a small class with a special education teacher and assistant trained in meeting the needs of a student with ADHD and/or learning disabilities and with greater opportunity to work at his own pace;[25] (2) a special education elective course called Developing Reading Skills in Content Areas, which is designed to improve reading skills in all classes for comprehension of content materials; (3) a general education remedial intervention course entitled Essential Standards Mathematics, to support STUDENT's successful completion of the California High School Exit Exam (CAHSEE), which he had previously failed; (4) general education economics and government with co-planning support from the special education teacher collaborating with the general education teacher, which ensures the content teacher can fully implement STUDENT's accommodations; and (5) a general education elective in the area of fine arts or technical arts or both, to meet the high school diploma requirements. (Dist.'s Exh. 1, pg. 18; testimony of D. Smith.)

The District also recommended and offered intervention programs such as before-and-after-school tutoring, Saturday School, CAHSEE preparation course, and other programs offered through Chatsworth's "Beyond the Bell" program. Counseling services were offered at the rate of one session each week for thirty minutes; extended school year (ESY) services were offered and would begin at the 2004-2005 ESY and would address credit recovery to make up for STUDENT's credit deficits. STUDENT's ESY program would have been provided by a special education teacher and supported by a paraprofessional teaching assistant/trainee, and the class would have had no more than twenty students enrolled. ESY would have taken place at Chatsworth, five days a week, 4.5 hours per day, for six weeks, beginning July 6, 2005, through August 16, 2005, and STUDENT could have earned up to ten credits through the ESY program. Accommodations for

Copyright © 2014 LRP Publications

STUDENT's participation in state-standardized testing included frequent breaks, extended time, and a small-group testing environment. No AT services were offered and the committee requested an update of STUDENT's continued need for exemption from physical education. (Dist.'s Exh. 1, pg. 19; testimony of D. Smith.)

Dr. Patterson testified that STUDENT desired to be on a high school campus, and according to Dr. Patterson, with the proper supports, STUDENT could be successful attending a high school campus. Dr. Patterson opined that STUDENT's placement in an SDC for the full day would not be appropriate because STUDENT would not attend. Dr. Patterson did believe, however, that it would be appropriate to place STUDENT in an SDC just for math and written language and then mainstream him for all other subjects. The evidence indicates that the program offered by the District embraced the concept espoused by Dr. Patterson, that STUDENT did not need to be in an SDC for a full day. The District's offered program would have provided STUDENT the specialized instruction in certain academic subjects, as well as access to the general education peer population.

The Hearing Officer found persuasive Ms. Smith's testimony about how the District's individually designed program and placement would have provided STUDENT access to a school campus with the amount of support he required. Ms. Smith testified that given STUDENT's ADHD and other needs, it would be difficult for him to transition directly into regular education classes, which typically have 35 to 40 students with no room assistant. Although Ms. Smith, Ms. Keyser, and Ms. Baskerville all believed STUDENT had the ability to do the academic work on a comprehensive high school campus, there was a concern that he needed a more gradual integration into the general education classes to ensure his success. Ms. Smith testified that STUDENT's math goal could be addressed in either the learning center class or the math essential standards class. His social-emotional goal would be addressed by the school counselor during his weekly

session, and his vocational education goal would be worked on in all of his classes since he would be allowed extended time to complete his assignments.

School psychologist Margie Keyser agreed with the IEP team's concern with STUDENT going from being around no peers, having no diversity of teachers, and being instructed individually to a full day program on a comprehensive high school campus. Ms. Keyser believed that the District offered STUDENT the best of all opportunities because he had three "worlds of opportunity" by having a schedule that included general education, special day program classes, and RSP collaborative classes. According to Ms. Keyser, the May 2005 IEP would have provided STUDENT a supportive environment and DIS counseling so that he felt as though someone was in "his corner."

The evidence establishes that appropriate goals and objectives were drafted to address STUDENT's specific needs. Additionally, interventions in tutoring, CAHSEE preparation, counseling, and instructional accommodations would be carried out each day in the special day program, the general education program, and through related services instruction. The Hearing Officer concludes that the District took into account all of STUDENT's identified needs and the resulting program, services, and placement proposed in the May 16, 2005 IEP were appropriate to address STUDENT's unique needs.

## Reasonably Calculated to Provide STUDENT with some Educational Benefit?

The District's offered program was individualized to address STUDENT's academic, social-emotional, and ADHD-related needs. Placement at Chatsworth with a program consisting of a combination of special day program classes, general education classes with special education teacher support, a remedial general education math class, and a general elective class would have allowed STUDENT to receive the additional support he required for some of his academic courses, give him

Copyright © 2014 LRP Publications

access to typically developing peers, and receive academic supports that would enable him to make educational progress. Given there were legitimate concerns about STUDENT's overall needs since he had been in home instruction for one year and had not passed the CAHSEE, the Hearing Officer finds that the proposed placement, program, and services would have assisted STUDENT in adjusting to the demands of a full-day schedule, keeping up with the homework, and successfully transitioning back to a comprehensive high school campus.

The Hearing Officer therefore concludes that the May 16, 2005 IEP was reasonably calculated to provide STUDENT with some educational benefit.

## Comported with His IEP?

Although the proposed May 16, 2005 IEP was not implemented, there was no indication that the offered program and services could not be implemented on the placement starting date indicated.

## Least Restrictive Environment?

Student argues that the least restrictive environment for him was and is placement in all general education classes with RSP support and tutoring. However, the evidence does not support Student's contention in this regard.

According to the testimony of Ms. Smith, the special day program classes at Chatsworth have approximately 14 to 16 students, a special education teacher, and a minimum of one full-time paraprofessional. (See also Dist.'s Exh. 1, pg. 18.) In contrast, the general education classes at Chatsworth have between 35 and 40 students. The evidence indicated that STUDENT's ADHD makes it difficult to place him in all general education classes and the RSP would not have supported his needs since it was changing in September 2005 to a collaborative model with no "pull-out services." Since STUDENT was transitioning from the most restrictive setting of a home program to the least restrictive setting of a comprehensive high school campus, the IEP team was correct in concluding that STUDENT would have difficulty fully integrating into all general education

courses with RSP support.

The District showed that STUDENT's placement at Chatsworth, with the combination of special day program and various general education classes, would have provided him with the support he required and with various opportunities to be around typically developing and lesser-disabled peers who could provide age-appropriate language, social, and learning behaviors. In light of all the above, the Hearing Officer concludes that the District's offer to place STUDENT at Chatsworth with the program and class schedule proposed in the May 16, 2005 IEP was the LRE.

## Conclusion

In sum, the Hearing Officer concludes that the District offered STUDENT a FAPE in the LRE in the May 16, 2005 IEP.

V. If the District denied STUDENT a FAPE from September 2001 to the date of hearing, is he entitled to compensatory education?

The Hearing Officer determined above that the District improperly failed to assess STUDENT's APE needs during the 2001-2002, 2002-2003, and 2003-2004 school years up to May 11, 2004. The Hearing Officer also found that the District improperly failed to assess STUDENT's AT needs from November 19, 2003, to the present. The District substantially failed to provide STUDENT a FAPE from the end of the 2002-2003 fall semester to the end of the 2002-2003 school year, particularly with respect to his math and written language needs. Additionally, the District procedurally failed to offer and/or provide STUDENT a FAPE with respect to the November 19, 2003, March 24, 2004, and April 19, 2004 IEPs. In sum, the District failed to assess STUDENT's APE needs for almost three years, and failed to assess his AT needs for approximately two years. Additionally, the District denied STUDENT a FAPE for approximately two school years, until it made an appropriate offer in the IEP dated June 15, 2004.

In light of these determinations, the Hearing

57

T - 069

Officer considers whether compensatory education is warranted. As a remedy for being denied a FAPE, Petitioner requests that the District be ordered to provide him compensatory education consisting of (1) 800 hours of educational therapy services in math and an unspecified amount of educational therapy to address his written expression needs and to help him pass the California High School Exit Exam (CAHSEE); (2) calculation operations/flash cards; (3) at least 150 hours of private psychological counseling services; (4) a consistent and well formulated program to develop social skills; (5) an independent assistive technology assessment; (6) specific accommodations in the classroom to address his inattention, impulsivity, distractibility, and other symptoms of ADHD; (7) a computer with printer to be used at school and home; (8) an independent assessment by a developmental optometrist to determine his need for vision therapy; and (9) one hour per week of ongoing mental health counseling for the current school year.[26]

The District argues that STUDENT should not be awarded any compensatory education because he presented no evidence of any loss of educational opportunity as a result of an alleged denial of a FAPE by the District.

Compensatory education is an equitable remedy that may be available when the school district has failed to provide the student with appropriate, special education services. *(Student W. v. Puyallup School District,* (9th Cir. 1994) 31 F.3d 1489, 1496; *see also S.V. v. Sherwood School District,* 75 F.Supp.2d 1153, 1157 (D. Oregon, 1999).) Compensatory education does not require day-for-day or session-for-session replacement for opportunity lost or time missed. Its purpose is to "ensure that the student is appropriately educated within the meaning of the IDEA." *(Puyallup School District, supra,* 31 F.3d at 1497.)

Student presented evidence that he needs compensatory educational therapy to help overcome lost academic instruction. As previously discussed, Dr. Robert Patterson conducted a psychoeducational evaluation of STUDENT in December 2004 and produced his final assessment results in writing in March 2005. Based on the results of his assessment, Dr. Patterson concluded that STUDENT had a significant discrepancy between his ability and achievement in the area of applied mathematics, calculations (completion of basic operations), and in written expression. With respect to STUDENT's difficulties with understanding and carrying out straightforward mathematic calculations, Dr. Patterson recommended, and Student therefore requests, that he receive educational therapy to bring him up to a level where he will be able to pass the CAHSEE. According to Dr. Patterson, STUDENT would not be able to pass the CAHSEE because of the "paucity of information that he has in the area of mathematics." (Dist.'s Exh. 16, pg. 253.)

Dr. Patterson testified, however, that he did not know how much educational therapy STUDENT needs. He therefore believed that STUDENT should receive an algebra assessment to determine his knowledge in all areas of algebra and that based on those results, the amount of necessary educational therapy could be determined. In the area of written expression, Dr. Patterson noted that STUDENT's actual writing skills had never been tested.

The District contends that it offered several alternatives to Student's request for 800 hours of educational therapy services. The District's May 16, 2005 IEP offer included compensatory educational therapy in the form of before- and after-school tutoring, Saturday School, CAHSEE preparation courses, and extended school year services through the special day program. (Dist.'s Exh. 1, pgs. 18-19.) Moreover, the District recommended that STUDENT enroll in a general education remedial intervention course in mathematics, which is designed to prepare students to take and pass the CAHSEE. With respect to written expression, it was recommended that STUDENT be placed in the special day program classes for English 12 and his twelfth grade English elective course. According to the District's May 2005 IEP offer, in the special day program classes, STUDENT would receive standards-based curriculum

Copyright © 2014 LRP Publications

40

T - 070

with accommodations to include extended time for assignment with work in progress; extended time for tests; frequent breaks in routine; preferential seating near the point of instruction; use of graphic organizers and outlines; shortened assignments when appropriate; teacher review of student assignment notes for accuracy; use of a calculator during instructional time; access to a word processor for written assignments; use of graph paper for math assignments; positive role modes; short, clear instructions provided in writing; provision of longer response time; and the teacher checking for his understanding of academic content. (Dist.'s Exh. 1, pg. 10.)

The Hearing Officer finds that the evidence did not support Student's contention that he requires 800 hours of educational therapy in math and written language to compensate him for the educational opportunity that he lost in the areas of math and written language. However, the evidence does support an award of some educational therapy given the loss of educational opportunity STUDENT experienced during the 2002-2003 and 2003-2004 school years. During the 2002-2003 school year, STUDENT's academic grades in algebra and English continued to drop substantially from the previous school year and in spite of this dramatic decline in his performance, the District failed to modify his educational program. (Dist.'s Exh. 68, pgs. 391-392.)

Although the District offered STUDENT compensation in the form of extra tutoring, summer school, classroom supports and interventions in the May 16, 2005 IEP, the Hearing Officer finds that the District's offer/recommendation "that STUDENT participate in intervention programs offered at Chatsworth, such as before school or after school tutoring, Saturday School, CAHSEE prep, or any other type programs offered through Beyond the Bell at Chatsworth High School" was not written specific enough to ensure that the areas in which STUDENT experienced educational loss would be adequately compensated.

Ms. Smith gave credible testimony about how

STUDENT could receive assistance in his areas of weakness through Chatsworth's before- and after-school intervention programs and his enrollment in the remedial math class and special day program English classes. Therefore, the Hearing Officer finds that appropriate compensatory services may be provided by the District. However, the District is required to specify in STUDENT's IEP exactly what District and/or school intervention programs will comprise STUDENT's compensatory program for math and written language and also to state the duration and frequency of those year-long services. The specifics of STUDENT's compensatory services shall be determined by the IEP team after the District's assessment of STUDENT's math and written language skills.

Additionally, given there has been no recent standardized assessment of STUDENT's actual writing skills beyond testing his spelling abilities, the fact that Dr. Patterson's assessment was conducted almost one year prior to the date of this Decision and the written language results were believed to be a possible underestimate of STUDENT's writing abilities, and given the questions as to the authenticity of the writing samples and other work samples produced in evidence at this hearing, the Hearing Officer orders the District to conduct a current assessment of STUDENT's written language skills to determine his current levels of performance. Assessment of STUDENT's written language skills must include a review and analysis of actual writing samples produced by STUDENT. In addition, based on Dr. Patterson's assessment results indicating that STUDENT had difficulties in the areas of applied mathematics and calculations (basic operations) and that the level of his algebraic skills were unknown, the Hearing Officer orders the District to assess STUDENT's math skills (including algebra).

After the assessments are completed, the District shall convene an IEP team meeting to review and discuss the assessment results and make determinations regarding any modifications necessary to STUDENT's IEP. The IEP team shall also

Copyright © 2014 LRP Publications

T - 071

**SpecialEdConnection® Case Report**

determine how to provide STUDENT the school year-long compensatory education services in math and written language and must take into consideration the fact that simultaneously with the delivery of the FAPE, the school may also be implementing the supplemental services provided through its various intervention programs at Chatsworth.

Student also requests that he be provided calculation operations/flash cards. However, there was no evidence that STUDENT's math skills are so low that the need arising from the District's denial of a FAPE can be specifically compensated by use of these calculation/flash cards. The primary responsibility for choosing the educational methodology and strategies most suitable to STUDENT's needs is left to the District. *(See Lachman v. Illinois State Board of Education* (7th Cir.) 852 F.2d 290.) Moreover, the Hearing Officer finds appropriate the District's offer to provide STUDENT with intensive math instruction through placement in a remedial math class specifically designed to help students learn skills to pass the CAHSEE. Any other determinations regarding specific methodologies or strategies to be utilized with STUDENT will be more properly made after STUDENT's math assessment and a review and consideration of those assessment results by the IEP team.

The Hearing Officer next addresses Student's request that the District be ordered to provide him 150 hours of private psychological counseling services to be utilized over the next three years to replace the educational opportunity he lost during the 2002-2003 and 2003-2004 school years. Dr. Patterson testified that he did not know if there was a compensatory strategy for psychological therapy services and did not know the amount of therapy STUDENT had received in the past. According to Dr. Patterson, STUDENT did not necessarily require services through a private psychologist, but needed therapy provided by someone who has a marriage and family therapist license and who could work with STUDENT on issues of trauma and provide conjoint therapy with

his mother. Dr. Patterson believed STUDENT needed help with developing an understanding of rules in the real world and needed practice at role-playing. Dr. Patterson also stated that an appropriately trained behaviorist could provide these recommended services.

There was no finding by this Hearing Officer that the District's denial of a FAPE related to STUDENT's loss of educational opportunity with respect to psychological services. Moreover, the Hearing Officer is not persuaded that STUDENT requires any psychological counseling services beyond the weekly DIS counseling services offered by the District in the May 2005 IEP in order to compensate him for the District's failure to provide him with appropriate behavioral supports pursuant to the November 19, 2003 IEP. Moreover the parties agreed at the beginning of the hearing that the District would refer STUDENT to Community Mental Health for a mental health assessment of any symptoms of anxiety and depression. The Hearing Officer denies Student's request for compensatory psychological services.

Regarding Student's request that the District be ordered to develop a social skills program, Dr. Patterson opined that STUDENT has limited social skills and requires intensive social skills training. Ms. Keyser, however, who spent time testing and providing counseling services to STUDENT, gave convincing testimony of how STUDENT's placement on a school campus would help him develop better social skills. Ms. Keyser disagreed with Dr. Patterson's recommendation that STUDENT needed a program to develop his social skills, stating that she measured and evaluated STUDENT's adaptive behavior skills and found STUDENT to be very well spoken and knowledgeable about social greetings and interaction skills. She stated that STUDENT would open the door for her and wait for her to enter, he would wait for her to sit down first, and he had a car and was driving at that time. Ms. Keyser also testified that she provided adaptive behavior interventions to STUDENT in 2003 and found the results of her

Copyright © 2014 LRP Publications

T - 072

assessment and recommended interventions to be in stark contrast to what Dr. Patterson reported.

According to Ms. Keyser, she did not observe STUDENT's adaptive skills to be as low as MOTHER had reported them to be.[27] Specifically regarding social skills, Ms. Keyser persuasively testified that STUDENT's placement on a school campus, as opposed to being placed in home instruction, would help him to develop social skills and appropriate peer relationships. The Hearing Officer is not convinced that intensive social skills training would compensate STUDENT for the District's failure to address his prior need for behavioral supports as there is no showing that STUDENT currently has social skills deficits that resulted from the denial of a FAPE. The evidence indicates that any social skills needs that may have arisen from the District's denial of a FAPE can be adequately compensated for by the DIS counseling services and the public school placement offered in the May 16, 2005 IEP. There was no evidence presented to the contrary. Therefore, the Hearing Officer denies Student's request regarding social skills training.

Student also requests an independent assistive technology assessment as compensatory education. The Hearing Officer found above that the District has failed to assess STUDENT's AT needs since November 19, 2003, and therefore, an AT assessment is warranted. However, there was no persuasive evidence that the AT assessment should be conducted by an independent assessor. The Hearing Officer therefore grants Student's request for an AT assessment; however, the District may use qualified District personnel to conduct the assessment.

Student's request for specific accommodations in the classroom to address his inattention, impulsivity, distractibility, and other symptoms of ADHD were in fact already offered in the May 2005 IEP. Ms. Keyser persuasively testified that the characteristics of ADHD, such as impulsiveness, exhibited by STUDENT were addressed by the instructional accommodations and interventions offered in the IEP by the District, including extended time on assignments, preferential seating to help him stay focused, repeating instructions to ensure his understanding, and allowing him to take frequent breaks. (Dist.'s Exh. 1, pg. 10.) Because these needs have already been addressed in the offered IEP, the Hearing Officer denies Student's request for other unspecified classroom accommodations as compensatory education.

Student requests that the District be ordered to provide him with a computer and printer to be used at school and home. Student made no showing, however, that he requires a computer both at home and at school as compensatory education. Regarding access to a computer at school, the May 2005 IEP indicates that STUDENT would have access to a word processor for his written assignments. (Dist.'s Exh. 1, pg. 10.) Additionally, because the District has failed to conduct an AT assessment since November 2003, the Hearing Officer has ordered the District to assess STUDENT's AT needs. Further, as discussed in detail below, the Hearing Officer has awarded the parent reimbursement for the computer and related products that she purchased for STUDENT and that he has been using at home to complete his school work. Thus, no additional remedy is warranted in light of the reimbursement award below.

Student requests an independent vision therapy assessment. The Hearing Officer is not persuaded by Dr. Patterson's testimony and recommendations that STUDENT requires screening by an independent developmental optometrist because of his difficulties with visual scanning and his slow processing speed score on the Visual Matching Test. Dr. Gonzalez persuasively testified that STUDENT has demonstrated very good vision scanning by his ability to play computer games and has won a tournament, which contradicts the notion that he has visual scanning deficits. In addition, his IEP states that he is more of a visual learner. Thus, in real life application, STUDENT does not appear to have a visual scanning deficit. Dr. Gonzalez also stated that there is little evidence that remediation of a student's vision scanning will improve his academic performance.

T - 073

According to Dr. Gonzalez, the education psychology field has moved into the practice of seeking to improve a student's academic deficits first.

Additionally, the Hearing Officer made no finding that the District failed to conduct a vision therapy assessment. Student's request for a vision therapy assessment is therefore denied. Should MOTHER continue to believe that a vision therapy assessment is warranted, she has the right to make that request in writing to the District or at an IEP team meeting.

Lastly, Student requests one hour per week of ongoing mental health counseling. The parties have already agreed to refer STUDENT for a Community Mental Health assessment. Moreover, there was no finding that the District denied STUDENT a FAPE with respect to any mental health needs. Thus, the Hearing Officer has no basis on which to make a determination of his need for mental health counseling as compensatory education. Additionally, DIS counseling services have been offered to STUDENT in the May 2005 IEP. Student's request for ongoing mental health counseling as compensatory education is therefore denied. The parties are otherwise encouraged to follow through with their agreement to refer STUDENT for a Community Mental Health assessment to determine his mental health needs.

VI. If the District denied STUDENT a FAPE, is his parent entitled to reimbursement for educational and sports-related services and merchandise she obtained for STUDENT?

Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when the school district has failed to provide a FAPE and the private placement or services are determined to be proper under IDEA and are reasonably calculated to provide educational benefit to the child. *(School Committee of the Town of Burlington v. Dept. of Education* (1985) 471 U.S. 359; *Student W. v. Puyallup School District* (9th Cir. 1994) 31 F.3d 1489, 1496.) Parents need not provide the exact proper placement or services required under

IDEA, but rather must only provide a placement or services that address the student's needs and provide the student with educational benefit. *(Florence County School District Four v. Carter* (1993) 510 U.S. 7, 13, 114 S.Ct. 361; *Alamo Heights Independent School District v. State Board of Education* (5th Cir. 1986) 790 F.2d 1153, 1161.)

MOTHER testified that she purchased a computer and various computer products for STUDENT to use in completing his schoolwork because the assistive technology devise previously provided by the District had malfunctioned and was never replaced. MOTHER testified and submitted documentation indicating she purchased a used computer hard drive ($486.00), a used monitor ($175.00), and a headset for the computer ($108.24). She also stated that she purchased a Windows 98 installation disc and paid for the set up ($30.00), and since they did not have a printer, they went to a computer internet cafe each day to print STUDENT's work ($162.00). (See Stud.'s Exhs. 522-527.) The District did not dispute the authenticity of any of the submitted proofs of purchase.

The Hearing Officer found above that the District failed to assess and address STUDENT's AT needs from November 19, 2003, to the present. Additionally, there was sufficient testimony that STUDENT used the computer and related products that his mother purchased to perform his school assignments. (Testimonies of MOTHER, STUDENT, and L. Baskerville.) Student has established that his use of the computer and related computer products provided some benefit to him and his educational program. For instance, Ms. Baskerville testified at hearing and reported at the March 2005 IEP meeting that when STUDENT used the computer for school assignments, it was easier for him to complete his work, his work was neater, and he spent more time on his written work and had more interest in it. (Stud.'s Exh. 2, pg. 22.) Additionally, there was evidence that, previously, STUDENT was provided an Alpha Smart Pro electronic keyboard and was thus previously eligible for similar assistive technology. (Dist.'s Exh.

Copyright © 2014 LRP Publications

44

T - 074

8, pgs. 192 and 194.) In light of the above, Student has established that he is entitled to reimbursement for the above-referenced computer and related computer products purchased by his parent.

MOTHER also testified that she purchased and/or rented various sporting equipment after STUDENT's home instruction teacher, Ms. Baskerville, suggested that STUDENT participate in different sports activities for socialization with other peers his age. MOTHER testified that she purchased a scooter, with a light and break kit so STUDENT could practice coordination in his legs ($144.25), a basketball ($39.99), hand weights ($39.99), shoes for exercising ($75.76), a hockey stick and mask ($77.50), a football ($43.28), shoe skates ($37.90), safety goggles for hockey ($16.35), hockey gloves ($21.64), ice hockey skates ($198.60), snow board bindings ($110.77), and rented snow boots ($19.74). (See Stud.'s Exhs. 531-542.)

Although the Hearing Officer found above that District failed to assess STUDENT's APE needs until May 11, 2004, Student has not shown a nexus between the items purchased and/or rented and any of his identified educational needs. Moreover, all of the sports items were purchased after the District's May 11, 2004 APE assessment. In addition, Ms. Baskerville testified that she did not suggest to STUDENT or MOTHER that MOTHER purchase any sports equipment for STUDENT or that STUDENT participate in any sports activities. Ms. Baskerville stated that she may have talked to MOTHER generally about STUDENT participating in different sports activities, but she was not recommending that he do them because she is not an expert in making those kinds of recommendations and it is not her job to do so.

Student did not establish that he required this specific sporting equipment or participation in any particular sports activities to meet his unique needs or to benefit from his educational program. Therefore, Petitioner has not established that he is entitled to reimbursement for the above-referenced sports equipment and activity fees. Student's request for reimbursement of the costs for the sporting equipment and activity fees is therefore denied.

VII. In order to be provided a FAPE for the 2005-2006 school year, does STUDENT require a program that includes placement in a general education classroom at Chatsworth High School, with pull-out resource specialist program (RSP) support in math and English and other specified services?

Student argues that, prospectively, he should be placed in a general education classroom at Chatsworth High School with pull-out RSP support in math and English. He also contends that the compensatory education services that he has requested (discussed above) be made a part of his educational program for the 2005-2006 school year.

The Hearing Officer already found above that the District's offer contained in the May 16, 2005 IEP was appropriately designed to meet STUDENT's unique needs and reasonably calculated to provide him educational benefit. The evidence indicates that the District continued to offer the program outlined in the May 16, 2005 IEP for the "remainder of the 2004-2005 school year, ESY for 2005, and through March 16, 2006." (See Dist.'s Exh. 1, pg. 18) Since there was no evidence of any substantial change in STUDENT's needs as of the completion of the hearing in this matter (July 2005) and since the evidence indicated that the District stood willing and ready to implement the offered program at Chatsworth at the beginning of the 2005-2006 school year, the Hearing Officer draws the same conclusion about the May 16, 2005 IEP as she did above and finds it was an offer of FAPE for the beginning of the 2005-2006 school year.

The Hearing Officer also concludes that the compensatory education services awarded above shall be made a part of STUDENT's IEP. As stated above, the IEP team shall meet to determine how best to incorporate the compensatory services into STUDENT's educational program.

Notwithstanding this finding of appropriateness of the May 2005 IEP for the beginning of the

---

Copyright © 2014 LRP Publications

2005-2006 school year, the Hearing Officer notes that she has ordered that STUDENT be assessed in the areas of math, written language, and assistive technology. Thereafter, the District is ordered to convene an IEP team meeting to review and discuss the assessment results and then determine whether the program, placement, and services offered in the IEP dated May 16, 2005, continue to be appropriate to meet STUDENT's needs and provide him with some educational benefit.

## Order

1. Within 30 calendar days of the date of this Decision, the District shall reimburse Student's parent for the costs of the computer and various computer products identified in Student's Exhibits 522 through 527.

2. Within 15 calendar days from the date of this Decision, the IEP team shall meet to develop an assessment plan for the purpose of assessing STUDENT's math and written language skills and his assistive technology needs. Qualified District personnel may conduct the assistive technology assessment.

3. Within 30 calendar days after assessing STUDENT's math and written language skills and his assistive technology needs, the IEP team shall meet and do the following:

(a) review and discuss the assessment results and make determinations regarding any modifications necessary to STUDENT's IEP,

(b) consider and address STUDENT's need for APE services, and

(c) specify, in writing, how the District intends to provide the school year-long compensatory education services in math and written language.

4. All of Student's remaining claims for relief are denied.

## Prevailing Party on Each Issue

Pursuant to California Education Code § 56507(d), the hearing decision must indicate the extent to which each party prevailed on each issue

heard and decided. The following findings are made in accordance with this requirement.

I. During the 2001-2002 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments, and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

Student prevailed on issue I.A. with respect to assessing his APE needs, and the District prevailed on issue I.B.

II. During the 2002-2003 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments, and

B. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

Student prevailed on issue II.A. with respect to assessing his APE needs, and prevailed on issue II.B in that he was denied a FAPE from the end of the 2002-2003 fall semester to the end of the 2002-2003 school year.

III. During the 2003-2004 school year, did the District

A. fail to conduct psychoeducational, adaptive physical education, and assistive technology assessments,

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment and specific learning disability, and

Copyright © 2014 LRP Publications

T - 076

C. procedurally and substantively deny STUDENT a free appropriate public education (FAPE) in the least restrictive environment with respect to its offers in the individualized educational programs (IEPs) dated November 19, 2003, March 24, 2004, April 19, 2004, May 24, 2004, and June 15, 2004?

Student prevailed on issue III.A. with respect to assessing his APE and AT needs. The District prevailed on issue III.B. Student prevailed on issue III.C. with respect to the IEPs dated November 19, 2003, March 24, 2004, and April 19, 2004. The District prevailed with respect to the June 15, 2004IEP, except to the limited extent that it failed to clearly specify that the April 19, 2004 BSP was intended to be included in the June 2004 IEP.

IV. During the 2004-2005 school year, did the District

A. fail to conduct psychoeducational and assistive technology assessments,

B. fail to identify STUDENT as eligible for special education services dually under the categories of other health impairment and specific learning disability, and

C. deny STUDENT a free appropriate public education (FAPE) by failing to offer or provide a program that was designed to meet his needs, reasonably calculated to provide educational benefit, conformed to his IEP, and that was in the least restrictive environment?

Student prevailed on issue IV.A. with respect to assessing his AT needs. The District prevailed on issues IV.B and C.

V. If the District denied STUDENT a FAPE from September 2001 to the date of hearing, is he entitled to compensatory education?

The District and Student both partially prevailed on this issue with respect to educational therapy in that Student was not awarded his specific compensatory education requests, but was awarded educational therapy in the areas of math and written language for an entire school year.

The District prevailed with respect to the request for compensatory education in the form of calculation operations/flash cards, psychological counseling services, social skills training, specific accommodations in the classroom to address his inattention, impulsivity, distractibility, and other symptoms of ADHD, a computer and printer, an independent vision therapy assessment, and ongoing mental health counseling.

VI. If the District denied STUDENT a FAPE, is his parent entitled to reimbursement for educational and sports-related services and merchandise she obtained for STUDENT?

Student partially prevailed on this issue in that his parent was awarded reimbursement for the computer and related computer products purchased. The District partially prevailed on this issue with respect to the request for reimbursement of costs for various sporting equipment.

VII. In order to be provided a FAPE for the 2005-2006 school year, does STUDENT require a program that includes placement in a general education classroom at Chatsworth High School, with pull-out resource specialist program (RSP) support in math and English and other specified services?

The District prevailed on this issue.

[1]The issues listed here differ in numbering and wording from those noticed by the District and Student before the hearing. Some issues were dismissed after discussions with the parties on the first day of the hearing and other changes were made for purposes of clarification or for appropriate analysis. At the beginning of the hearing, the District indicated that although it initially sought a determination as to whether it offered STUDENT a free appropriate public education (FAPE) for the 2003-2004 and 2004-2005 school years, it was withdrawing its issues with respect to the 2003-2004 school year. Student, however, indicated that he continued to have issues related to the 2003-2004 school year and those issues were further clarified by Student at hearing.

Copyright © 2014 LRP Publications

T - 077

[2]But see the discussion of issue III.C. below, where the Hearing Officer addresses the acknowledgement made by the District during a manifestation determination IEP meeting that the November 19, 2003 IEP was not appropriate because it failed to address STUDENT's behavior, impulsivity, assistive technology, and APE needs.

[3]STUDENT takes several asthma medications daily. In 1998, Dr. Linda Feinfeld evaluated and diagnosed STUDENT with ADHD and prescribed Dexedrine. This medication was discontinued in November 2003.

[4]The District was not provided a copy of the Dr. Patterson's report until May 28, 2005.

[5]According to Ms. Rutalj, the KTEA is a standardized, normed academic performance test. The test covers five areas of academic achievement including math application, math computation, reading decoding, reading comprehension, and spelling.

[6]"Special education" is defined as specially designed instruction, at no cost to parents, to meet the unique needs of the student. (20 U.S.C. § 1401(25).) The term "related services" includes transportation and other developmental, corrective, and supportive services as may be required to assist a child to benefit from special education. (20 U.S.C. § 1401(22).) California Education Code section 56363(a) similarly provides that designated instruction and services (DIS), California's term for related services, shall be provided "when the instruction and services are necessary for the pupil to benefit educationally from his or her instructional program."

[7]An IEP team meeting must be convened at least annually, to review a student's progress, the IEP, the appropriateness of the placement, and to make any necessary revisions. (Cal. Educ. Code § 56343.) The Hearing Officer notes that Student did not raise the issue of the timeliness of an annual IEP meeting, which would have been due by October 25, 2001. Therefore, the Hearing Officer will not address that issue in this Decision.

[8]A request for a due process hearing must be filed within three years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (Cal. Educ. Code § 56505(j).) Student filed his request for a due process hearing on September 28, 2004; therefore, the Hearing Officer can only consider issues that Student knew or should have known since September 28, 2001.

[9]Dr. Gonzalez testified that he had worked as a school psychologist for the District for six years and currently worked as a due process specialist for the District for one and one-half years. He stated that he also was a neuropsychologist and that he maintains a private practice in neuropsychology with children and adults. Dr. Gonzalez testified that he received his bachelor's degree in psychology in 1986 from the University of California, Los Angeles, a master's degree in school psychology in 1991 from the University of Georgia, and a Ph.D. in educational psychology in 1995 from the University of Georgia. (See also Dist.'s Exh. 72 -- resume of J. Gonzalez.)

[10]Ms. Rutalj testified that she administered the KTEA to STUDENT just before the January 8, 2002 IEP meeting. According to Ms. Rutalj, the average range for a standard score on the KTEA is 89 to 109. Ms. Rutalj also stated that she has been a special education teacher for twelve years and has had a mild to moderate special education credential since 2001. Ms. Rutalj testified that she met STUDENT in September 2001 when he was placed on her case load and also in her physical science class. As STUDENT's case manager, Ms. Rutalj stated that she was responsible for reviewing his progress in his classes, determining whether he was meeting or exceeding his IEP goals, and ascertaining how he was doing in his classes.

[11]According to Ms. Rutalj, regular education science classes typically had 35 students, with one teacher and no assistant.

[12]Student did not raise as an issue for hearing the lack of an annual IEP meeting during the 2002-2003 school year.

Copyright © 2014 LRP Publications

48

T - 078

[13]The Hearing Officer notes that this was the law in effect at the time of this hearing.

[14]As will be discussed later, even after making that determination in March 2004, the District still did not order an assistive technology assessment. The District did, however, eventually conduct an APE assessment on May 11, 2004, and produced a written report of those results on May 24, 2004. (Dist.'s Exh. 17.)

[15]According to Ms. Rutalj's testimony, as far back as the fall semester of the 2002-2003 school year, STUDENT had been exhibiting off-task behavior, failing to complete his assignments, and wandering in and out of class.

[16]Ms. Smith testified that she has a bachelor's degree and a master's degree. She has learning handicapped and severely handicapped credentials and a resource specialist certificate. She also stated that she has an administrative tier 1 teaching credential and has previously worked as a general education, special day program, and resource specialist program teacher. Ms. Smith testified that she previously served as a program specialist in the District's West Valley special education unit, and two years ago, she became a least restrictive environment behavior specialist for the District.

[17]Dr. Gonzalez testified that there was a correction to STUDENT's math application standard score from 77 to 84, based on the corrected raw score of 36.

[18]Student produced at hearing a letter dated July 5, 2005, from Dr. Carmichael indicating that STUDENT could be "evaluated for adaptive PE, and if he qualifies, he may attend." (Student's Exh. 94.)

[19]An annual IEP meeting was convened on March 9, 2005, to discuss STUDENT's progress toward meeting his goals and objectives in his then-current home instruction program. There was no offer made at the March 2005 IEP meeting and it was continued to May 16, 2005, to allow the District more time to obtain updated present levels of performance from STUDENT's home instructor, Lillian

Baskerville, and to receive Dr. Patterson's assessment report. (Dist.'s Exh. 1, pg. 17.) Student's counsel made clear at the hearing in this matter that Student was not contending that the March 2005 IEP was incomplete. Therefore, the Hearing Officer will not address the appropriateness of the March 2005 IEP as it was not intended to represent the District's offer, which was ultimately made on May 16, 2005.

[20]The Hearing Officer notes that the terms "special day program" and "special day class" are used interchangeably throughout the Decision to refer to one type of class.

[21]Ms. Dwyer testified that the goal achievement page of the March and May 2005 IEPs was later corrected after the May 2005 IEP meeting to properly reflect that STUDENT had met his goals in math, vocational education, reading, and written language. (Dist.'s Exh. 1, pgs. 2 and 27.) The corrected IEP goal achievement page is reflected in the District's Exhibit 75.

[22]The District did not receive Dr. Patterson's report until May 28, 2005, after both 2005 IEP meetings. (Testimonies of D. Smith and H. Tovmassian; Dist.'s Exh. 1, pg. 17.)

[23]The allegation that MOTHER was pressured by Ms. Baskerville to forge STUDENT's work samples was not raised as an issue at the beginning of the hearing. This allegation was not made until MOTHER made the statements during her testimony in this matter.

[24]The Hearing Officer will address the need to assess STUDENT's writing skills in the discussion of remedies below.

[25]The IEP team discussed, and Ms Smith testified at hearing, that as of September 2005, Chatsworth would go to a "full collaborative model" for its resource program. This meant that resource students programmed into the general education classes would receive resource support in the general education classroom and in learning centers from credentialed special education teachers who are experts in strategies and accommodations. According

Copyright © 2014 LRP Publications

T - 079

to Ms. Smith, Chatsworth would no longer have a "pull-out" resource program with small resource classrooms, but the new special day program would function much like the "pull-out" resource program previously functioned. So students who have a need for more individualized instruction and a small classroom environment with more support would be appropriately placed in the special day program class.

[26]In his issue statement, Student made other requests for compensatory education that were resolved before hearing, including his request for a referral to Community Mental Health for assessment and his request for an APE assessment. Therefore, the Hearing Officer will not discuss those specific requests for compensatory services.

[27]Dr. Patterson noted in his report that because of the severity of the ratings of STUDENT's mother on several of the social-emotional functioning scales, including the Personality Inventory for Children (PIC), "caution has to be applied in interpreting the level of severity." (Dist.'s Exh. 16, pg. 248.) Dr. Gonzalez also testified that after reviewing STUDENT's historical record, the only records consistent with the Devereux Rating Scale of Mental Disorder completed by MOTHER were historical records from MOTHER. He stated that he saw no information in any of STUDENT's IEPs, psychological reports, or school records that were consistent with MOTHER's reportings on the Devereux.

Copyright © 2014 LRP Publications

T - 080

**EXHIBIT "2"**

Case 2:18-cv-00919-CAS-JC Document 25-2 Filed 03/13/19 Page 82 of 165 Page
ID #:190
Case 2:07-cv-02164-CAS-RZ Document 60 Filed 11/10/2008 Page 1 of 15

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

O

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| CATHERINE JEANG<br>MICHELE MURRAY | LAURA ELIAS | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| John Fiske<br>Geoffrey R. Winterowd | Henry Tovmassian<br>George Crook |

**Proceedings:** **DEFENDANTS' MOTION FOR ATTORNEYS' FEES** (filed 09/25/08)

## I.    INTRODUCTION

On April 2, 2007, plaintiff Torrance Unified School District ("the District") brought the instant action against defendants E.M., a minor; Maryl Magee, E.M.'s mother and guardian ad litem ("Ms. Magee") (collectively, "defendants"); and the California Office of Administrative Hearings ("OAH"). The instant action is an administrative appeal of a due process hearing before OAH, in which defendants alleged that the District failed to provide E.M. with a free appropriate public education ("FAPE") during the 2003-04, 2004-05, and 2005-6 school years, in violation of the Individuals with Disabilities Act (the "IDEA"), 20 U.S.C. §§ 1400 et seq. In the due process hearing, defendants alleged that they were entitled to (1) compensatory education, (2) reimbursement for and prospective placement at a nonpublic school, and (3) reimbursement for the costs of obtaining an independent assessment. The Administrative Law Judge's ("ALJ") decision found that the District did not violate its child find obligation during the 2003-04 and 2004-05 school years, and therefore did not deny E.M. a FAPE during the 2003-04 and 2004-05 school years, but that the District had denied E.M. a FAPE during the 2005-06 school year, and that, therefore, defendants were entitled to the three forms of relief sought.[1] The District sought review of those issues of

[1]A school district breaches its child find duty if it had reason to, but did not, suspect a child as having a disability and needing special education services, and therefore did not assess the child for such services. See Dep't of Educ. v. Cari Rae S.,

Case 2:18-cv-00919-CAS-JC   Document 25-2   Filed 03/13/18   Page 83 of 165   Page
ID #:191
Case 2:07-cv-02164-CAS-RZ   Document 60   Filed 11/18/2008   Page 2 of 15

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

O

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

the administrative decision on which defendants had prevailed.  On May 29, 2007, defendants filed a counterclaim seeking review of those issues of the administrative decision on which the District prevailed.

On August 21, 2008, this Court upheld the administrative decision, finding that, as of October 27, 2005, E.M. qualified as a child with a disability by reason of a "serious emotional disturbance."  As a result, the Court held that the District had denied E.M. a FAPE to which she was entitled during the 2005-06 school year, and that the ALJ had appropriately ordered the District to classify E.M. as eligible for special education and to reimburse defendants for the cost of attending a non-public school.  However, the Court also upheld the ALJ's finding that the District did not violate its child find obligation during the 2003-04 and 2004-05 school years.

On September 25, 2008, defendants filed the instant motion for attorneys' fees, pursuant to 20 U.S.C. § 1415(i)(3)(B), seeking attorneys' fees and costs totaling $431,770.05.[2]  See Reply, Ex. B.  On October 27, 2008, the District filed an opposition. On October 28, 2008, the District filed a notice of errata and an amended opposition.  A reply was filed on November 3, 2008.  A hearing was held on November 10, 2008.  After carefully considering the arguments set forth by the parties, the Court finds and concludes as follows.

## II.     DISCUSSION

Under the IDEA, 20 U.S.C. § 1415(i)(3)(B), "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability."  Congress' intent was to provide parents with disabled

---

158 F. Supp. 2d 1190, 1194 (D. Hawaii 2001)

[2] In their Reply, defendants request $432,225.05, which includes hours spent in connection to the instant motion for attorneys' fees.  However, at oral argument, defendants requested that the Court subtract $325 charged for 2.5 hours of work on September 26, 2008 and $130 charged for .4 hours of work on October 31, 2008, which were charged in error.  Therefore, the Court has subtracted $455 from the requested attorneys' fee award.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-2164 CAS (RZx) | | Date | November 10, 2008 |
|----------|---------------------|--|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | | |

children a substantive right that could be enforced through the procedural mechanisms in the IDEA. Barlow-Gresham Union High Sch. Dist. No. 2 v. Mitchell, 940 F.2d 1280, 1286 (9th Cir. 1991).

Attorneys' fees awarded under the IDEA are governed by the "degree of success" standard, in which a partially prevailing party may not recover fees for unsuccessful claims, and the level of the party's success is relevant to the amount of fees to be determined. See Aguirre v. Los Angeles Unified School District, 461 F.3d 1114, 1121 (9th Cir. 2006) (applying analysis used in Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)). Indeed, "the most critical factor is the degree of success obtained." Id. The hourly rate for fees charged "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. 1415(i)(3)(c).

The District contests many of the $431,770.05 of attorneys' fees and costs claimed by defendants on the grounds that (1) many of the hours charged were spent on matters not reasonably related to the litigation; (2) many of the hours charged were duplicative or excessive; (3) the calculated rates were unreasonable; and (4) defendants were unsuccessful on some of their claims. Therefore, the District argues, defendants are only entitled to recover $48,465.25.[3]

## A.    Hours Reasonably Related to the Litigation

The District argues that many of the hours charged by defendants were spent on matters not reasonably related to the instant litigation. Opp'n at 4.

### 1.    Expulsion Proceedings

First, the District argues that hours spent on matters pertaining to expulsion proceedings that the District initiated against E.M. must be excluded, because the expulsion proceeding was entirely separate from the administrative due process hearing at issue in the instant action. Opp'n at 5. The District points out that neither the ALJ nor

---

[3] This estimate does not include time charged in connection with the instant motion.

Case 2:18-cv-00910-CAS-JC Document 25-2 Filed 03/13/19 Page 85 of 165 Page
Case 2:07-cv-02164-CAS-RZ Document 260 Filed 11/13/2008 Page 4 of 15
ID #:193

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

this Court made any holding regarding E.M.'s expulsion from school. Opp'n at 5. Therefore, the District argues, hours spent in connection with the expulsion proceedings must be excluded.

Defendants, however, argue that their claims regarding E.M.'s expulsion involve a core of facts related to E.M.'s eligibility for special education and were based on interconnected legal theories. Reply at 19. Defendants argue that because IDEA prohibits the expulsion of students with disabilities for behavior that is a manifestation of the disability, and because the District expelled E.M. several months after she became eligible under IDEA, defendants' efforts to prevent E.M's expulsion as a violation of the IDEA are compensable.[4] Reply at 20, citing Doe v. Maher, 793 F.2d 1470, 1486 (9th Cir. 1986).

Defendants further argue that the District's calculations of the time charged related to the expulsion hearing, contained in the District's Exhibit B to the Geoffrey Winterowd declaration, do not accurately segregate attorney time spent on the expulsion proceedings from time spent on other proceedings, because some of the charges that were wholly disregarded by the District as applying to the expulsion proceeding also related to due process issues. Reply at 20. Defendants appear to be correct that some of the charges identified by the District as being related to the expulsion proceeding also contain charges

---

[4] 20 U.S.C. § 1415(k)(5) provides that

A child who has not been determined to be eligible for special education and related services under this part [20 USCS §§ 1411 et seq.] and who has engaged in behavior that violates a code of student conduct, may assert any of the protections provided for in this part [20 USCS §§ 1411 et seq.] if the local educational agency had knowledge. . . that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.. . . If a local educational agency does not have knowledge that a child is a child with a disability . . . prior to taking disciplinary measures against the child, the child may be subjected to disciplinary measures applied to children without disabilities who engaged in comparable behaviors.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

○

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | | Date | November 10, 2008 |
|---|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | | |

for hours related to the administrative due process hearing as well.[5]

The Court finds the District is correct that attorneys' fees incurred for work related to E.M.'s expulsion hearing are not directly related to the instant proceeding. The expulsion hearing was a distinct proceeding than the instant action, and neither the OAH nor this Court made any holding regarding E.M's expulsion from school. However, the Court is also mindful that there was likely overlap of core facts and legal theories, and that some of the fees identified by the District as being related to the expulsion proceeding may be partially related to the due process hearing as well. Therefore, the Court finds that defendants are entitled to half of the $24,453 in fees identified by the District as relating to the expulsion hearing. The Court therefore reduces defendants' fees by $12,226.50.

## 2.  IEP Team Meetings

Second, the District argues that fees incurred on October 25, 2005 and October 27, 2005 related to an October 27, 2005 team meeting regarding E.M.'s Individualized Education Program ("IEP") were not convened as a result of the administrative proceeding or the Court proceeding, because defendants had not yet filed a request for an expedited due process hearing. Opp'n at 8, citing 20 U.S.C. § 1415(i)(3)(D)(ii) ("Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened as a result of an administrative proceeding or judicial action.")

Defendants do not dispute that the 4.9 hours spent on October 25, 2005 and October 27, 2005 related to the October 27, 2005 IEP meeting should not be included. Therefore, the Court reduces defendants' attorneys' fees by $686.

## 3.  Work Related to Defendants' Separate Complaint for Damages

The District argues that defendants are not entitled to recover fees for work related to defendants' separate complaint for damages billed on June 27, 2007, July 17, 2008, July 27, 2007, August 1, 2007, and September 15, 2007. Defendants agree that the entries on June 27, 2007, July 27, 2007, and August 1, 2007 should be deducted. Defendants further agree that 1.3 of the 1.6 hours charged on July 17, 2007 should be deducted. However,

---

[5] For example, the charges for November 3, 2005 and December 1, 2005 appear to relate to both the expulsion hearing and the due process hearing.

T - 086

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

○

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|----------|----------------------|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

they argue, and the Court agrees, that there does not appear to be any charge related to the complaint for damages on September 15, 2007. Therefore, the Court reduces the attorneys' fees award by $792, the total of the charges on June 27, 2007, July 27, 2007, August 1, 2007, and 1.3 hours of the charges on July 17, 2007.

> **4.** **Work Related to Defendants' Requests for Continuances and Extensions, Defendants' Motion for Preliminary Injunction, and Defendants' Renewed Request for an Expedited Due Process Hearing**

The District argues that defendants are not entitled to recover fees for hours spent requesting continuances and extensions of time, given that such requests did not result from any action taken by the District, and because the District agreed to these continuances and extensions.[6] Opp'n at 9. The District also argues that defendants are not entitled to recover fees incurred in filing their motion for preliminary injunction, wherein defendants requested that the Court order the District to comply with the OAH decision. Opp'n at 11. The District argues that they should not be charged for these fees, because (1) defendants were not successful on this motion and (2) defendants could have achieved the same goal through filing an opposition to the District's motion for a stay of the administrative order.[7] In addition, the District argues that defendants cannot collect fees incurred for the filing of a renewed request for an expedited due process hearing before the OAH. Opp'n at 14-15. This renewed request was filed after the OAH denied defendants' request for an expedited due process hearing on November 30, 2005. Opp'n at 14. The District argues that the renewed request was both meritless and unsuccessful. Opp'n at 14.

Defendants, however, argue that the District has presented no authority to support

---

[6] The District states however that it does not dispute claimed hours spent opposing the District's motion to continue the due process hearing. Opp'n at 9.

[7] On September 10, 2007, the Court denied both the District's motion for stay and defendants' motion for preliminary injunction. Because the two motions were heard on the same day, the District does not oppose fees charged by defendants for appearing at the consolidated hearing.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|----------|----------------------|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

its argument that defendants are not entitled to recover these fees. Reply at 17. Furthermore, with regard to the motion for preliminary injunction and the renewed request for an expedited due process hearing, defendants argue that although they were not ultimately successful on these motions, they are nevertheless entitled to the entire fee because their claims were related and arose from a common set of facts as those that were argued successfully in the instant action. Reply at 17.

The Court finds that because defendants ultimately prevailed on their claims as discussed in Part II.D infra, they are entitled to reasonable attorneys' fees, even for work on motions that were not ultimately successful. Therefore, the Court declines to deduct fees for hours related to defendants' request for continuances and extensions, defendants' motion for preliminary injunction, and defendants' renewed request for an expedited due process hearing.

### B.    Duplicative and Excessive Time

The District additionally argues that many of the hours charged by defendants are either duplicative or excessive.

### 1.    Duplicative, Unnecessary, and Undocumented Time

The District argues that some of defendants' charged hours are duplicative, unnecessary, and undocumented. Opp'n at 12. Specifically, the District disputes (1) 2 hours charged for work on July 26, 2006 drafting a writ petition that was never filed; (2) 6.6 of the 8.6 hours charged for work on September 18, 2006 involving, among other things, analysis of documents for the September 27, 2006 hearing, because, the District argues, such analysis should have been completed before Defendants' Prehearing Conference Statement was drafted; (3) 5.6 hours of 6.6 hours charged for work on September 19, 2006 finalizing the notice of witnesses and exhibit lists when such lists should have already been finalized by that date; (4) hours charged related to Crook's attendance at E.M.'s due process hearing, because Tovmassian was the attorney presenting defendants' case and the record indicates that Crook played no active role; (5) 1.6 of the 2.6 hours charged for time spent updating Ms. Magee and reading a scheduling order, arguing that only one hour is reasonable; (6) hours charged for Tovmassian on September 9-10, 2007 to prepare for and attend the hearing on the stay and preliminary

Case 2:18-cv-00912-CAS-JC Document 25-2 Filed 03/13/18 Page 89 of 165 Page
ID #:197
Case 2:07-cv-02164-CAS-RZ Document 60 Filed 11/18/2008 Page 8 of 15

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

○

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|----------|----------------------|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

injunction, because Crook's time for these activities is also billed and Crook was the attorney who presented defendants' case, thereby rendering Tovmassian's time duplicative; and (7) hours charged for both Crook and Tovmassian to attend the March 31, 2008 scheduling conference, when only one attorney was required to attend. Opp'n at 12-13. Defendants, however, argue that the District has failed to provide any evidence that these charges were duplicative, unnecessary, or undocumented. Reply at 19, citing McGrath v. County of Nev., 67 F.3d 248, 255 (9th Cir. 1995) ("the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort").

The Court agrees that the District has failed to provide sufficient evidence that any of the above charges are duplicative, unnecessary, or undocumented, and therefore declines to deduct them from the fee award.

> ### 2. Hours Spent Drafting Defendants' Closing Brief, Defendants' Motion for Summary Judgment, Defendants' Reply to the District's Opening Brief, and Defendants' Reply to the District's Objections to Defendants' Motion for Summary Judgment

The District argues that the 152.3 hours charged for drafting defendants' closing brief for the administrative due process hearing are excessive, and that they should therefore be reduced to 100 hours. Opp'n at 6. The District also argues that the 107.8 hours charged for drafting defendants' motion for summary judgment are excessive, and that they should therefore be reduced to 60 hours. Opp'n at 6. The District further argues that the 97.6 hours charged for drafting defendants' reply to the District's opening brief and defendants' reply to the District's objection to defendants' motion for summary judgment are excessive, given that the reply to the opening brief was limited to 10 pages, and the reply to the District's objections would not have been necessary if defendants had conformed their motion for summary judgment to the Local Rules.[8] Opp'n at 7. Therefore, the District argues that the hours should be reduced to 50 hours. Opp'n at 8.

Defendants, however, argue that the District presents no evidence to substantiate its claim that the hours spent on these filings were unreasonable. Reply at 15-16.

---

[8] The District's objections stated that defendants' motion improperly referenced documents not part of the administrative record and was improperly long

Case 2:18-cv-00019-CAS-JC  Document 25-2  Filed 03/13/18  Page 90 of 165  Page
ID #:198
Case 2:07-cv-02164-CAS-RZ  Document 60  Filed 11/10/2008  Page 9 of 15

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

The Court agrees that the District has failed to present any evidence that these fees are unreasonable. The Court therefore declines to deduct them from the fee award.

### 5.  Costs

The District argues that defendants cannot recover costs for such charges as messenger services, telephone, postage, Westlaw, office expenses associated with the due process hearing and the appeal of the due process hearing decision, because IDEA does not provide for a separate award of costs.  Opp'n at 19.

The IDEA states that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . ." 20 USC § 1415(i)(3)(B)(I). In Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, the Court held that "the term 'costs' in 20 U.S.C. § 1415(i)(3)(B), like the same term in Fed. R. Civ. P. 54(d), is defined by the categories of expenses enumerated in 28 U.S.C. § 1920."  In other words, the Court held that under the IDEA, parties are entitled to recover costs for

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title [28 USCS § 1923];
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title [28 USCS § 1828].

28 U.S.C. § 1920.

Furthermore, additional costs claimed by defendants' attorneys may be recovered as part of the attorneys' fee award.  Because out-of-pocket litigation expenses that would normally be charged to a fee-paying client are reimbursable as part of the attorneys' fee, distinct from costs.  See Harris v. Marhoefer, 24 F.3d 16, 19-20 (9th Cir. 1994); Sexcius v. District of Columbia, 839 F. Supp. 919, 927 (D.D.C. 1993) ("reasonable photocopying,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

postage, long distance telephone, messenger, and transportation and parking costs are customarily considered part of a reasonable attorney's fee"). Because the costs claimed by defendants appear to be those that would normally be billed by an attorney to clients, and the costs claimed are reasonable, the award of costs is appropriate.

### C. Reasonableness of Calculated Rates

Under 20 USC § 1415 (i)(3)(C), attorneys' fees awarded in an IDEA action "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of service furnished." In <u>Davis v. San Francisco</u>, 976 F.2d 1536, 1544 (9th Cir. 1987), <u>vacated in part on denial of hearing</u>, 984 F.2d 245 (9th Cir. 1993), the Court noted that attorneys' fees should be calculated with "close attention paid to the fees charged by lawyers of reasonably comparable skill, experience, and reputation."

The hourly rate charged by defendants' attorney Valerie Vanaman ("Vanaman"), an attorney with Newman Aaronson Vanaman ("NAV") was $575. Vanaman Decl. ¶ 19. The hourly rate charged by defendants' attorney Henry Tovmassian ("Tovmassian"), an of counsel with NAV, was $495. Tovmassian Decl. ¶ 8. The hourly rate charged by defendants' attorney George Crook ("Crook"), an attorney with NAV, was $575 per hour. Crook Decl. ¶ 9. Vanaman, Tovmassian, and Crook each state that the rate they charged is less than the prevailing market hourly rate for an attorney with comparable skill and experience in Los Angeles. Defendants also submit the declaration of Carol Sobel, a civil rights practitioner in Los Angeles, who states that she is familiar with the work of defendants' attorneys, and that she believes that the rates charged are far below market rate for attorneys of comparable skill and experience. Sobel Decl. ¶ 4. She further states that the rate of $575 is $100 below her billing rate for 2008, despite the fact that Vanaman and Crook graduated from law school before she did. Sobel Decl. ¶ 4. Sobel also cites other cases in this district awarding attorneys' fees over $575 per hour in civil rights litigation. With their reply, defendants also file an additional declaration of Marcy J.K. Tiffany ("Tiffany"), an attorney who practices in the special education field and who is familiar with NAV, who states that the NAV rates are comparable with her firm's rates, which in May 2006 were $440 for due process proceedings and $525 for state and federal court litigation. Tiffany Decl. ¶ 8-10. Tiffany further states that the billing rates for paralegals at her firm are $115-$175. Tiffany Decl. ¶ 9.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

The District, however, argues that the hourly rate charged by defendants' attorneys should be no greater than $350 per hour, arguing that this rate is in line with the prevailing market rate for similar services by lawyers of reasonably comparable skill. Opp'n at 14. The District argues that the declarations of Vanaman, Tovmassian, and Crook are insufficient to establish that the rates charged are reasonable, because "it is the fee applicant's burden to produce evidence, other than the declarations of interested counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." Opp'n at 16; see Miller v. San Mateo-Foster City Unified School Dist., 318 F.Supp. 2d 851, 865 (N.D. Cal. 2004). The District further asserts that the Sobel declaration is insufficient to establish that defendants' attorneys' fees are reasonable. The District argues that the cases cited by Sobel in which comparable attorneys' fees were awarded are irrelevant because they did not involve similar legal issues, and that Sobel's knowledge regarding the setting of rates by attorneys with comparable skill and experience does not pertain specifically to attorneys representing parents and students under the IDEA. Opp'n at 18. The District cites two special education cases in which reasonable hourly rates for attorneys were set between $225 and $350 per hour. Opp'n at 19, citing J.C. v. Vacaville Unified School District, CIV. S-05-0092 KJM (E.D. Cal. 2007); Noyes v. Grossmont Union High School District, 331 F.Supp.2d 1233, 1249 (S.D. Cal. 2004). The District also submits three declarations from Margaret A. Chedester, Ricardo Soto, and Peter Sansome, each of whom state that their firms represent clients at due process hearings under IDEA in southern California (including Los Angeles, Riverside, Orange, San Diego, and San Bernadino) and that the rates they charge are under $300.

The District further argues that defendants' request for reimbursement for clerical work done on September 18-20, 2006 and August 27, 2007 at a rate of $140 per hour is unreasonable. Opp'n at 19. The District argues that clerical work should be charged at no more than $90 per hour. Opp'n at 19.

Defendants, however, argue that they have made a sufficient prima facie showing of the reasonableness of the rates charged. Reply at 9. Defendants argue that they have established the reasonableness of their rates through (1) the Tovmassian, Crook and Vanaman declarations, which set forth, among other things, their background and experience and their past rate determinations; (2) the Sobel and Tiffany declarations, which establishes NAV's reputation as a firm and establishes that the NAV rates are in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

line with those in the community; (3) evidence of other court-ordered attorneys' fee awards, including those involving Tovmassian, Crook, and Vanaman, which are relevant to determining market rates; and (4) the 2004 Helder Associates' Attorney Billing Rate Survey, which establishes that the hourly rates sought by NAV are below the prevailing rate. Reply at 11.

Furthermore, defendants argue, the District has not rebutted defendants' showing of reasonableness. Reply at 12. Defendants argue that the evidence submitted by the District – the Chedester, Soto, and Sansome declarations – are irrelevant, because Chedester, Soto, and Sansome are each school district attorneys, and attorneys hired by districts are not in the same legal market as private plaintiffs' attorneys. Reply at 12.

The Court finds that defendants have sufficiently established that the rates charged by Tovmassian, Crook, and Vanaman are reasonable. The Tiffany and Sobel declarations submitted by defendants demonstrate that the rates charged by defendants' attorneys are comparable to the fees charged by lawyers of reasonably comparable skill, experience, and reputation engaged in special education and other civil rights litigation. The Tiffany declaration further establishes that the rates charged for clerical work are reasonable as well. Therefore, the Court declines to reduce the rate charged to $350 per hour.[9]

**D. Unsuccessful Claims**

The District argues that the calculated fees should be adjusted downwards, because defendants were only successful on some of their claims. Opp'n at 20; See J.C. v. Vacaville Unified School District, 2007 WL 112138 (E.D. Cal.) (the most relevant factor

---

[9] At oral argument, the District argued that fee rates for administrative proceedings should be lower than the rate for proceedings in court. In a supplemental pleading filed on November 11, 2008, defendants cite S.W. ex. rel. N.W. v. Board of Educ. of City of New York (Dist. Two), 257 F.Supp. 2d 600, 605 (S.D.N.Y. 2003), in which the court held that there was "no support in the law" for the proposition that fee awards for IDEA administrative proceedings should be lower than fee awards for "full blown trials or litigation in court." The court held that such a distinction would be "contrary to public policy," in that it would discourage attorneys from providing representation in IDEA administrative proceedings, an area where there is already "a dearth of lawyers." See id. Given this holding, the Court declines to reduce the fees for administrative proceedings.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|----------|----------------------|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

in the case was the degree of success achieved, allowing the attorney to be awarded 40% of attorneys' fees because the attorney prevailed on 40% of the claims). Specifically, the District argues that, in defendants' request for an expedited due process hearing, defendants claimed (1) a denial of FAPE for the 2003-2004 school year; (2) a denial of FAPE for the 2004-2005 school year; (3) that the District could not expel E.M.; and (4) a denial of FAPE for the 2005-2006 school year. Opp'n at 20. The District argues that, because defendants lost on the first two issues, and because defendants never obtained a holding from the OAH or the District that E.M. could not be expelled, their claimed attorneys' fees should be reduced by 75%.

In Webb v. Sloan, 330 F.3d 1158, 1169 (9th Cir. 2003), the court held that, where the prevailing party has not won every claim brought, the court must determine the appropriate reduction in attorneys' fees to compensate for the limited success. The first step is to consider whether "the [defendants] failed to prevail on claims that were unrelated to the claims on which [they] succeeded." Id., citing Hensley, 461 U.S. at 434. "Claims are unrelated if they are entirely distinct and separate from the claims on which the [defendants] prevailed." Id. If the hours are unrelated and unsuccessful, they should not be included in the award of fees. Id. The second step is to consider whether "the [defendants] achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." Id. "Where a [defendant] has obtained excellent results, his attorney should recover a fully compensatory fee." Id.

Defendants argue that they obtained "excellent results," in that they succeeded in securing all of the relief they sought: namely: (1) compensatory education, (2) reimbursement for and prospective placement at a nonpublic school, and (3) reimbursement for the costs of obtaining an independent assessment. Reply at 2, 8. Although defendants concede they had also contended that the District denied E.M. a FAPE during the 2003-04 and 2004-05 school years, defendants argue that they did not seek any relief from these claims beyond the relief they eventually obtained from OAH, and they presented these arguments only to comply with their obligation to exhaust administrative remedies before filing a complaint for damages. Reply at 2, n.1. Furthermore, defendants argue, evidence presented regarding E.M. during the 2003-04 and 2004-05 school years contributed to defendants' successful showing that E.M. was eligible for special education as of 2005. Reply at 8-9. Therefore, they argue, it would be impossible to separate the attorney hours charged on a claim-by-claim basis. Reply at 8.

T - 094

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-2164 CAS (RZx) | | Date | November 10, 2008 |
|---|---|---|---|---|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | | |

In addition, defendants note that the Supreme Court has rejected "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." Hensley, 461 U.S. at 435, n.11.

The Court finds that, regardless of the fact that defendants did not succeed on their claims that the District denied E.M. a FAPE in 2003-04 and 2004-05, defendants are entitled to recover all of the fees claimed, except as otherwise noted herein. Defendants' unsuccessful claims were not "entirely distinct and separate" from their successful claims, but instead arise from a "common core of facts," as evidence of E.M.'s situation during 2003-04 and 2004-05 were relevant in defendants' successful showing that E.M. was eligible for special education in 2005. See Webb, 330 F.3d at 1169; See OAH Decision (January 5, 2007) ¶ 63 ("By the time of the District's psychoeducational assessment, however, Student's history from kindergarten onward demonstrated a pattern of unpredictable and aggressive temper tantrums across numerous environments. . . and there was no reason to anticipate that they would simply stop"). Furthermore, defendants "obtained excellent results" in the instant action, because they obtained all of the relief they sought, regardless of the fact that they were not successful on some of their claims. See id. Therefore their attorneys "should recover a fully compensatory fee." See id.

## IV.  CONCLUSION

In accordance with the foregoing, the Court GRANTS defendants' motion for attorneys' fees against the District. The Court reduces the attorneys' fees by $12,226.50 (half of the fees identified by the District as related to the expulsion hearing), $686 (fees related to the IEP team meeting), and $792 (fees related to defendants' separate complaint for damages). Therefore the Court awards $418,065.55 in attorneys' fees to defendants.

IT IS SO ORDERED.

Case 2:13-cv-00919-CAS-JC Document 25-2 Filed 08/13/19 Page 96 of 165 Page
Case 2:07-cv-02164-CAS-RZ Document 60 Filed 11/10/2008 Page 15 of 15
ID #:204

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

○

**CIVIL MINUTES - GENERAL**

| Case No. | CV 07-2164 CAS (RZx) | Date | November 10, 2008 |
|----------|----------------------|------|-------------------|
| Title | TORRANCE UNIFIED SCHOOL DISTRICT v. ERIN MAGEE, ET AL. | | |

| | 00 | : | 10 |
|---|---|---|---|
| Initials of Preparer | | MDM | |

**EXHIBIT "3"**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA   JS - 6   O

**CIVIL MINUTES - GENERAL**

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|---|---|---|---|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|---|---|

Present: The Honorable   CHRISTINA A. SNYDER

| CATHERINE JEANG | LAURA ELIAS | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| George Crook<br>Richard Pearl | Charles Weatherly |

**Proceedings:    PLAINTIFF'S MOTION FOR LIFTING OF STAY AND FOR DETERMINATION OF PREVIOUSLY FILED MOTION FOR ATTORNEYS' FEES AND COSTS FILED 4/21/2008** (filed 07/20/10)

## I.    INTRODUCTION

On October 15, 2004, plaintiffs H.B., an autistic child, and Mrs. B., his mother, brought the instant action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et. seq. ("IDEA"), seeking judicial review of an administrative decision in favor of defendant Las Virgenes Unified School District (the "District). On August 22, 2005, Judge Florence-Marie Cooper[1] reversed the decision of the Hearing Officer, finding that "H.B.'s placement was predetermined, and accordingly, the procedural requirements of the IDEA were violated." Order Reversing Decision of Hearing Officer, Aug. 18, 2005, at 18. On September 19, 2005, the District appealed this decision ("Appeal I"). On October 21, 2005, Judge Cooper awarded plaintiffs attorneys' fees and costs in the sum of $335,112.79, and stayed the execution of the award pending the District's appeal to the Ninth Circuit ("2005 Fees Award"). On July 3, 2007, the Ninth Circuit vacated the ruling and remanded for the district court to make further factual findings regarding the District's intent or state of mind prior to and during the relevant IEP meeting.

---

[1]The instant case was originally assigned to the Chambers of Judge Florence-Marie Cooper.  It was transferred to this Court on June10, 2010.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA      JS - 6  O

## CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|----------|---------------------|------|---------------------|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|-------|---------------------------------------------------------------------|

On March 26, 2008, Judge Cooper issued an Order on Remand, which, like the original order, found that the decision of the Hearing Officer should be reversed based on violations of the procedural requirements of the IDEA. Order on Remand, March 26, 2008, at 7. On April 21, 2008, plaintiffs filed a motion requesting attorneys' fees incurred on Appeal I and on remand from Appeal I ("2008 Fees Motion"). On June 13, 2008, Judge Cooper issued an order holding the 2008 Fees Motion in abeyance pending the Ninth Circuit's decision on plaintiff's appeal of Judge Cooper's Order on Remand ("Appeal II"), in part because the District had indicated that it was going to argue on appeal that the district court had not had jurisdiction because the case was moot. Order Staying Adjudication of Attorneys' Fees Motion, June 13, 2008 at 1.

On March 11, 2010, the Ninth Circuit issued a Memorandum affirming Judge Cooper's March 26, 2008 decision. On July 23, 2010, the Ninth Circuit issued an order granting a motion filed in that court by plaintiff-appellees for attorneys' fees incurred on Appeal II.

On July 20, 2010, plaintiffs filed the instant motion. On August 13, 2010, the District filed two opposition briefs. On September 3, 2010, plaintiffs filed a reply. After carefully considering the parties' arguments, the Court finds and concludes as follows.

## II.   LEGAL STANDARD

Under the IDEA, 20 U.S.C. § 1415(i)(3)(B), "the court, in its discretion, may award reasonable attorneys' fees as part of the costs to a prevailing party who is the parent of a child with a disability." Congress' intent was to provide parents with disabled children a substantive right that could be enforced through the procedural mechanisms in the IDEA. Barlow-Gresham Union High Sch. Dist. No. 2 v. Mitchell, 940 F. 2d 1280, 1286 (9th Cir. 1991).

Attorneys' fees awarded under the IDEA are governed by the "degree of success" standard, in which a partially prevailing party may not recover fees for unsuccessful claims, and the level of the party's success is relevant to the amount of fees to be determined. See Aguirre v. Los Angeles Unified Sch. Dist., 461 F. 3d 1114, 1121 (9th Cir. 2006) (applying analysis used in Hensley v. Eckerhart, 461 U.S. 424, 436 (1983)). Indeed, "the most critical factor is the degree of success obtained." Id. The hourly rate

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA    JS - 6  O

### CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|----------|---------------------|------|---------------------|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|-------|---------------------------------------------------------------------|

for fees charged "shall bee based on rates prevailing in the community in which the
action or proceeding arose for the kind and quality of services furnished." 20 U.S.C.
§1415(i)(3)(c).

## III.   DISCUSSION

### A.   2005 Fees Award

Plaintiffs move to lift the stay on the execution of the 2005 Fees Award. Mot. at 7.
Plaintiffs assert that this is proper because "[a]ll possible appeals on the merits have now
been determined[, p]laintiffs have prevailed, and with the exception of adding post-
judgment interest to the amount awarded, [the Fees Award] is not subject to any appeal or
adjustment." Id. at 7-8.

Defendant argues that the 2005 Fees Award was "nullified when the Ninth Circuit
vacated the substantive decision on which the attorneys' fees award was based." Opp. To
Plaintiff's Mot. For Lifting of Stay ("Stay Opp.") at 2. Further, defendant argues,
plaintiffs "are not entitled to fees as they have failed to achieve a result that materially
alters the legal relationship between the parties today, and therefore are not the prevailing
party for the purposes of attorneys' fees. Id. at 4. Assuming, however, that the Court
were to find that plaintiffs are entitled to some attorneys' fees, defendant argues that the
amount of fees awarded to plaintiffs should be reduced to account for "time spent on
issues on which Plaintiffs were unsuccessful." Id. at 5. Specifically, defendant argues
that plaintiffs' fees award should be reduced for time spent on the many issues raised at
the administrative hearing on which they were unsuccessful, and because plaintiffs were
unable to establish that the substantive requirements of the IDEA were not met by the
District. Id. at 5-13. The District also argues that "the lodestar figure identified by
Plaintiffs in their 2005 Attorneys' Fees Request is based on an inflated hourly rate and an
unreasonable number of hours expended." Id. at 13.

In their reply, plaintiffs argue that the 2005 Fees Award is final and binding.
Reply at 6. Plaintiffs assert that "an attorney fee order becomes final when the time to
appeal that order expires [30 days after the order becomes final], even if the merits have
been previously appealed." Id. Therefore, plaintiffs argue, because defendants did not
timely file an appeal to the 2005 fees award, a motion pursuant to Fed. R. Civ. Proc.
60(b) is their exclusive remedy. Id. However, plaintiffs assert that such a motion is not

Case 2:18-cv-00919-CAS-JC   Document 25-2   Filed 03/13/19   Page 101 of 165   Page
ID #:209
Case 2:04-cv-08572-CAS-SS   Document 128   Filed 09/29/10   Page 4 of 9   Page ID #:2221

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          JS - 6  O

### CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|---|---|---|---|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|---|---|

appropriate at this stage. Id. at 9. First, there is no basis for the District's challenge of the fee award based on the fact that Judge Cooper's original decision was vacated, because the decision on the merits of this case has since been affirmed. Id. at 9-10. Moreover, defendants cannot challenge the "underlying substance" of the 2005 Fees Award ("its findings on hours and rates") because "a Rule 60(b)(5) motion is not a substitute for an appeal that could and should have been made previously." Id. at 10.

The Court agrees with plaintiffs that Judge Cooper's order of October 21, 2005, granting plaintiffs their reasonable attorneys' fees is final and binding on the parties. Therefore, the Court GRANTS plaintiffs' motion to lift the stay on the execution of the 2005 Fees Award. The Court further finds that it is appropriate to include post-judgment interest pursuant to 28 U.S.C. § 1961.

### B.     2008 Fees Motion

Plaintiffs also request that this Court consider the briefing filed in connection with its 2008 Fees Motion, held in abeyance until the resolution of Appeal II, which has since been decided in plaintiffs' favor. Mot. at 7. Plaintiffs assert that such consideration is now appropriate because "[a]ll possible appeals on the merits have now been determined." Id. at 8.

Defendant argues in opposition that plaintiffs are not entitled to the fees requested in the 2008 Fees Motion. Opp. To Mot. For Determination of Previously Filed Mot. For Attorneys' Fees ("Fees Opp") at 7. First, the District argues that plaintiffs are not a prevailing party for purposes of the fee-shifting statute because the resolution of the dispute did not "change the relationship between [plaintiffs and defendants]." Id. at 7-11. Second, defendant argues that even if plaintiffs are entitled to some portion of their attorneys' fees for the relevant time period, they should be reduced "based on unreasonable hours expended, duplicative hours, and an excessive hourly rate." Id. at 12.

In reply, plaintiffs contend that the Ninth Circuit's order of July 23, 2010, granting plaintiffs' motion for attorneys' fees incurred in Appeal II is determinative of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA    JS - 6  O

## CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | | Date | September 27, 2010 |
|---|---|---|---|---|
| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. | | | |

prevailing party issue.[2]  The Court agrees that plaintiffs are the prevailing party, and therefore finds that plaintiffs are entitled to their reasonable attorneys' fees for the period of December 1, 2005-April 17, 2008.[3]

Therefore, the Court proceeds to consider whether the hours and rates proposed by plaintiffs are reasonable and whether any reason exists for the lodestar to be reduced. Under 20 U.S.C. § 1415(i)(3)(C), attorneys' fees awarded in an IDEA action "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of service furnished."  In <u>Davis v. San Francisco</u>, 976 F. 2d 1536, 1544 (9th Cir. 1987), <u>vacated in part on denial of hearing</u>, 984 F. 2d 245 (9th Cir. 1993),

---

[2]In reply, plaintiffs also object to defendant's use of its opposition to this motion to present new evidence and argument in opposition to the 2008 Fees Motion. Reply at 12. They request that the Court ignore this new evidence.  <u>Id</u>.  If the Court chooses to accept defendant's "new evidence and argument on the 2008 Fee Motion, Plaintiffs request permission to file a full response."  <u>Id</u>. at 13.  The Court denies that request.

[3]The Court also finds that the Ninth Circuit's decision that plaintiffs were the prevailing party and entitled to reasonable attorneys' fees is determinative of defendants' argument in their opposition to the 2008 Fees Motion that plaintiffs were not entitled to attorneys' fees based on mootness. Opp. To 2008 Fees Motion at 1-11. Even if the Ninth Circuit decision did not preempt that argument, the Court would still be inclined to reject it. Defendant does not appear to have argued mootness in any brief on the merits of this case either to the district court or to the Ninth Circuit. Given that defendant continued to appeal the district court decision, forcing plaintiffs to incur attorneys' fees on two appeals and on remand, it is inequitable to allow the District to now assert that the issues were already moot and thereby require plaintiffs to bear those costs. Relatedly, the Court rejects defense counsel's argument at the hearing on this matter that the fees awarded should be reduced based on the contention that the relationship between the parties did not change as a result of this litigation. As plaintiffs' counsel argued in response, plaintiffs were fully successful on their claims before the district court, resulting in the provision of hundreds of thousands of dollars worth of education expenses by defendant. Moreover, as discussed above, having forced plaintiffs to incur fees on two appeals and on remand, it is inequitable for the District to now assert that the litigation was meaningless in order to limit its liability.

T - 102

Case 2:18-cv-00919-CAS-JC    Document 25-2    Filed 03/13/19    Page 103 of 165    Page
ID #:211
Case 2:04-cv-08572-CAS-SS   Document 128    Filed 09/29/10   Page 6 of 9   Page ID #:2223

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA       JS - 6 $^{O}$

## CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|----------|---------------------|------|--------------------|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|-------|---------------------|

the Court noted that attorneys' fees should be calculated with "close attention paid to the fees charged by lawyers of reasonably comparable skill, experience, and reputation." The Court is satisfied, based on the Declarations of George D. Crook, Valerie Vanaman, Robert M. Myers, Henry Tovmassian, Sharon Robinson, and Carol A. Sobel in support of the 2008 Motion, and the exhibits attached to those declarations, that the rates requested ($575, $495, and $430 per hour) are reasonable and consistent with rates previously approved by courts in cases such as the one at bar.

With respect to the time spent on the litigation, defendants object to the following hours on the basis that they were unnecessary and/or duplicative in their opposition to the instant motion:

- 2.20 hours billed by Ms. Vanaman and 20.0 hours billed by Mr. Chavira for their work in connection with the preparation of the brief presented to the Ninth Circuit on Appeal I. Fees Opp. at 13.
- 15.90 hours by Mr. Tovmassian and 4.00 hours by Ms. Vanama incurred preparing for Mr. Crook's oral argument to the Ninth Circuit.
- 6.80 hours billed by Mr. Myers for reviewing and revising plaintiffs' post-hearing brief to the district court. Id. at 14.
- 24.20 hours billed by Ms. Vanaman to rewrite and edit the reply brief in support of plaintiffs' 2008 Fees Motion. Id. at 14-15.
- 38.50 hours billed by Mr. Winn to review the reply brief and conduct research on the 2008 Fees Motion. Id. at 15.

The Court finds that defendants have established that the challenged hours were duplicative and unnecessary. The Court therefore finds it appropriate to reduce the award by $40,725.50.

To the extent that defendant argues that plaintiff's failure on the substantive requirements prong of their IDEA claim necessitates a reduction in the fees awarded based on their 2008 Fees Motion, the Court rejects this argument for the same reasons it was rejected in Judge Cooper's 2005 Fees Award. "The fact that a party may obtain all the relief sought as a result of procedural violations of the IDEA rather than substantive violations does not diminish the extent of that party's success. Accordingly, under the IDEA, success on only procedural grounds does not deprive a party of prevailing party

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA   JS - 6 <sup>O</sup>

**CIVIL MINUTES - GENERAL**

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|---|---|---|---|
| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. | | |

status and does not limit the amount of fees to be awarded." 2005 Fees Award at 5 n.1. Moreover, this argument is even less persuasive with respect to the time period for which plaintiffs currently seek fees because in this time period, the only issue was the procedural element: "no time was spent by either side on the 'substantive' aspects of the IEP." Reply at 13. The Court also disagrees with defendants' characterization of the plaintiffs as having unnecessarily protracted this litigation, and therefore does not find it necessary to reduce any of the fees awarded on this basis. Fees Opp. At 22-23.

### C.   Fees incurred for work on the instant motion

Plaintiffs further request an award of fees incurred "in seeking and collecting their statutory attorneys' fees." Mot. at 9. Plaintiffs submit declarations with accompanying exhibits to demonstrate the reasonableness of the rates charged and the hours spent "researching and preparing [the instant] motion and accompanying documents." Id.

Defendant argues that the rates are "excessive, do not represent the prevailing market rates in the Los Angeles area for this type of action, and are not the rates necessary to attract competent counsel," and offers expert testimony to this effect. Fees Opp. at 21. The District also challenges the contrary opinion offered by plaintiffs, suggesting that the "firms cited by Mr. Pearl in support of counsel's rates are those law firms that charge the highest rates in California, and, for that matter, in the country, to perform highly complex commercial and class action litigation," and are therefore not relevant to the analysis at hand. Id. at 20. Defendant further argues that, to the extent plaintiffs present evidence that this Court has previously approved of the 2008 rates of the attorneys in question, that it is not reasonable that their rates would have gone up between 2008 and today given the state of the economy. Id. at 20-21. Based on survey data, the District suggests that the prevailing rate for attorneys is $250 per hour, as opposed to the rates requested, which are $650 for Mr. Crook and Ms. Vanaman, $550 for Mr. Tovmassian, $500 for Ms. Robinson, and $170 for Mr. Chan. Id.

In their reply, plaintiffs argue that their moving papers presented specific evidence that the rates requested were reasonable, and that the District failed to meet their burden to present "equally specific countervailing evidence." Reply at 15. Plaintiffs further

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          JS - 6  O

## CIVIL MINUTES - GENERAL

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|---|---|---|---|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|---|---|

argue that defendant's evidence of the prevailing rates lacks credibility, and that its argument is based on the wrong legal standard. Id. at 16. Moreover, plaintiffs argue, "the hourly rates requested here are quite modest in view of the experience and accomplishments of Plaintiffs' lawyers," and compared with rates that courts in this circuit have previously approved. Id. at 10. The Court agrees with plaintiffs and finds that the rates requested are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 895 n. 11 (1984).

Defendant also argues that plaintiffs are not entitled to recover fees incurred by Mr. Pearl, because he is "a lawyer who is compensated to render expert opinions in support of attorneys' fees applications," and "the IDEA is clear that parties may not recover fees for experts or consultants." Fees Opp. at 22. Plaintiffs contend that "[t]he undisputed facts here are that Mr. Pearl was associated into this case as an attorney/advocate, not an expert, to guide and prepare Plaintiffs' appellate and district court fee motions." Reply at 20. The Court agrees and finds that Mr. Pearl's fees are recoverable by plaintiffs.

However, the Court finds that the amount requested for work on the instant motion–$77,255.30–and particularly the $56,016.20 requested in connection with the reply brief and oral argument, is unreasonably high. The Court finds that half of the amount requested for work on the reply brief is reasonable, and reduces the award accordingly. The Court therefore finds that an award of $49,247.20 in attorneys' fees for work on the instant motion is reasonable.

## IV.   CONCLUSION

Based on the foregoing, the Court GRANTS plaintiffs' motion for lifting of stay and for determination of previously filed motion for attorneys' fees and costs. The District is hereby directed to pay plaintiffs the following sums:

a.    $335,112.79 in fees and costs as ordered in the October 19, 2005 order granting attorneys' fees and costs to the plaintiffs, plus accrued interest of $64,712.58 through July 20, 2010, plus interest at the daily rate of $34.52.

b.    $667,029.20 in fees and costs incurred between December 1, 2005 and April

Case 2:18-cv-00919-CAS-JC   Document 25-2   Filed 03/13/19   Page 106 of 165   Page
ID #:214
Case 2:04-cv-08572-CAS-SS   Document 128   Filed 09/29/10   Page 9 of 9   Page ID #:2226

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          JS - 6 $^{O}$

**CIVIL MINUTES - GENERAL**

| Case No. | CV CAS 04-8572(SSx) | Date | September 27, 2010 |
|---|---|---|---|

| Title | H.B., ETC.; ET AL. v. LAS VIRGENES UNIFIED SCHOOL DISTRICT; ET AL. |
|---|---|

17, 2008, plus accrued interest from March 11, 2010.

c.   $49,247.20 in fees incurred on the instant motion.

IT IS SO ORDERED.

|  | 00 | : | 09 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |

**EXHIBIT "4"**

1

2

3

4

5

6

7

8

9                              UNITED STATES DISTRICT COURT

10                            CENTRAL DISTRICT OF CALIFORNIA

11

12   JOSE BANDA, MANUEL BANDA and        )   CASE NO.  CV 13-3358-R
     LORENA BANDA,                       )
13                                       )   ORDER GRANTING PLAINTIFFS'
                          Plaintiffs,    )   MOTION FOR ATTORNEYS' FEES AND
14                                       )   EXPENSES
           v.                            )
15                                       )
     ANTELOPE VALLEY UNION HIGH          )
16   SCHOOL DISTRICT,                    )
                                         )
17                        Defendant.     )
                                         )
18                                       )

19          Before the Court is Plaintiffs' Motion for Attorneys' Fees and Expenses and Plaintiffs'

20   Motion for Reasonable Attorneys' Fees on Appeal. Having been thoroughly briefed by both

21   parties, this Court took the matter under submission.

22          Title 20 U.S.C. § 1415(i)(3)(B)(i) provides that the court may award reasonable attorneys'

23   fees to the prevailing party. "The most useful starting point for determining the amount of a

24   reasonable fee is the number of hours reasonably expended on the litigation multiplied by a

25   reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "[T]he fee applicant

26   bears the burden of establishing entitlement to an award and documenting the appropriate hours

27   expended and hourly rates." *Id.* at 437; *see also* 20 U.S.C. § 1415(i)(3)(F) (stating that "the

28   court shall reduce" an award if the time spent was "excessive").

T - 108

1    The Ninth Circuit raised three issues with this Court's previous order granting in part and

2    denying in part Plaintiffs' Motion for Attorneys' Fees and Expenses. (Dkt. No. 20). These issues

3    were: (1) the lack of adequate explanation given for reducing the time spent on closing brief by 15

4    hours; (2) the lack of further identification of hours block billed beyond the 48.9 to justify this

5    Court's reduction of 100 hours; and (3) this Court's error in refusing to award attorneys' fees for

6    the action of bringing the motion itself. In addition, the Ninth Circuit has given this Court

7    jurisdiction over Plaintiffs' Motion for Reasonable Attorneys' Fees on Appeal.

8    First, this Court addresses the fact that Plaintiffs' Counsel spent more than 80 hours on the

9    closing brief, which was previously found to be excessive. The Ninth Circuit has ruled that district

10   courts have the discretion to reduce hours for duplicative work and can "impose a small reduction,

11   no greater than 10 percent—a "haircut"—based on its exercise of discretion and without a more

12   specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1112, 1116 (9th Cir. 2008). Thus,

13   this Court imposes a 10% reduction of the total hours Plaintiff's Counsel attributed to working on

14   its closing brief. Therefore, instead of the original 15 hour reduction, 8 hours will be deducted.

15   Second, as mentioned in this Court's previous order, many of Counsel's billing entries are

16   too vague to permit a reasonable analysis. In addition to the 48.9 hours originally identified by this

17   Court, which the Ninth Circuit affirmed, an additional 71.2 hours of entries are too vague to

18   permit a proper reasonable analysis. For example, on October 14, 2012, there is a 2-hour entry for

19   "Continue preparation for hearing." Similarly, on October 15, 2012, there is a 2-hour entry for

20   "Continue to prepare for hearing." On June 21, 2012, Counsel billed 10 hours for various tasks but

21   did not itemize the tasks. Accordingly, it is difficult to determine whether the billing was

22   reasonable. In an effort to be specific, this Court details each occurrence where Plaintiff's Counsel

23   billed hours while failing to itemize the tasks: 6.80 hours on August 9, 2012; 0.10 hours on

24   October 27, 2012; 0.10 hours on October 31, 2012; 14.40 hours on December 3, 2012; 9 hours on

25   December 5, 2012; 9 hours on December 6, 2012; 8.30 hours on December 11, 2012; and 9.50

26   hours on December 12, 2012. By utilizing this block billing technique, Plaintiffs' Counsel has

27   failed to meet its burden of showing that the requested fees are reasonable. *Welch v. Metropolitan

28   Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). Accordingly, this Court has discretion to deduct a

T - 109

Case 2:19-cv-00819-CAS-JC   Document 25-2   Filed 03/13/19   Page 110 of 165   Page
ID #:891
Case 2:13-cv-08358-RSCW   Document 85-5   Filed 07/28/16   Page 3 of 11   Page ID #:218

1    total of 120.10 hours as being insufficiently documented.

2        The Ninth Circuit approved the original deduction of 35 hours for the excessive hearing

3    preparation time. Additionally, 120.10 hours is deducted as being insufficiently documented and 8

4    hours is deducted from the time spent preparing the closing brief. Accordingly, 243.80 hours is the

5    amount of time reasonably expended on the administrative proceeding. As affirmed by the Ninth

6    Circuit, the market rate for an attorney with the experience of Plaintiffs' Counsel in Antelope

7    Valley during the time the administrative proceeding took place is $350.00 per hour. Thus, 243.80

8    hours multiplied by the local rate of $350.00, totals $85,330.00.

9        Third, with respect to attorneys' fees for the district court action, the Ninth Circuit ruled

10    that this Court erred in refusing to award fees on fees. *See Barlow-Gresham Union High Sch. Dist.*

11    *No. 2 v. Mitchell*, 940 F.2d 1280, 1286 (9th Cir. 1991); *Gonzalez v. City of Maywood*, 729 F.3d

12    1196, 1210 (9th Cir. 2013). Accordingly, the Court proceeds with a reasonableness analysis.

13    While Plaintiffs' Counsel seeks 151 hours of attorneys' fees along with $479.95 in additional

14    costs, 22.2 hours of Plaintiffs' billing entries are too vague to permit a consideration as to whether

15    they are reasonable. Again, in an effort to be specific, this Court details each occurrence where

16    Plaintiff's Counsel billed hours while failing to itemize the tasks: 0.20 hours on July 25, 2013;

17    0.10 hours September 9, 2013; 2.30 hours on September 12, 2013; 3 hours on September 17, 2013;

18    0.40 hours on September 18, 2013; 0.80 hours on October 1, 2013; 7.80 hours on December 5,

19    2013; 6 hours on December 8, 2013; 0.50 hours on January 7, 2014; 0.10 hours on January 9,

20    2014; and 1 hour on February 9, 2014. By utilizing this block billing technique Plaintiffs' Counsel

21    has failed to meet their burden of showing that the requested fees are reasonable. *Welch,* 480 F.3d

22    at 948. Accordingly, Plaintiffs' Counsel is entitled to 128.80 hours of compensation and $479.95

23    in costs.

24        A reasonable hourly rate is "to be calculated according to the prevailing market rates in the

25    relevant community…for similar services by lawyers of reasonably comparable skill, experience,

26    and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The Ninth Circuit has consistently

27    held that the "relevant community" is the forum in which the district court is located. *Davis v.*

28    *Mason County*, 927 F.2d 1473, 1488 (9th Cir. 1991); *Gonzalez v. City of Maywood*, 729 F.3d

T - 110

1196, 1205 (9th Cir. 2013). Plaintiffs have documented the appropriate hourly rates, which they supported with evidence that the $650.00 an hour and $575.00 sought by Plaintiffs' Counsel is the market rate in the legal community for lawyers of comparable skill, experience, and reputation. Of the 128.80 hours that Plaintiffs' Counsel is entitled to, 66.10 is attributable to the attorney with a reasonable hourly rate of $650.00 an hour and 62.70 is attributable to the other attorney at $575.00 an hour. When the hours attributable to each attorney are multiplied to the respective local hourly rate and then added together, Plaintiffs' Counsel is entitled to $79,017.50 plus the $479.95 in costs. Accordingly, $79,497.45 is awarded to Plaintiffs for this action.

Finally, the Ninth Circuit has assigned Plaintiffs' Motion for Reasonable Attorneys' Fees on Appeal to this Court. In the Ninth Circuit, "fees are ordinarily available to compensate attorneys for successful litigation of their fee applications, including work on appeal." *Barlow-Gresham*, 729 F.3d 1196 at 1210. Plaintiffs' Counsel was successful in litigating their fee applications on appeal. Furthermore, Plaintiffs have documented the appropriate hours expended and hourly rates. Accordingly, the $182,063.00 Plaintiffs seek for its work on the appeal is granted in its entirety.

In total, Plaintiffs' Counsel is awarded fees for the administrative hearings, plus fees and costs for this action, plus fees for the appeal. Accordingly, $346,890.45 is awarded to Plaintiffs.

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Attorneys' Fees and Expenses is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Reasonable Attorneys' Fees on Appeal is GRANTED.

Dated: July 28, 2016.

_____
MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

T - 111

**EXHIBIT "5"**

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

|  |  |
|---|---|
| In the Matter of:<br><br>PARENTS ON BEHALF OF STUDENT,<br><br>v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT. | OAH Case No. 2017041138 |

## DECISION

Parents on behalf of Student filed a request for Due Process Hearing with the Office of Administrative Hearings, on April 24, 2017, naming Los Angeles Unified School District. District served Student with a response to his complaint on May 3, 2017. On June 6, 2017, OAH granted the parties' joint request for a continuance.

Administrative Law Judge Darrell Lepkowsky heard this matter in Van Nuys, California, on September 5, 6, 7, 12, and 13, 2017.

Attorneys Henry Tovmassian and George Crook appeared on behalf of Student. Mother and Father attended the entire hearing. Student did not attend.

Attorney Karl Widell appeared on behalf of District. District Due Process Specialist Anait Sinanian or Due Process Specialist Juan Tajoya attended the hearing on behalf of District on different days.

At the parties' request, OAH continued the hearing to October 16, 2017, for written closing arguments. Closing arguments were timely filed, the record was closed, and the matter was submitted for decision on October 16, 2017.

ISSUES[1]

1.      Whether District denied Student a free appropriate public education by:

(a)      Failing to meet its child find obligation to him from April 25, 2015,[2] through the end of the 2016-2017 school year; and

(b)      Failing to conduct timely assessments in all areas related to Student's suspected disability, including (i) intellectual functioning, including areas of attention; concentration; executive functioning; information processing; visual/perceptual skills; and memory functioning, including verbal and non-verbal memory; (ii) language processing, including development and use; (iii) academic functioning; (iv) gross and fine motor functioning and sensory integration; (v) social-emotional functioning; and (vi) behavior from April 25, 2015 through the 2016 – 2017 school year?

(c)      Failing to conduct appropriate assessments in all areas related to Student's suspected disability, including (i) intellectual functioning, including areas of attention; concentration; executive functioning; information processing; visual/perceptual skills; and memory functioning, including verbal and non-verbal memory; (ii) language processing, including development and use; (iii) academic functioning; (iv) gross and fine motor functioning and sensory integration; (v) social-emotional functioning; and (vi) behavior from April 25, 2015 through the 2016 – 2017 school year?

2.      Whether District committed procedural violations, which denied Student a FAPE by:

(a)      Failing to timely review and consider third party assessments;

(b)      Failing to hold timely individual education program team meetings to determine Student's eligibility for special education;

(c)      Failing to meet its child find obligations to Student from April 25, 2015, through the end of the 2016-2017 school year; and

---

[1] The issues were clarified by Student and agreed to by District on the first day of hearing, and finalized in an Amended Order Following Prehearing Conference dated September 8, 2017.  The ALJ has further reorganized the issues for clarity.  The issues as outlined in this Decision are the only issues heard and decided.  The ALJ has the authority to redefine a party's issues providing no substantive changes are made.  (*J.W. v. Fresno Unified School Dist.* (9th Cir. 2010) 626 F.3d 431, 442-443.)

[2] Student does not raise any claims outside of the applicable two-year statute of limitations.

       (d)     Failing to make a formal, specific, written offer of FAPE in the IEPs of
(i) September 15, 2016 and (ii) October 17, 2016?

    3.     Whether District denied Student a FAPE from April 25, 2015, though the end
of the 2016-2017 school year, by failing to find him eligible for special education and related
services, and develop an appropriate IEP for him to address all of his unique needs?

## SUMMARY OF DECISION

    Student convincingly demonstrated that District should have assessed him for special
education eligibility after Parents asked District to convene a Section 504[3] team meeting on
March 9, 2016, in response to his increased inability to focus and attend in class, increased
poor behavior in class, and increased absences due to anxiety about attending school.
Student also met his burden of persuasion that he should have been found eligible for special
education at that time as a child with other health impairment and emotional disturbance.  At
the time of the Section 504 meeting, Student had limited strength, vitality or alertness, due to
his chronic attention deficit hyperactivity disorder and accompanying anxiety.  His behaviors
in class were disruptive and he was off-task 50 percent of the time.  Student's anxiety
manifested itself primarily as a resistance to attending school.  Student developed physical
gastrointestinal health issues that had no medical basis but were instead caused by his anxiety
concerning school.  Although Student continued to make good grades academically, his
focus and attention at school was impaired, as was his behavior in class.  His anxiety and
resulting physical symptoms caused him to miss a significant amount of school days.
Student's 504 plan failed to address these issues.  Student required special education
interventions that could only be provided through an individualized education program.

    Student also proved for the same reasons that District should have found him eligible
for special education and developed an IEP for him at the October 17, 2016 IEP team
meeting District convened after it assessed him for special education eligibility in the spring
and fall of 2016.  Although Student's academic grades did not suffer, Student's anxiety the
previous school year caused him to miss substantial amounts of school days, and his
behavior, attention, and lack of focus in school continued through the end of the 2015-2016
school year, in spite of changes District made to his section 504 plan.  District's reliance on
the fact that Student was able to maintain his grades was misplaced.  Lack of academic
achievement is not the only factor to consider in determining whether a child qualifies for
special education.

    Student failed to meet his burden of persuasion that District had an obligation to
assess him and/or find him eligible for special education prior to March 9, 2016, or that
District denied him a FAPE in any manner other than those discussed above.

---

[3] Section 504 refers to Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701
et seq.)

## FACTUAL FINDINGS

1.      Student was an 11-year-old sixth grader at the time of the hearing who attended Bridges Academy, a private school.  Parents unilaterally placed Student at Bridges at the beginning of the 2016-2017 school year.  Student resided with Parents within District boundaries.  At the time of hearing, Student was not eligible for special education services.

*Educational Background: Kindergarten Through Second Grade*

2.      Parents chose to enroll Student in a private school of their choice for kindergarten through second grade.  Even at a young age, Student presented with difficulties at home and in school.  He had many irrational fears and anxiety.  He was impulsive, had an inability to concentrate long enough to complete homework assignments, and could not eat a meal without being constantly in motion.  He had difficulty concentrating, particularly on tasks that were not of interest to him.  When Student was six years old, his physician diagnosed him with attention deficit hyperactivity disorder and prescribed several medications to address Student's symptoms.

3.      Although Student was successful academically at his private school, Parents were concerned that the small size of the school would not provide him with enough social opportunities.  They began to consider transferring Student to public school.  Parents had another, older child, who had already been found eligible for special education.  They were familiar with the IEP process but were not certain if Student's issues would qualify him for special education.

4.      On June 7, 2013, Mother wrote to Deborah Plat, who was the Principal of Wilbur Charter School for Enriched Academics, asking that District assess Student for an IEP.  Wilbur Charter was a District charter school in the neighborhood where Student lived.  At hearing, Ms. Plat could not recall receiving Mother's June 7, 2013 request that District assess Student.  Neither Ms. Plat nor any other District staff person responded to the request or contacted Parents about it.  Parents did not pursue the issue of assessment.  Rather, they had Student assessed by Dr. Sandra Kaler, a psychologist who had provided services to Student's older sibling.

### DR. KALER'S PSYCHO-EDUCATIONAL EVALUATION[4]

5.      Parents contacted Dr. Kaler in early June 2013 to assess Student due to their concerns about his impulsivity, inability to control his activity levels so that he could complete homework, inability to eat a meal without being in constant motion, and inability to focus on tasks in which Student was not interested.  Dr. Kaler conducted her assessment over

---

[4] The terms "assessment" and "evaluation" are synonyms and were used interchangeably by the parties and witnesses at hearing.  They are used interchangeably in this Decision as well.

four days in June, July, and August 2013. Student was approximately seven-and-a-half years old when she started her assessment, and was just finishing first grade.

6.     Dr. Kaler received a masters' of science degree in nursing in 1976, and was certified as a family nurse practitioner in 1978. After working in the nursing field as a practitioner and instructor for over 15 years, she returned to school and obtained a doctorate degree in psychology from the University of California, Los Angeles in 1990. She thereafter worked as a staff psychologist and assistant research psychologist at UCLA, working predominantly with children with cognitive, social and environmental delays. She had maintained a private psychology practice since 1992, and had been an assistant clinical professor at UCLA since 1996. She was well-qualified to assess Student.

7.     Dr. Kaler used a variety of standardized testing instruments to assess Student in the areas of cognition, academics, behavior, and social and emotional development. The tests included rating scales that Mother completed. Dr. Kaler also observed Student during the assessment process. She did not have Student's teachers complete the rating scales. She did not observe Student at school or interview his teachers.

8.     During the assessment process, Student was articulate, but attempted to talk off-topic frequently. He demonstrated a marked motor restlessness. He had trouble keeping his hands still and kept bending pages in Dr. Kaler's workbook, even after she tried to re-direct him. He had difficulty attending to tasks in which he was not interested. When asked to do tasks of low interest, Student complained about his head hurting. Dr. Kaler surmised that Student was somaticizing as Student's stress and dislike of the tasks manifested as the physical symptom of a headache. On language tasks, Student missed information due to his lack of attention. He would sometimes hit his head with his hand to stay focused. Student also had difficulty doing tasks or answering questions that required him to be introspective. He also had negative attention-seeking and provocative behaviors. For example, when asked to do something, he would respond "You can't make me."

9.     Student's overall intelligence quotient was 123, in the superior range. He also scored above grade level in all but one of the areas tested. His academic achievement scores were also very high. Student's scores were primarily in the above-average to superior range. The only exceptions were average scores in sentence composition and in oral expression.

10.     Dr. Kaler administered several testing instruments to Student to review his social/emotional and adaptive levels. Student scored in the clinical range for thought problems, attention, and aggression. His scores were in the clinical range for attention deficit/hyperactivity problems and oppositional-defiant problems, as well as for externalizing problems. Student's scores on these testing measures indicated he had sleep issues, was dependent, nervous, fearful, and worried a lot. Student's scores also demonstrated he had a deficiency in social awareness. He had difficulty understanding emotional states past a superficial level. Student's scores on adaptive tests were all in the average range. Dr. Kaler did not find that Student had any fine or gross motor deficits, or any sensory-motor integration issues that needed to be addressed.

11.     Dr. Kaler agreed with Student's physician that Student had attention deficit hyperactivity disorder.  Student was impulsive, constantly distracted, and had a high degree of motor restlessness in spite of the medications he took.  She also confirmed that Student had a lack of basic social foundational understanding although he was not on the autism spectrum.  She recommended that Student receive social skills support as well as in-home behavioral support due to how both Student's and his older sibling's behavior was impacting the family at home.

12.     Dr. Kaler determined that Student required a section 504 plan at school to provide him with accommodations and behavioral support.  She also felt that, given Student's high degree of impulsivity and provocative behavior, he might appear to be a person with emotional difficulties if he attended a mainstream classroom.  Dr. Kaler therefore recommended that Parents retain Student in his private school placement until a medication regimen was found that would address Student's behavioral issues.  Once Student's behaviors were medically controlled, Dr. Kaler believed Student would then be ready to transition to a larger school setting with section 504 accommodations.

13.     Dr. Kaler did not believe that Student qualified for special education at the time she assessed him in June through August 2013.  She did not recommend that Parents request a special education assessment from his school district.  Rather, she believed that section 504 accommodations were sufficient to address Student's issues and that he should remain in his private placement until his medications were stabilized.  She recommended that Parents have Student reassessed the following year.

14.     Mother took a copy of Dr. Kaler's assessment report to Wilbur Charter and gave it to Ms. Plat.  Neither Ms. Plat nor any other District staff member contacted Parents to discuss the report.

2013-2014 School Year and Section 504 Eligibility

15.     Parents followed Dr. Kaler's recommendation and retained Student in his private school placement for second grade, and also enrolled Student in a social skills program.  The social skills group was run by Dr. Jeffrey Jessum, a doctor of psychology who had been in private practice since 1994.  Dr. Jessum focused on teaching the children in the group how to see things from another person's perspective, how to read social and cultural context, how to act with sportsmanship behavior, and how to give feedback.  Student remained in the group for approximately two years.

16.     Student successfully completed second grade at his private school.  At the end of the 2013-2014 school year, Parents had Dr. Kaler re-assess him.  Dr. Kaler did a brief psychoeducational evaluation that was not as in-depth as the full evaluation she did the year before.  Although Student still demonstrated a high degree of distractibility, Dr. Kaler advised Parents that Student should be able to transition to public school as long as he had accommodations under a section 504 plan.  She did not believe that Student qualified for special education in June 2014, when Student was completing second grade.  Dr. Kaler

believed that a section 504 accommodations plan would address sufficiently Student's distractibility, motor restlessness, and impulsivity. She did not suggest that Parents ask District to assess Student as she did not believe an assessment was necessary.

17.     Mother contacted Wilbur Charter in June 2014, and met with assistant principal David Price on June 9, 2014. Although Dr. Kaler had said that a section 504 plan would meet Student's needs, at the meeting Mother verbally asked Mr. Price to have District assess Student for special education eligibility. Mr. Price felt that a section 504 accommodation plan would be sufficient to meet Student's needs and that it was not necessary for Student to have an IEP. Parents acceded to Mr. Price's recommendation and did not renew their request for a special education assessment at that time.

18.     Mother signed a request for a section 504 evaluation on June 9, 2014, the day she met with Mr. Price. The request for evaluation stated that learning, concentrating, working, and thinking were life activities substantially limited by Student's attention disability. Mr. Price accepted Mother's input and Student's medical diagnosis of attention disorder and developed a section 504 plan based on that information. Mr. Price developed the plan the same day he met with Mother.

19.     Under the section 504 plan, Student would receive accommodations during testing. He would also receive the following accommodations in his general education classroom, which his teacher would implement: preferential seating; extended time on assignments and tests (one and a half times the normally allotted period); time for Student to review his answers if he handed in a test or assignment too quickly; homework to be limited to one hour a day, with no deduction for unfinished work; ability to stand rather than sit in class as necessary; and two-to-three minute breaks as necessary. Student's teacher would be in charge of teaching him how to take the breaks. Mother consented to the section 504 plan.

*Third Grade: 2014-2015 School Year*

20.     Student attended Jennifer Stern's general education classroom for third grade. Ms. Stern implemented the section 504 plan. Student had some behavior challenges during the school year. He was impulsive and sometimes engaged in inappropriate behavior, such as drawing inappropriate pictures or calling a classroom aide "a loser." Some of the behaviors were the result of changes in his medications that resulted in Student not being able to sleep. Ms. Stern worked on his behavior at school and asked Parents to reinforce the same at home. She also used reinforcers, such as having Student earn tickets for good behavior and losing them for not following class rules, such as being late to line up.

21.     Although Student contends that his lack of focus and attention and behavior in class should have alerted District that he might have a disability and therefore should be assessed, Student's lack of focus and inappropriate behaviors did not significantly interfere with his ability to access his education during third grade. While Ms. Stern noted on Student's report cards that he had difficulty settling down to the quiet routines in class, there

is no persuasive evidence that Ms. Stern was unable to successfully redirect Student and keep him on task so that he could complete his schoolwork.

22.    Student's academic grades for the first two trimesters of third grade were all in the proficient or advanced levels.  His only low scores for work and study habits and learning and social skills were in the areas of organizing materials, following directions, exercising self-control, and demonstrating appropriate social interaction with peers.  Student received scores of "2" in those four areas, indicating that he was making partially proficient progress.  However, there is no persuasive evidence that his behaviors interfered with his ability to access his education or that it interfered with his classmates' ability to learn.  Nor is there any evidence that Student's very few absences in third grade were the result of his anxiety, physical symptoms caused by anxiety, or a refusal to go to school.  Rather, most of the absences were due to Student's reactions to new medications.

23.    At some point during the Student's second or third grade year, Parents began taking him to see a counselor for individual counseling.  By the end of third grade, they stopped having Student participate in Dr. Jessum's social skills group in favor of the one-on-one counseling.  The counseling was primarily in response to difficulties Student had at home.

24.    Dr. Kaler continued to have contact with Mother while Student was in third grade, primarily because of issues with Student's sibling.  Mother informed her of Student's challenges at school.  However, Dr. Kaler did not believe that any of those challenges were significant enough to recommend changes to Student's section 504 plan, or to recommend that Parents request District to assess Student for special education eligibility.  At hearing, Dr. Kaler stated that she did not believe Student was eligible for special education while he was in third grade.  She stated that there was no reason for her to recommend an assessment for special education at that time.

*Fourth Grade: 2015-2016 School Year*

FALL 2015

25.    Student attended fourth grade in Victoria Greene's general education class.  Ms. Greene had a multiple subject teaching credential and been a general education teacher since 2004.  She began working at Wilbur Charter in 2005, and was still there at the time of the hearing.  Ms. Greene had no special education certifications or training.  There were 36 to 37 pupils in Ms. Greene's class during the 2015-2016 school year.

26.    Although Student contends that he demonstrated significantly disruptive behaviors during the first trimester at school, which ran from August 18, 2015, to November 6, 2015, that should have alerted District that he might be a child with a disability, there is little persuasive evidence to support that contention.  Student was off-task in class, said inappropriate things, talked too loudly and too much, and tended to engage in behavior to attract attention, but Ms. Greene was able to redirect him.  Student's academic grades

remained at the proficient to advanced levels.  He was only absent one day and only tardy three times during this first trimester.  Father informed District at a March 9, 2016 section 504 team meeting, discussed below, that Student had loved to go to school and had a wonderful first trimester in Ms. Greene's class.

27.    Student's behaviors and difficulties with school began to increase toward the end of the first trimester.  He began to experience extreme anxiety about going to school and began expressing to Parents that he did not want to go.  However, Parents did not have any significant difficulty convincing Student to go to school before District's winter break, which began on December 21, 2015.

28.    Student was selected to participate in Wilbur Charter's gifted and talented education program, known as GATE, on October 15, 2015.  It is an enrichment program for high academic achievers.  Pupils participated in the GATE program an hour a week during school time and were given different projects on which to work.  Because of his anxiety about school, Student was unable to complete a single project in the GATE program during the 2015-2016 school year.  As discussed below, his anxiety increased substantially after returning from winter break in January 2016.  The burden of having to complete the extra assignments and his embarrassment about his inability to do the GATE projects added to Student's anxiety.  Parents eventually withdrew Student from the GATE program because he was too anxious to do any of the work and being pulled from class to participate increased his anxiety.

29.    District contends that Ms. Greene continued to be able to address Student's issues in class during the entire 2015-2016 school year and that none of Student's issues affected him academically.  District overlooks what was happening with Student beginning in January 2016.

WINTER 2016

30.    Student began having even more difficulty organizing his tasks and activities after he returned to class in January 2016 following District's winter break.  He avoided tasks that involved sustained mental effort.  He was talking more in school to his classmates, and talking more about inappropriate things to gain attention, even if the attention was negative.  Ms. Greene tried moving Student's seat, but it did not stop the behaviors.  Student often lost things that were necessary to do work.  His work notebooks and folders were disorganized.  He had difficulty doing his homework and turning in assignments.  He blurted out answers in class no matter how many times he was asked to wait to be called on to answer.  He interrupted others when they were talking.  He had difficulty waiting his turn.  He was forgetful.  He would deliberately act silly to gain attention, or do things like try to trip his classmates in an effort to gain attention.  He was constantly off-task.

31.    Student's anxiety also increased substantially after returning from winter break in January 2016.  Student was more and more resistant to going to school.  He complained of headaches and stomach aches.  He complained that he had difficulty going to the

9

bathroom and would vomit in the morning before it was time to go to school. He would go into the bathroom at home in the morning and refuse to leave, complaining of various physical symptoms.

32.    Student's anxiety caused him to freeze up and be unable to complete assignments. It became a cycle: Student could not do an assignment because he was overcome by anxiety, and then he did not want to go to school because he was humiliated that he had not done the assignment. Student was not keeping up with class assignments and often had to continue working on an assignment and project while the rest of his classmates had moved on to something else.

33.    Parents made sincere efforts to get Student to school. They told Student he needed to take responsibility for his school obligations and that he needed to change his priorities with getting his work done. They told Student they were not happy with his lack of responsibility. Their encouragement and interventions were not successful. Student continued to exhibit physical manifestations of his anxiety in the mornings and he continued to refuse to go to school. Parents often had to physically drag Student out of the house and place him in the car.

34.    Wilbur Charter's second trimester went from November 9, 2015, to February 26, 2016, that consisted of 56 school days. Student was absent for 11 of those days, which amounted to almost 20 percent of class days during the trimester. He was tardy on four days. The majority of days tardy and days absent were due to Student's refusal to go to school. As of January 2016, Student was almost as big as Mother. She was no longer able to physically pick him up and place him in the car. Father often had to become involved in getting Student to school, even though it interfered with his ability to get to work.

35.    Although school attendance is compulsory and truancy can be addressed through school attendance review board proceedings,[5] District never contacted Parents about Student's excessive absences, never addressed the issue, and took no action to procure Student's attendance in class.

36.    Mother communicated her concerns to Ms. Greene through emails. She expressed to Ms. Greene that what she was seeing in Student was more than just disorganization and forgetting to bring his homework assignments from school. After winter break, Mother started seeing much more anxiety and worry in Student than she previously saw. Parents tried giving Student more structure at home and limited his access to things like video games and other electronic diversions, but it did not help. Mother noted that Student was having a more difficult time controlling his impulses and was more hyperactive. In a January 27, 2016 email to Ms. Greene, Mother expressed her fear that, although Student had loved school to that point and had been doing well, that had changed and she was concerned about how this was affecting him at school.

---

[5] See, generally, Education Code section 48200, et seq.

37.     Ms. Greene did not refer Student for an assessment and did not contact any of Wilbur Charter's administrators about Mother's concerns.  Neither Ms. Greene nor any Wilbur Charter administrator took any action based upon Student's excessive absences the second trimester of school.

MARCH 9, 2016 SECTION 504 TEAM MEETING

38.     Between the end of January 2016 and the beginning of March 2016, Student's anxiety issues and physical reactions to the anxiety continued unabated.  Since District did not take any action in response to her concerns expressed to Ms. Greene, Mother asked District to convene a section 504 plan team meeting to discuss Student's needs.  District convened the meeting on March 9, 2016.  Present at the meeting were Parents, Ms. Greene, and Maeva Carter, who was a District assistant principal and elementary instructional specialist.  Ms. Carter had a master's degree in educational administration.  Before becoming an assistant principal, she was a special education teacher and program specialist for over 25 years.  She was assigned to assist principals at several District schools meet special education compliance obligations.

39.     During the section 504 meeting, the participants discussed Student's issues at school.  Ms. Greene informed the team that Student's behavior in class at been "off the charts" since returning from winter break.  He constantly talked to classmates.  He was off-task at least 50 percent of the time.  Student would talk about anything other than the assignment or project on which he was supposed to be working.  He had not finished a class project that the pupils had about a month and a half to complete, even when Ms. Greene provided Student with extra time, and even though she redirected him and told him he would suffer consequences for not finishing the project.  The class had started working on another project and finished it, and Student had not finished his.  Ms. Greene had a plastic divider she would use to separate Student from his classmates so he could focus on doing his work, but the divider did not decrease Student's behaviors.

40.     Student could not remain in his seat, but rather was constantly walking or running around the classroom.  At times he would engage in attention seeking behavior such as trying to trip classmates, even after Ms. Greene told him he could hurt someone that way.  Student spent half his time being silly, disruptive, or off-task.  Student attempted constantly to get attention, even if it was in a negative way.

41.     Ms. Carter recognized that Student's behaviors were disruptive and interfered with his learning in class. She also recognized that his behaviors needed to be controlled before he went to middle school, because there would be less tolerance for them there.  However, she did not refer Student for a special education assessment after the March 9, 2016 section 504 team meeting, because Student's academic grades were not affected by his behaviors.  She opined at hearing that a pupil had to have an academic need to qualify for an IEP.  She also stated that if the pupil had some social/emotional deficits but was not a danger to himself or to others, the pupil also would not qualify for an IEP.  For these reasons, she felt that Student's issues could be addressed through changes to Student's section 504 plan,

11

and by teaching Student how to control the things he was then unable to control. Ms. Carter's belief that a pupil with good grades was not eligible for an IEP, unless a danger to themselves or to others, was voiced by the majority of District staff who testified at hearing. Those witnesses included Ms. Plat and District school psychologist Ashley Laucis, as discussed below.

42.    At the March 9, 2016 section 504 team meeting, District amended Student's section 504 plan by adding a specific accommodation to use a privacy divider during class work. District also added an accommodation for Student to write down his homework assignments every day and to take home his math, science, health, and writing folders every day as well. The plan also included an accommodation to use a token system in class as Parents did at home. However, Ms. Greene had already tried unsuccessfully to use reward and consequence systems with Student, and had already tried unsuccessfully to use the dividers. Hence, adding their use to the section 504 plan failed to address Student's needs.

43.    District retained several accommodations from Student's prior section 504 plan. The plan again provided the accommodations of giving him extended time to finish assignments and tests, allowing Student to stand at his desk to complete assignments, permitting Student to take two to three minute breaks, and having Student's teacher instruct him on how to take a break. These latter accommodations had been in place all through fourth grade, and Ms. Greene had implemented them. However, even with these accommodations, Student's behaviors had not decreased and his anxiety had substantially increased. Retaining unsuccessful accommodations failed to address Student's needs.

44.    District did not explain at the section 504 team meeting or in the plan itself how Ms. Greene was supposed to teach Student to take breaks, or who was going to teach her how to address Student's behavior. Ms. Greene had no training in addressing the needs of a pupil with attention disorders and had not received training on how to teach pupils to take breaks.

45.    Parents acknowledged, during the March 9, 2016 section 504 team meeting, that Student had done well in school before the winter break and had enjoyed going to school. However, they also voiced their concern with Student's increased anxiety about attending school, his resultant physical symptoms, and the extreme difficulty they had getting Student to attend school. District did not address these issues through the amended section 504 plan, did not offer Student any type of counseling, did not address Student's absences or anxiety, and did not offer to assess him for special education eligibility.

*District's Initial Assessment of Student*

EVENTS LEADING UP TO PARENT'S REQUEST FOR ASSESSMENT

46.    Student continued experiencing high levels of anxiety about going to school after the March 9, 2016 section 504 team meeting, and after Ms. Greene implemented the new accommodations. Parents continued to have Student see a private therapist. On

March 10, 2016, the day after the meeting, Mother sent an email to Ms. Greene giving her written permission to speak with Student's therapist, or to send her a form to give such permission. Ms. Greene did not contact the therapist or tell Parents they needed to fill out a release form. Ms. Greene did not forward the email to any school administrators.

47.    Although Student expressed interest in the new token award system Ms. Greene implemented pursuant to the revised section 504 plan, the system was not successful. On April 27, 2016, Mother sent an email to Ms. Greene describing the challenges Parents experienced since the Student returned to school after winter break. Student's behavior had a pattern. He was fine during the school day, but suddenly, at bedtime or in the morning, he would complain of stomach pain and having an upset stomach. Student had diarrhea at times and sometimes vomited in the morning. He complained about being anxious. Student did not have a fever and Mother did not believe there was anything physically wrong with him. She believed the physical symptoms were the result of Student's anxiety.

48.    Student was afraid and embarrassed to use the restroom at school and afraid he would have a bathroom accident because of this. He thought the bathrooms were too filthy. This was causing him additional anxiety.

49.    Parents continued having considerable difficulty getting Student to school. On one occasion, Russell Wise, a Wilbur Charter special education teacher, had to go to Parents' car when the family arrived at school to coax Student to get out and go to class. On another occasion, Mother and Father both had to physically put Student in the car in his pajamas. They had to put the child locks on in the car and both had to take Student to school because he was trying to climb into the front seat and exit the car while it was moving.

50.    Student would sob on most days Parents took him to school, saying he did not want to go. Sometimes Parents were able to get him into the car, other days he would remain in the bathroom. Even when Parents were successful getting Student into the car, they were not always successful in convincing him to get out of the car and go to class.

51.    Wilbur Charter's third trimester lasted from February 29, 2016, to June 10, 2016, 65 school days. Student was absent 17 days during the third trimester and was tardy seven days. Neither Ms. Greene nor any District administrator took any action to address Student's excessive absences. No one contacted Parents to determine why Student was absent and/or how District could address Student's school anxiety. Although Student was absent for over 25 percent of the third trimester, District did not look into the cause of the absences or refer Student to a school attendance board. District chose to ignore the issue because Student was able to maintain high grades.

52.    Although Ms. Greene did attempt to implement Student's accommodations, they were not successful. Student continued to engage in off-task and disruptive behaviors. Ms. Greene's response often was to have Student remain in class during recess or what was called "Fun Fridays." She had Student complete eight-paragraph introspective essays on his

13

behavior. Ms. Greene believed that Student was deliberately misbehaving and that he could control his behavior if he really wanted to. Ms. Greene's methods failed to address Student's needs because his attention deficit hyperactivity disorder meant he was unable to control his behavior. He therefore did not know why it occurred and could not state how he could stop it. He blamed himself and thought it meant he was bad. This added to his anxiety. Additionally, given Student's hyperactivity and motor restlessness, prohibiting him from recess activity increased his disruptive behaviors rather than serving to inhibit them. Student felt that he was being punished for something he did not understand and could not control.

53.     At some point before the end of the 2015-2016 school year, Mother took Student to see a gastroenterologist. She wanted to determine if there was a medical basis for Student's diarrhea, vomiting, headaches, and stomach aches. The doctor could not find any medical reason for Student's symptoms.

54.     On April 27, 2016, Mother made a formal request for District to assess Student. District sent Parents an assessment plan on May 13, 2016. The plan proposed assessing Student in the areas of health and development; general ability; academic performance; language function; motor abilities; and social/emotional status, including the area of emotional disturbance. Mother signed consent to the assessment plan on May 16, 2017.

DR. KALER'S MAY 9, 2016 BRIEF PSYCHOLOGICAL EVALUATION

55.     Dr. Kaler maintained contact with Parents due to her past relationship with them and ongoing concerns about Student and his sibling. Mother communicated with her over the course of the 2015-2016 school year, describing Student's increasing anxiety and school refusal, and the physical symptoms he was manifesting. Parents asked Dr. Kaler to re-assess Student soon after Mother requested District assess him.

56.     Dr. Kaler re-evaluated Student using many of the testing instruments she used in 2013. She had Student complete some of the rating scales that previously only Mother completed. However, Dr. Kaler did not do any academic assessment of Student. She did not list or summarize any of Student's school records. Although she observed him during her assessment she did not observe him at school at Wilbur Charter. She did not think it necessary because she was familiar with both schools and had observed some of the classrooms when assessing other children. Dr. Kaler did not contact Ms. Greene to get any input from her on Student's needs. Nor did Dr. Kaler contact Student's treating therapist or his treating physician. She did not observe Student at Bridges or speak with his teachers after he began attending school there.

57.     During Dr. Kaler's assessments, Student demonstrated continual motor restlessness. He expressed concern that he missed school due to his stomach problems. Student felt like he was aching all the time. He felt that his teacher yelled at him and kept him from doing fun activities because of his behaviors. He felt that he was being punished for things that he could not control.

14

58.     The rating scales Mother completed indicated Student was in the clinical range for being anxious and depressed; withdrawn; having somatic complaints; having attention problems; demonstrating aggressive behavior; internalizing problems; being hyperactive; being impulsive; having difficulties with executive functioning; and being defiant.  Student also self-rated himself in the clinical range in several areas.

59.     Student scored in the clinically significant range in the area of social awareness on a test that measured social responsiveness.  The test result indicated that Student had deficiencies in reciprocal social behavior.  This meant that his ability to interact appropriately with peers was negatively impacted.

60.     Dr. Kaler re-assessed Student's cognitive levels.  His full scale intelligence quotient dropped from the score of 123 on the 2013 assessment, to 111 on the new assessment.  Dr. Kaler acknowledged during her testimony that it is fairly common for a child's full scale intelligence quotient to drop up to 15 points during the course of a child's education.  However, in Student's case, she felt that his attentional and emotional difficulties suppressed some of his scores.  She came to that conclusion because Student's sub-test scores were scattered, which had not been the case when she previously assessed him.

61.     Dr. Kaler concluded that Student was experiencing increasing stress at school.  Although Student denied that he was depressed or anxious, his somatic symptoms contradicted his self-assessment.  Dr. Kaler was concerned that Student was becoming increasingly dysregulated, which impacted his moods.  She concluded that Student's school anxiety, which resulted in his physical symptoms and corresponding refusal to go to school, clearly demonstrated that Student was not accessing his education.

62.     Dr. Kaler ultimately concluded that Student required an IEP for social and emotional reasons.  She believed that Student would not be able to be successful in school while placed in a general education classroom with a large number of pupils.  She also believed that Student needed to continue with individual therapy.  Dr. Kaler recommended that Parents initiate the IEP process with Student's school.  She also recommended that Parents place Student in a private school.  She recommended Bridges Academy.  Although not certified by the State of California as a non-public school, Dr. Kaler made the recommendation because the focus at Bridges was addressing the educational needs of children who are twice exceptional, meaning they have high cognition but also have a disability.  Student, with his above-average full scale intelligence quotient and diagnosis of attention deficit hyperactivity disorder, was the type of pupil Bridges served.

DISTRICT'S ASSESSMENT

63.     District's initial assessment of Student took place in May, August, September, and October 2016.  The results of the assessment were memorialized in a report dated

15

T - 127

October 10, 2016,[6] and included reference to each of the assessments District administered. The only portions of the assessment completed before the end of the 2015-2016 school year were the school psychologist's review of Student's records, her observation of Student in Ms. Greene's classroom, and Ms. Greene's completion of the Attention Deficit Hyperactivity Disorder-Fourth Addition rating scales.  All other assessments were completed after Student began the 2016-2017 school year at Bridges Academy.

64.    School nurse Lindsay Quiazon completed the health assessment component. Her report was based on information from Mother and a review of Student's school records. The report noted that Student had a diagnosis of attention deficit hyperactivity disorder and was prescribed medication to treat the disorder.  The report further noted that Student received private psychology therapy once a week, but did not have a history of serious or chronic illness.  Although Student had been absent 11 days in the second school trimester of the 2015-2016 school year and 17 days over the course of his third trimester, the health report stated that Student's physical health was not an area of need, and did not impact Student's participation, performance, and access in his educational program.  However, this was a conclusion and recommendation and did not invalidate the assessment.

65.    Special education teacher Mr. Wise assessed Student's present academic levels using the Woodcock-Johnson IV Tests of Achievement.  The test measured Student's academic abilities in various components of reading, mathematics, writing, and academic skills.  Although Mr. Wise administered the test, he left Wilbur Charter before writing his assessment report.  Wilbur Charter special education teacher Christine Kazandjian wrote the assessment report based on the scores Mr. Wise obtained.

66.    Student's standard scores on the Woodcock-Johnson ranged from the average range to the superior range.  They were similar to his scores on Dr. Kaler's 2013 assessment. His only low score was an 82 in spelling, which was in the below average range.  The score was considerably lower than the score in spelling on Dr. Kaler's 2013 assessment, where Student had scored 117, which was above average.

67.    District school psychologist Ashley Laucis administered the remaining portions of District's psycho-educational assessment.  Ms. Laucis had a masters' degree in educational psychology, an education specialist degree, and a pupil personal specialist credential.  At the time of the hearing, she had been a school psychologist for five years, all with District.  Ms. Laucis had assessed many pupils during the course of her career.  She received additional training from District in assessing pupils and in making determinations of eligibility for special education.  Ms. Laucis was qualified to assess Student.

---

[6] The original psycho-educational assessment report was dated September 14, 2016. It was revised after District assessors had an opportunity to observe Student in his classroom at Bridges and receive input from his teachers there.

68.     Ms. Laucis reviewed Student's school records; received written input from Ms. Greene and Mother; observed Student in Ms. Greene's classroom on June 8, 2016, and observed him in his classes at Bridges on September 29, 2016; and administered several testing instruments and rating tools to assess various aspects of Student's development. Ms. Laucis also reviewed Dr. Kaler's 2013 assessment and her recent May 2016 assessment.

69.     During Ms. Laucis' observations of Student in Ms. Greene's classroom, he was on-task and demonstrated no disruptive behaviors. Student's classroom at Bridges the following school year had only nine pupils. Student's seat was a type of rocking chair. As he had during the observation in Ms. Greene's classroom, Student participated in the lessons, raised his hand appropriately to ask and answer questions, and was not disruptive except for one time when he interrupted a classmate by blurting out an inappropriate comment. His teacher easily re-directed him.

70.     Ms. Greene's evaluation of Student was that he was at or above grade level in all academic areas. She felt that although Student was often disruptive in class, made inappropriate comments, and needed re-direction to stay on task, he was academically successful as indicated by his high grades in all areas. Ms. Greene did not recount to Ms. Laucis the comments she made at the March 9, 2016 section 504 team meeting, where she informed Ms. Carter and Parents that Student's behavior was "off the charts." Nor did Ms. Greene discuss Student's anxiety and substantial absences. She was aware that Student had stopped attending the GATE program since he was no longer pulled out of class for it. However, she failed to inform Ms. Laucis that Student had withdrawn from the GATE program. Mother filled out an interview questionnaire as part of Ms. Laucis' assessment. She too neglected to tell Ms. Laucis that Student had to withdraw from GATE due to his anxiety.

71.     Student's teachers at Bridges were more specific about Student's challenges in class. Although Student's classes only had about nine pupils, Student still needed prompting to refrain from disruptive behavior. Student continued to make off-topic comments and jokes in class; blurted out answers out-of-turn; talked while classmates were answering questions; had difficulty staying on task; and had poor self-control. As he had while attending Wilbur Charter, Student's academic achievement remained high at Bridges. However, although Student continued having challenges controlling his behavior in class, his anxiety levels had decreased. While he still voiced anxiety to Parents about going to school, Student had ceased refusing to go to school. He no longer had the gastrointestinal problems he had during the spring of 2016 while at Wilbur Charter. Student attributed this to the fact that he was eating better, but there is no evidence that corroborated Student's belief. Once Student began attending Bridges, Parents no longer had to forcibly place him in the car and Student no longer locked himself in the bathroom, or experienced many of the physical symptoms he had the previous school year.

72.     District did not use general standardized tests to determine a pupil's intelligence quotient. Rather, it used a variety of procedures, including review of records,

17

observations, interviews, and other types of formal and informal testing instruments, to determine a pupil's general abilities and cognitive functioning.

73.    Ms. Laucis administered the Cognitive Assessment System-Second Edition to evaluate Student's cognitive processing.  This assessment is based on four areas: planning, attention, and successive and simultaneous processing.  The planning processing scale measured Student's ability to strategize solutions to problems and work under time-restraints. Student's standard score in planning was 91, in the lower average range.  Student's score on the attention processing scale reflected his ability to sustain focused attention and resist distractions.  Student scored 109, which was near the top of the average range.  In the area of simultaneous processing, which measures Student's ability to relate parts into a group or whole and to understand relationships among pictures and words, Student's standard score was 124, in the superior range.  Because Student's subtest scores in these three areas were scattered, Ms. Laucis believed that his overall scores needed to be interpreted with caution. On the successive processing scale, which reflected Student's ability to work with information in a specific linear order, Student's standard score was 106, in the average range. Overall, however, Student's scores indicated his high level of cognition.

74.    Ms. Laucis administered the Test of Auditory Perceptual Skills – Third Edition, which measured Student's ability to process and interpret what he heard orally. Student scored in the average range in all three auditory memory index subtests.

75.    Ms. Laucis administered the Motor-Free Visual Perception Test-Third Edition to assess Student's overall visual perceptual ability without motor involvement.  Student's skills were in the average range on this test.

76.    To test Student's ability to integrate visual perception and fine motor skills, Ms. Laucis administered the Beery-Buktenica Developmental Test of Visual-Motor Integration-Sixth Edition.  Student was required to copy shapes and symbols.  His standard score on this test was 75, in the below average range.  Ms. Laucis concluded that Student demonstrated a significant deficit in his overall visual and fine motor abilities, but attributed his low score to his impulsivity.  She felt that Student had the potential to show higher visual and fine motor skills, but acknowledged that Student's low performance might be reflective of his lack of organizational skills, attention difficulties, and impulsivity.  She based this conclusion as well on the fact that neither Dr. Kaler's 2013 assessment or Dr. Kaler's 2016 assessment of Student indicated that Student had any deficits in the areas of fine or gross motor skills, or in the area of sensory processing.  Ms. Laucis did not recommend further testing in the area of sensory-motor integration.  Student failed to provide any persuasive evidence at hearing that he had a deficit in that area, or that Ms. Laucis should have suggested additional testing for Student, especially in light of Dr. Kaler's prior findings.

77.    Ms. Laucis found that Student functioned in the superior range in the area of conceptualization, which is the ability to learn new concepts.  Student was also in the high average range in association, which is the ability to acquire and store information in your memory.  Student had average processing abilities in visual processing, auditory processing,

18

auditory comprehension, auditory reasoning, expression, attention, phonological processing receptive language, and expressive language.

78.     Ms. Laucis used a variety of methods to assess Student's social/emotional status.  She had Ms. Greene, Mother, three of Student's teachers at Bridges, and Student complete the Behavior Assessment Scale for Children-Second Edition.  These were rating scales covering numerous areas of emotional and social development.  Scores in the clinically significant range suggested a high level of maladjustment.  Scores in the at-risk range identified either a significant problem that might not be severe enough to require formal treatment or indicated a potential for developing a problem that should be monitored.

79.     Although Ms. Greene had called Student's classroom behavior "off the charts" in March 2016, the only behavior she rated above the average range for Student was in the area of hyperactivity, which she rated as at-risk.  Ms. Greene did not indicate any issues with Student's anxiety or somatization despite the fact she was aware that he had missed over 25 percent of class for the last trimester of the 2015-2016 school year due to anxiety about attending school.  She was aware of Student's resulting physical manifestations because of her correspondence with Mother and the discussions at the March 9, 2016 section 504 team meeting.  At hearing, Ms. Greene could not persuasively explain why her responses during the assessment process contradicted her communications with Mother and the information discussed at the section 504 team meeting.

80.     One of Student's teachers at Bridges rated Student at-risk only in the area of hyperactivity; he rated Student as average in all other areas.  Another teacher rated Student as average in all areas.  The third teacher rated Student at risk only in the areas of study skills and leadership.  He rated Student average in all other areas.  None of the teachers testified at the hearing, so it is unknown if they believed that Student no longer had issues in those areas or if they believed that it was the small classroom environment that helped him control his maladaptive behaviors, lack of focus, and lack of attention.

81.     Mother rated Student in the clinically significant range for hyperactivity, somatization, adaptability, and activities of daily living.  She rated Student at-risk in the areas of aggression, conduct problems, anxiety, depression, attention problems, and social skills.  Student's responses were all in the average range, although he did voice his prior anxiety about attending school to Ms. Laucis.  Student completed the Behavior Assessment Scales after he had started school at Bridges, which affected his self-rating in the average range.  He was much happier attending school there than he had been at Wilbur Charter.

82.     Ms. Laucis had Mother, Ms. Greene, and Student's three teachers at Bridges complete the Attention Deficit Hyperactivity Rating Scale-Fourth Edition.  This testing tool is one of several used to determine if a child is demonstrating characteristics of inattention and/or hyperactivity and impulsivity.  Mother scored Student in the clinically significant range in both areas.  Ms. Greene and Student's teachers at Bridges scored Student in the average range in both areas, although Ms. Greene's scores were higher than were those of the teachers at Bridges.

83.     Ms. Laucis and Ms. Greene completed the Childhood Autism Rating Scales-Second Edition.  This test is designed to help determine if a child is on the autism spectrum.  Scores on this test demonstrated that Student did not manifest any symptoms of autism.

84.     To determine if Student was demonstrating symptoms of depression, Ms. Laucis had Student and Mother complete the Children's Depression Inventory-Second Edition, another test consisting of rating scales.  Their responses demonstrated that Student's functional and emotional problems were in the average range, compared to other children his age.

85.     The Multidimensional Anxiety Scale for Children-Second Edition is an assessment of anxiety dimensions in children.  It is used to help diagnose anxiety disorders.  Like many of the other assessments Ms. Laucis administered, this test consisted of rating scales.  Mother and Student completed the scales.  Student rated himself as average in all areas.  Mother rated Student as having slightly elevated separation anxiety and phobias.  She rated Student as very elevated for having a general anxiety disorder.

86.     Ms. Laucis noted in her assessment report that Dr. Kaler's most recent assessment had determined that Student was experiencing increasing stress at school and was becoming increasingly dysregulated.  However, Ms. Laucis did not mention in her assessment report that Dr. Kaler had determined that Student qualified for special education based on his anxiety and attention deficit at the time she assessed him in May 2016, and required an IEP to address his school-related anxiety.

87.     After summarizing Student's test results in her assessment report, Ms. Laucis reviewed several special education eligibility categories.  In pertinent part, she determined that Student did not qualify for special education as other health impaired because she felt the test result indicated Student did not exhibit a heightened alertness to environmental stimuli that might have been due to his attention deficit.  Although Student had attention deficit hyperactivity disorder, Ms. Laucis concluded that the disorder did not appear to be adversely impacting his academic performance.  Therefore, Student did not meet the eligibility criteria for other health impairment.  Ms. Laucis discounted Student's anxiety and barely mentioned his significant absences while he was in the general education classroom at Wilbur Charter.  She did not find that his anxiety qualified him for other health impaired because she felt it was not affecting him academically.

88.     Ms. Laucis' assessment report also reviewed the five criteria for determining if a child had an emotional disturbance for purposes of qualifying for special education.  She found that Student did meet one of the five criteria because he had a tendency to develop physical symptoms or fears associated with personal or school problems.  She noted that these symptoms had prevented Student from coming to school "at times."  Ms. Laucis found that Student's symptoms had been observed for a long period of time, and that they had been present to a marked degree, at least until Student started attending Bridges.

89.     However, Ms. Laucis discounted the fact that Student had missed approximately 20 percent of school days during his second trimester at Wilbur Charter and over 25 percent of school days his third trimester.  Her focus was rather that Student did not present with anxiety when he was at school.  When he was there, even at Wilbur, Student participated in class and did not demonstrate any outward signs of anxiety.  Although the criteria looks to whether a child's "educational performance" has been adversely affected, Ms. Laucis focused on the fact that Student's "academic performance" was above average.  She concluded that Student's physical symptoms of school-related anxiety did not adversely affect his academic performance and did not require special education support because of Student's good grades and his participation in the GATE program.

90.     Ms. Laucis was unaware at the time of her assessment that Student had not been able to complete a single project in the GATE program, and that he had dropped out of it due to his anxiety.  During her testimony, she, as had Ms. Plat, acknowledged that had she known that information, it might have changed her opinion regarding Student's eligibility.

*September 15, 2016 and October 17, 2016 Initial IEP Team Meetings*

91.     Had District started the assessment process after the March 9, 2016 section 504 team meeting, it would have completed Student's initial assessment and convened an IEP team meeting prior to the end of the 2015-2016 school year on June 10, 2016.  Since the process was not started until Mother requested the assessment on April 27, 2016, District did not complete its assessment of Student prior to the end of the 2015-2016 school year.  Rather, Ms. Laucis continued the assessment process after District's summer break and after Student had started attending Bridges.  The majority of Ms. Laucis' assessment was done on August 29, 2016, or later.

92.     Ms. Laucis completed her draft assessment report in September 2016.  District convened an initial IEP team meeting for Student on September 15, 2016, a few weeks after he started the 2016-2017 school year at Bridges.  District timely noticed Parents about the meeting on August 22, 2016.  Mother and Father attended the meeting, as did Dr. Kaler.  Present for District was assistant principal Crystal Shirley, who served as District's administrator; special education teacher Ms. Kazandjian; Ms. Greene; Ms. Laucis; district nurse Ms. Quiazon; and Jodie Mensik, a district specialist in the area of least restrictive environment placements.  All required IEP members were present.  No one from Bridges attended.

93.     Ms. Quiazon reviewed her health assessment with the team.  There were no questions or concerns about her assessment.

94.     District then determined that it wanted to observe Student at his placement at Bridges and receive input from his present teachers there to have a clearer picture of his needs.  Parents agreed with the District team members' recommendation to recess the IEP team meeting so that the information could be gathered.  In the intervening month before the

21

continued meeting, Ms. Laucis completed the assessment process by observing Student at Bridges, getting input from his teachers there, and revising her assessment report.

95.    Student's IEP team reconvened on October 17, 2016.  Mother attended the meeting, as did Dr. Kaler.  District team members consisted of Ms. Shirley; Ms. Kazandjian; Ms. Laucis; and Ms. Mensik.  Ms. Greene was not available for the meeting so District general education teacher Diane Schulte attended in her place.  All required IEP team members were present.

96.    The IEP team reviewed the results of District's psycho-educational assessment.  The team reviewed the input from Ms. Greene and from Student's teachers at Bridges.  The team reviewed Student work samples, the results of Ms. Laucis' observations of Student at Wilbur Charter and at Bridges, and the results of all the assessments, including the rating scales completed by Mother, Student, and Student's teachers.  The team discussed placement options including general education with no special education supports; general education with special education support services; and special day class placement.

97.    The IEP team reviewed Dr. Kaler's report.  She was present at the two IEP team meetings and presented her opinion that Student qualified for and required special education support to address his school anxiety and inability to regulate his behavior.  However, the District team members determined that Student did not qualify for special education.  The District team members arrived at this conclusion even though Ms. Laucis had determined that he met one of the criterions for having an emotional disturbance based upon his anxiety, which resulted in developing physical symptoms associated with his fear of going to school.  District based its denial of eligibility on the fact that Student's grades and test scores demonstrated that he was at proficient levels or higher in all academic subjects.  District staff also based their denial of eligibility on the fact that Student's teachers at Bridges had not indicated that he had any emotional problems at school or that his attention deficit was causing significant issues in class.  District felt that Student's ability to maintain his high academic levels demonstrated that he was able to access his education without special education supports.

98.    At hearing, Ms. Carter, Ms. Laucis, Ms. Plat, and Ms. Greene all took the position that a child cannot qualify for special education eligibility if his or her grades are not impacted by a disability.  Although none of District's witnesses suggested that Student's excessive absences during his last two trimesters at Wilbur Charter were not validly based on his physical symptoms and/or anxiety, none of the witnesses believed that the absences affected Student's ability to access his education because his grades and continued high academic achievement were not affected.

99.    The October 17, 2016 IEP team clearly reviewed Student's present levels of performance.  The IEP document clearly stated that District did not find Student eligible for special education and therefore was not offering him any special education placement or services.  Parents did not agree with District's denial of eligibility and did not sign consent to the IEP.

TESTIMONY OF STUDENT'S EXPERT DR. KALER

100.    Dr. Kaler opined that District inappropriately delayed assessing Student and inappropriately found Student ineligible for special education. She felt that District had failed to consider Student's school anxiety and the fact that the anxiety resulted in Student's loss of so many days at school. She pointed to the fact that Ms. Laucis had found Student met one of the criteria for emotional disturbance, but had then failed to acknowledge that Student missed so much school for the very reasons that he met the criteria. She believed that District should have assessed Student following the March 9, 2016 section 504 tam meeting. Dr. Kaler believed that Student could not benefit educationally from placement in a large general education classroom. Student was not able to screen out stimuli. He knew what he was supposed to do, but just could not do it. Writing in detail was onerous for him as was attempting to keep track of things such as his homework assignments.

101.    Dr. Kaler opined that Student required a small class with one-on-one instruction to address his anxiety and to prevent him from becoming bored in class. She opined that Student not only met the criteria for eligibility under emotional disturbance due to his physical symptoms resulting from his school anxiety, but he also met the criteria for eligibility under other health impairment. Student's anxiety resulted in his limited alertness to the demands of his classroom. Although she had originally believed that a section 504 plan could meet Student's needs, it was apparent to her after her May 2016 assessment, and after reviewing District's assessment, that the section 504 plan, even as modified, was not successful in addressing Student's needs. Student's anxiety affected his educational performance because Student did not regularly attend school, was not completing assignments, had to drop out of the GATE program, and not functioning at his cognitive or achievement levels.

102.    Dr. Kaler's opinion that Student met the eligibility categories of other health impairment and emotional disturbance, was more persuasive than the opinion of District's witnesses that Student failed to meet eligibility criteria. District witnesses inappropriately failed to consider as significant that Student missed 28 days of school and was tardy on 11 days during his last two trimesters of fourth grade, primarily due to school anxiety. They failed to consider that Student had never completed a single project or assignment for the GATE program and stopped participating in it due to his anxiety over the work assigned in the program. Finally, District witnesses failed to consider the amount of assignments Student could not complete in Ms. Greene's class. Rather, they mistakenly focused solely on Student's ability to maintain his grades as the only criteria on which to base an eligibility determination.

103.    Dr. Kaler believed that Student required a placement in a small, structured setting with few pupils in the class and opportunities for Student to receive one-on-one instruction. She was familiar with Student's classroom at Wilbur Charter, and did not believe that a general education classroom with up to 39 pupils (the maximum permitted in a fifth grade classroom) could meet Student's needs. Dr. Kaler believed that Student was

getting an optimal education at Bridges because its instructional model addressed his disabilities as well as his high cognitive skills.

104.    Dr. Kaler did not address in her 2016 assessment, or in her testimony at hearing, whether District did or did not have other schools and/or classrooms that could meet Student's needs.  She did not assess Student after May 2016, and did not observe him either in his classroom at Wilbur Charter or at Bridges.  Dr. Kaler therefore did not have any evidence to present on what Student's needs were at the time of the hearing, which took place 16 months after she assessed him.  Dr. Kaler did not recommend any certified non-public schools that would also be able to meet his needs.

TESTIMONY OF DR. JESSUM

105.    Student began receiving individual therapy from Dr. Jessum in October 2016, soon after he began attending Bridges.  Dr. Jessum's therapy concentrated on addressing Student's impulsivity, affect, motor restlessness, arousal, staying on task, focus, lack of organization, and difficulty with self-regulation.  He explained during his testimony that Student had difficulty modulating his feelings, had trouble self-soothing, had difficulty seeing his part in problems, and in finding language for what he was feeling.  Student had difficulty self-censoring his comments or realizing that what he was saying was inappropriate.

106.    Student continued to have these difficulties through the course of the 2016-2017 school year.  Dr. Jessum opined that Student could not control his behavior and could not find the language to express what he was feeling, so he acted out.  Student had low self-esteem in the past and continued to demonstrate the same as of the time of the hearing.  His low self-esteem resulted in Student bragging and engaging in self-inflating behaviors.  Student's anxiety was related to his sense that he could not do things well, which was independent of his high cognition.  Since Student could not control his behaviors, he constantly felt out-of-control.

107.    Dr. Jessum stated that Student's school refusal was still present to some extent after Student began attending Bridges, but was nowhere near the extent it had been the previous school year.  Dr. Jessum was familiar with Bridges as he had other patients who attended school there.  He attributed the decline in Student's anxiety and refusal to attend school to the small-class instructional model at Bridges and the non-traditional ways of teaching, such as permitting pupils to sit in bean bag chairs or lie on the floor.  Dr. Jessum also opined that staff at Bridges was trained to address the needs of pupils with emotional issues, such as anxiety, and who had attention disorders.  Additionally, Bridges had a psychologist and counselors on staff to serve its pupils.  The trained teachers, counselors, and psychologist provided a program that addressed the pupils' emotional, social, and psychological needs.

108.    Neither Dr. Jessum, nor any other witness, testified as to what specific type of counseling services Student received at Bridges during the 2016-2017 school year. Dr. Jessum did not observe Student at Wilbur Charter or at Bridges.

*Parents' Unilateral Placement of Student at Bridges Academy for Fifth Grade and Other Costs Claimed*

109.    Parents followed Dr. Kaler's recommendation to place Student at Bridges. Parents gave notice to District on May 27, 2016, by Mother's email to Ms. Greene that they intended to privately place Student at Bridges if the school accepted him. Parents could no longer cope with Student's constant anxiety and refusal to attend school. They also felt that he needed a classroom with fewer pupils so that he would get individual attention, which would reduce his anxiety. Parents enrolled Student at Bridges at the beginning of the 2016-2017 school year. Student remained at Bridges through the time of the hearing. The parties stipulated that Bridges is not certified by the State of California as a non-public school.

110.    Student's class had nine students with at least two other adults supporting the classroom. Student only missed a few days of class during fifth grade. Although he still complained of being anxious, once at Bridges, Student no longer complained much of having stomach aches and headaches. He did not vomit before school. Parents no longer had to physically drag him into the car to take him to school. His teachers indicated to Ms. Laucis that Student was making good academic progress in school, and that he benefitted socially from interacting with his peers, who had similar behavioral and/or social/emotional challenges.

111.    The total cost for Student's fifth grade year for the 2016-2017 school year at Bridges, including enrollment costs and other fees, was $42,990. Parents paid the tuition costs as soon as they could after the costs were due. Parents provided proof of payment through exhibits at hearing as well as through Father's testimony of the amount they paid.

112.    Student presented documentary and testimonial evidence that Parents paid $1,800 for Dr. Kaler's May 2016 Brief Psychoeducational Evaluation. They also presented documentary and testimonial evidence that they paid Dr. Jessum $6,120 from October 2016 through August 2017, for individual counseling sessions for Student.

113.    Although Student requested compensatory education as a remedy, he failed to put on any evidence whatsoever of the type, amount, and duration of compensatory education, or why he would be entitled to compensatory education in addition to reimbursement for his tuition at Bridges or the cost of his counseling with Dr. Jessum. He did not address the issue of compensatory education in his closing brief, other than to assert he was entitled to it in an amount and type to be determined by the ALJ.

114.    Student failed to submit persuasive evidence at hearing as to why Bridges, and the psychology and counseling staff at Bridges, did not adequately address any emotional or

social issues he had, including his school anxiety, or why he needed additional counseling services in order to access his education at Bridges.

115.    In his closing brief, Student did not request that OAH order any type of prospective placement for him if this decision found him eligible for special education.  In any case, Student failed to put on evidence of his present needs as of the time of the hearing.  He failed to address whether District did or did not have any type of classroom or program that would meet his needs.  Dr. Kaler opined that Student required a classroom with few pupils and opportunities for one-on-one instruction, and therefore should not return to the general education classroom at Wilbur Charter.  However, shed did not testify as to whether District had classrooms or programs that met the small-classroom setting she believed Student required.

## LEGAL CONCLUSIONS

*Introduction – Legal Framework under the IDEA[7]*

1.    This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations intended to implement it.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006)[8] et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are:  (1) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living, and (2) to ensure that the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

2.    A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's individualized education program.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.)  "Special education" is instruction specially designed to meet the unique needs of a child with a disability.  (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.)  "Related services" are transportation and other developmental, corrective and supportive services that are required to assist the child in benefiting from special education.  (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363, subd. (a).)  In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel that describes the child's

---

[7]  Unless otherwise indicated, the legal citations in the introduction are incorporated by reference into the analysis of each issue decided below.

[8]  All subsequent references to the Code of Federal Regulations are to the 2006 version.

26

needs, academic and functional goals related to those needs, and a statement of the special
education, related services, and program modifications and accommodations that will be
provided for the child to advance in attaining the goals, make progress in the general
education curriculum, and participate in education with disabled and non-disabled peers.  (20
U.S.C. §§ 1401(14), 1414(d)(1)(A); Ed. Code, §§ 56032, 56345, subd. (a.).)

3.    In *Board of Education of the Hendrick Hudson Central School District v.
Rowley* (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] ("*Rowley*")*,* the Supreme
Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to
specialized instruction and related services which are individually designed to provide
educational benefit to" a child with special needs.  *Rowley* expressly rejected an
interpretation of the IDEA that would require a school district to "maximize the potential" of
each special needs child "commensurate with the opportunity provided" to typically
developing peers.  (*Id.* at p. 200.)  Instead, *Rowley* interpreted the FAPE requirement of the
IDEA as being met when a child receives access to an education that is reasonably calculated
to "confer some educational benefit" upon the child.  (*Id.* at pp. 200, 203-204.)

4.    The Supreme Court recently clarified and expanded upon its decision in
*Rowley*.  In *Endrew F. v. Douglas County Sch. Dist. RE-1* (2017) 580 U.S.___ [137 S.Ct.
988, 997-1002; 197 L.Ed.2d 335] (*Endrew F.*), the Court stated that the IDEA guarantees a
FAPE to all students with disabilities by means of an IEP, and that the IEP is required to be
reasonably calculated to enable the child to make progress appropriate in light of his or her
circumstances.  The Court re-affirmed its earlier findings in *Rowley* that any review of an
IEP must appreciate that the question is whether the IEP is reasonable, not whether the court
regards it as ideal.  The Court stated that it would not attempt to elaborate on what
"appropriate" progress will look like from case to case.  "It is in the nature of the Act and the
standard we adopt to resist such an effort: The adequacy of a given IEP turns on the unique
circumstances of the child for whom it was created."  (*Id.* at 1001.)  The Ninth Circuit further
refined the standard delineated in *Endrew F.* in *M.C. v. Antelope Valley Unified Sch. Dist.*
(9th Cir. 2017) 858 F.3d 1189, 1201.)  The court stated that an IEP should be reasonably
calculated to remediate and, if appropriate, accommodate the child's disabilities to enable
progress commensurate with non-disabled peers, taking into account the child's potential.

5.    The IDEA affords parents and local educational agencies the procedural
protection of an impartial due process hearing with respect to any matter relating to the
identification, evaluation, or educational placement of the child, or the provision of a FAPE
to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502,
56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the
issues alleged in the complaint, unless the other party consents.  (20 U.S.C. § 1415(f)(3)(B);
Ed. Code, § 56502, subd. (i).)  Subject to limited exceptions, a request for a due process
hearing in California must be filed within two years from the date the party initiating the
request knew or had reason to know of the facts underlying the basis for the request.  (20
U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505, subd. (l); *M.M. & E.M. v. Lafayette School
Dist.* (N.D.Cal., Feb. 7, 2012 Nos. CV 09–4624, 10–04223 SI) 2012 WL 398773, ** 17 – 19,
*aff'd in part and reversed on other grounds* at *M.M. v. Lafayette School Dist.* (9th Cir. 2014)

767 F.3d 842.)  At the hearing, the party filing the complaint has the burden of persuasion by
a preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct.
528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA
administrative hearing decision is preponderance of the evidence].)  Here, Student carries the
burden of persuasion.

      6.     A district's determinations regarding special education are based on what was
objectively reasonable for the district to conclude given the information the district had at the
time of making its decision.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149
(*Adams*); *Tracy N. v. Dept. of Educ., State of Hawaii* (D. Hawaii 2010) 715 F.Supp.2d 1093,
1112.)  This evaluation standard is known as the "snapshot rule."  (*J.W. v. Fresno Unified
School Dist.* (9th Cir. 2010) 626 F.3d 431, 439 (*J.W.*).)  Under the snapshot rule, the decision
concerning an IEP is not evaluated retrospectively or in hindsight.  (*Ibid.*; *J.G. v. Douglas
County School Dist*. (9th Cir. 2008) 552 F.3d 786, 801.)  In reviewing the sufficiency of an
IEP's offer of FAPE, the snapshot rule looks at what is reasonable given the information
available to the team at the time.

      7.     To assist courts and administrative tribunals, the Supreme Court established a
two-part test to determine whether an educational agency has provided a FAPE for a disabled
child.  (*J.L. v. Mercer Island School Dist.* (9th Cir. 2010) 592 F.3d 938, 947.)  "First, has the
State complied with the procedures set forth in the Act?  And, second, is the individualized
education program developed through the Act's procedures reasonably calculated to enable
the child to receive educational benefits?"  (*Rowley*, *supra*, 458 U.S. at pp. 206-207.)  "If
these requirements are met, the State has complied with the obligations imposed by Congress
and the courts can require no more."  (*Id.* at p. 207.)

      8.     States must establish and maintain certain procedural safeguards to ensure that
each student with a disability receives the FAPE to which the student is entitled, and that
parents are involved in the formulation of the student's educational program.  (*W.G. v. Board
of Trustees of Target Range School Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target*
Range), *superseded by statute on other grounds, as stated in R.B. v. Napa Valley Unified
School Dist.* (9th Cir.2007) 496 F.3d 932, 939.)  Citing *Rowley, supra*, the Ninth Circuit
recognized the importance of adherence to the procedural requirements of the IDEA, but
determined that procedural flaws do not automatically require a finding of a denial of a
FAPE.  (*Id.* at 1484.)  This principle was subsequently codified in the IDEA and Education
Code, both of which provide that a procedural violation only constitutes a denial of FAPE if
the violation (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's
opportunity to participate in the decision-making process regarding the provision of a FAPE
to the child; or (3) caused a deprivation of educational benefits.  (20 U.S.C.
§ 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2).)  The Ninth Circuit Court of Appeals has
confirmed that not all procedural violations deny the child a FAPE.  (*Park v. Anaheim Union
High School Dist.* (9th Cir. 2006) 464 F.3d 1025, 1033, fn.3; *Ford v. Long Beach Unified
School Dist.* (9th Cir. 2002) 291 F.3d 1086, 1089.)  The Ninth Circuit has also found that
IDEA procedural error may be held harmless.  (*M.L. v. Fed. Way School Dist.* (9th Cir. 2005)
394 F.3d 634, 652.)

T - 140

*Determination of Issues*

ISSUES 1(A), 1(B), 2(B), 2(C), AND 3: DISTRICT'S CHILD FIND OBLIGATION, DUTY TO ASSESS, AND STUDENT'S ELIGIBILITY FOR SPECIAL EDUCATION

9.      Student stated his contention that District did not meet its child find obligation to him from April 15, 2015, (two years prior to the filing of his complaint) through the end of the 2016-2017 school year, in several of his issues for hearing.  For this reason, those issues are analyzed collectively here.  Student fundamentally contends that District failed to meet its child find obligation and therefore denied him a FAPE, by failing to assess him for special education eligibility prior to beginning the assessment process in May 2016.  Thereafter, District denied him a FAPE by failing to find him eligible for special education as a child with other health impairment and an emotional disturbance.  Student contends that District's assessments failed to acknowledge that his attention deficit hyperactivity disorder caused him to be unfocused, inattentive and, at times, out-of-control in class.  Student contends that he also had a high level of anxiety that manifested in his refusal to go to school and in physical symptoms, which had no underlying medical basis.  Student contends that although District found that he met a criterion for emotional disturbance, District's failure to find that the emotional disturbance impacted his educational performance was incorrect.  Student contends that his lack of attendance at school was the direct result of his disabilities, which District should have found qualified him for special education.

10.      District generally contends that it successfully met Student's needs through section 504 accommodations plans and that Student's high grades demonstrated that he was accessing his education without special education supports.  Student therefore did not require an IEP.  District contends that its assessments of Student properly determined that he was not eligible for special education.

APPLICABLE LAW ON CHILD FIND

11.      School districts have an affirmative, ongoing duty to actively and systematically seek out, identify, locate, and evaluate all children with disabilities residing within their boundaries who may be in need of special education and related services. (20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111(a); Ed. Code, §§ 56171, 56300 et seq.) This ongoing duty to seek and serve children with disabilities is referred to as "child find." California law specifically incorporates child find in Education Code section 56301.  (Ed. Code, § 56301, subds. (a), (b).)

12.      A school district's child find obligation toward a specific child is triggered when there is knowledge of, or reason to suspect, a disability and reason to suspect that special education services may be needed to address that disability.  A disability is "suspected," and a child must be assessed, when the district is on notice that the child has displayed symptoms of that disability or that the child may have a particular disorder. (*Timothy O. v. Paso Robles Unified School Dist.* (9th Cir. 2016) 822 F.3d 1105, 1120-21 (*Timothy O.*); *Department of Educ., State of Hawaii v. Cari Rae S.*  (D. Hawaii 2001)

T - 141

158 F.Supp. 2d 1190, 1194 (*Cari Rae S.*).)  That notice may come in the form of concerns expressed by parents about a child's symptoms, opinions expressed by informed professionals, or other less formal indicators, such as the child's behavior.  (*Timothy O., supra,* 822 F.3d at 1119-1120 [citing *Pasatiempo by Pasatiempo v. Aizawa* (9th Cir. 1996) 103 F.3d 796, and *N.B. v. Hellgate Elementary School Dist.* (9th Cir. 2008) 541 F.3d 1202].) The threshold for suspecting that a child has a disability is relatively low.  (*Cari Rae S. supra,* 158 F.Supp.2d at p. 1195.)  A school district's appropriate inquiry is whether the child should be referred for an evaluation, not whether the child actually qualifies for services. (*Ibid.*)

13.     California Code of Regulations, tit. 5, section 3021, subdivision (a) requires that "all referrals for special education and related services shall initiate the assessment process and shall be documented.  When a verbal referral is made, staff of the school district, special education local plan area, or county office shall offer assistance to the individual in making a request in writing, and shall assist the individual if she requests such assistance."

14.     Education Code section 56321, subdivision (a) requires a school district to provide a parent with a written assessment plan within 15 days of a referral for assessment. This section also states that if a referral is made 10 days or less before the end of the school year, the district must develop an assessment plan within 10 days of the start of the next school year.

15.     Special education law does not recognize the doctrine of continuing violations. (71 Fed. Reg. 46697 (Aug. 14, 2006); *J.L. v. Ambridge Area School Dist.* (W.D.Pa. 2008) 622 F.Supp.2d 257, 268-269; *Moyer v. Long Beach Unified School Dist.* (C.D.Cal., Jan. 24, 2013, No. CV 09-04430 MMM AJWx) 2013 WL 271686; *Patrick B. v. Paradise Protectory and Agricultural School, Inc.* (M.D.Pa., Aug. 6, 2012, No. 1:11-CV-00927 ) 2012 WL 3233036, p. 6; *Baker v. Southern York Area School Dist.* (M.D. Pa., Dec. 8, 2009, No. 1:CV-08-1741) 2009 WL 4793954, p. 5; *Evan H. v. Unionville-Chadds Ford School Dist.* (E.D. Pa., Nov. 4, 2008, No. 07-4990) 2008 WL 4791634, p.5.)

APPLICABLE LAW FOR EMOTIONAL DISTURBANCE

16.     A child with emotional disturbance exhibits one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: (a) an inability to learn that cannot be explained by intellectual, sensory, or health factors; (b) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (c) inappropriate types of behavior or feelings under normal circumstances; (d) a general pervasive mood of unhappiness or depression; and (e) a tendency to develop physical symptoms or fears associated with personal or school problems.  (Cal. Code Regs., tit. 5, § 3030, subd. (b)(4).)

*APPLICABLE LAW FOR OTHER HEALTH IMPAIRMENT*

17.    A child is eligible for special education and related services in the category of other health impairment if he or she is a pupil with limited strength, vitality or alertness, due to chronic or acute health problems which adversely affect his or her educational performance.  (Cal. Code Regs., tit. 5, § 3030, subd. (b)(9).)[9]  Attention Deficit Hyperactivity Disorder may be a qualifying health condition for other health impairment eligibility, but all the requirements of the definition above still must be met.  (Ed. Code, § 56339, subds. (a), (b).)  Eligibility criteria also require a student to be unable to access the school program without the instruction or placement that is provided by a FAPE.  (Ed. Code § 56026, subds. (a), (b).)

*ANALYSIS OF CHILD FIND: 2014-2015 SCHOOL YEAR*

18.    Student argues that District was on notice during spring 2015 that he was a child who might have disability based on four contentions: 1) Mother asked District to assess Student approximately two years earlier in her letter dated June 7, 2013; 2) Mother provided District with Dr. Kaler's summer 2013 psychoeducational evaluation in 2013, and District never responded to it; 3) Mother asked District, through Mr. Price, to assess Student before he began third grade at the beginning of the 2014-2015 school year; and 4) Student's off-task and disruptive behaviors during third grade in Ms. Stern's class should have alerted District that it should have assessed Student, at least by April 15, 2015.  Student failed to meet his burden of persuasion as to the 2014-2015 school year.

19.    District had an obligation to assess Student when Mother requested the assessment on June 7, 2013.  Student resided within District's boundaries and Mother was an appropriate person to refer him for assessment.  The fact that Student was not enrolled in a District school at the time is irrelevant as District's responsibility for child find extended to all children living within its boundaries.  However, District's failure to assess based on Mother's June 7, 2013 letter is outside the applicable two-year statute of limitations and Student specifically limited his issues to those arising within the statute of limitations.  Likewise, Mother's request for assessment to Mr. Price, made at the beginning of the 2014-2015 school year, is outside the statute of limitations.  Parents were aware they made the request for assessment in both cases and were aware of assessment and IEP procedures because Student's older sibling was already eligible for special education and had an IEP.  Parents were therefore aware of the facts giving rise to District's failure to assess when Mother requested the assessments, but chose not to file for due process.

20.    Mother's submission of Dr. Kaler's summer 2013 psychoeducational assessment is also outside the statute of limitations.  More significant, however, is the fact that Dr. Kaler's assessment did not find Student eligible for special education, did not

---

[9] The regulation lists various other health impairments that are not relevant to this decision.

suggest that Parents pursue obtaining an IEP from District, and specifically found that Student required a section 504 accommodations plan instead.  During her testimony, Dr. Kaler reiterated her earlier determination that Student did not demonstrate indications of a disability that required special education intervention in second grade.  Therefore, Dr. Kaler's summer 2013 psychoeducational assessment did not put District on notice that Student might be a child with a disability.  There was no reason for District to have assessed Student based upon Dr. Kaler's 2013 assessment.

21.    The question is therefore whether District should have assessed Student after April 25, 2015, when the two-year statute of limitations began to run.  District developed a section 504 accommodation for Student at the beginning of third grade when he enrolled in District and was placed in Ms. Stern's classroom.  Student states that District should have assessed him at least by the end of the 2014-215 school year based upon his off-task and disruptive behaviors in class.  Student points to the correspondence between Mother and Ms. Stern addressing Student's behaviors.  However, there is nothing in the correspondence that suggests Ms. Stern was not implementing the section 504 plan successfully or that she was somehow unable to address Student's issues.  Student's grades remained high.  He was not tardy often and rarely missed school.  Mother indicated to Ms. Stern that when Student did miss school, it was the result of his negative reaction to new medications rather than based upon anxiety or other types of school refusal.

22.    Significantly, Mother was in contact with Dr. Kaler frequently during the 2014-2015 school year.  Mother discussed with her Student's behavior issues in Ms. Stern's class.  Dr. Kaler never suggested to Mother that Student should be referred for a special education assessment or that Student had a disability that required special education intervention.  At hearing, Dr. Kaler acknowledged that she did not believe that Student should have been assessed during the 2014-2015 school year or that District failed in its child find obligation to him any time during that school year.  For these reasons, Student failed to meet his burden of persuasion that District should have assessed him and found him eligible for special education during third grade.

*ANALYSIS OF CHILD FIND: 2015-2016 SCHOOL YEAR*

23.    Student had a successful first trimester in Ms. Greene's fourth grade class.  His grades remained high, he was selected for the GATE program, and Ms. Greene successfully redirected his off task behaviors such as blurting out answers, interrupting others, failing to remain in his seat, and not working on assignments.  At the March 9, 2016 section 504 team meeting, Father acknowledged that Student had loved going to school and had a great school year up to the winter break.  Dr. Kaler was in frequent contact with Mother, who relayed facts concerning Student's behavior during the trimester.  Dr. Kaler did not advise Mother to request an assessment and did not suggest that Student had a disability at any time during the first trimester in Ms. Greene's class.  Student presented no persuasive evidence that District should have assessed him at that time.

32

24.     However, after returning to school from winter break, Student's maladaptive behaviors in class increased significantly.  His off-task behaviors increased as did his disruptions in class.  He interrupted his classmates more; he blurted out answers more; he failed to complete assignments.  Student's aggressive behaviors increased:  he ran around the classroom and tried to get attention by doing things like attempting to trip classmates.

25.     More significant was the anxiety Student began experiencing.  While he had "loved to go to school" the first trimester, after winter break he began exhibiting extreme anxiety related to going to school and refused to go.  Student could not do any of the projects assigned in his GATE class, which met once a week, because his anxiety prevented him from doing the work.  His anxiety increased when Student became embarrassed that he was not able to do the work, exacerbating his reluctance to go to the class.  Parents eventually withdrew Student from the GATE program because his anxiety prevented him from participating at all in the program.

26.     Student began having headaches and stomach aches, had diarrhea and vomited, in the mornings before school.  At times, Parents would have to physically carry Student to the car, lock the doors so he could not exit the car, and force him to go to school.  Once, they took him to school in pajamas.  On another occasion, special education teacher Mr. Wise had to coax Student from the car.  During the second school trimester, Student missed almost 20 percent of school days, primarily because his anxiety caused him to exhibit physical symptoms of illness and/or because Mother could not get him into the car to take him to school.  District ignored the fact that Student missed 11 days of class during the second trimester because Student, due to his high cognition, was able to maintain high grades.  District failed to question the cause of Student's absences or intervene even though school attendance is compulsory.

27.     Mother conveyed her concerns to Ms. Greene, but Ms. Greene did not act on them other than to reassure Mother that Student was still doing well academically.  Since District did not respond to Student's increased in-class behaviors or his absences, Mother requested a section 504 team meeting.  At that meeting, Ms. Greene acknowledged that Student's behavior was "off the charts" beginning after the winter break.  She told Parents that Student was off-task at least 50 percent of the time, and constantly talked in class about anything other than what the assignment was at the time.  Although Ms. Greene gave Student catch-up time pursuant to Student's section 504 plan, Student was not finishing work, particularly long-term assignments such as class reports.  Student constantly tried to trip his classmates if they walked by him, although Ms. Greene had counseled him numerous times that he could hurt someone by the behavior.  Ms. Greene told Parents at the meeting that Student would rather be disruptive in class than do his work.  He needed attention, even if it was in a negative way.  Ms. Greene told Parents that Student's behavior was more aggressive in class and more mean-spirited than it had been previously.

28.     Ms. Greene's response to Student's behavior in class was often to require him to remain in class during recess time or during the "Friday Fun Time," and make Student write eight-paragraph essays reflecting on his behavior.  Instead of helping Student, this

33

caused him more anxiety as he did not know why he engaged in the behaviors and did not know how to control them.

29.     At the March 9, 2016 meeting, Parents described Student's headaches, stomach aches, vomiting and diarrhea before school.  They explained how difficult it was to get Student to go to school and that they often had to physically lift him together to place Student in the car.

30.     Ms. Carter, who is a special education specialist, attended the March 9, 2016 meeting.  She acknowledged to Parents then, and acknowledged at hearing, that there were things that Student could not control and that Student had to be taught how to control them.  However, in spite of Ms. Greene's description of Student's in-class behavior, and the implication that she could not address the behaviors because they continued to increase, and in spite of Parents' description of Student's school refusal anxiety, District did not refer Student for assessment at that time.  Rather, it merely added provisions to Student's section 504 plan, although Ms. Greene had already tried implementing some of the new provisions unsuccessfully.

31.     As stated above, the actions of a school district with respect to whether it had knowledge of, or reason to suspect a disability, must be evaluated in light of information that District knew, or had reason to know, at the relevant time.  It is not based upon hindsight.  (See *Adams, supra,* 195 F.3d at p. 1149, citing *Fuhrmann v. East Hanover Bd. of Education.* (3rd Cir. 1993) 993 F.2d 1031, 1041.)  The inquiry is not whether Student actually was eligible for special education, but a lower standard of whether there were indications that a he *might be* eligible.  Violations of child find are procedural violations of the IDEA and the Education Code.  (*Cari Rae S., supra,* 158 F.Supp. 2d 1190 at p.1196).)

32.     Here, District had more than enough information to suspect that Student might be a child with a disability as of the March 9, 2016 section 504 team meeting.  His off-task and disruptive behaviors in class had substantially increased and become more aggressive.  Ms. Greene acknowledged the increase, which implied that she was not able to address the behavior.  Parents explained the physical symptoms Student demonstrated every day before school.  They explained their difficulty in getting Student to attend school.  During the second trimester of school, which ended about two weeks prior to the March 9 meeting, Student had missed 11 days of school, primarily because of school related anxiety.  This was sufficient notice to District that it should have assessed Student.

33.     Therefore, Student met his burden of proof of establishing that District's child find obligation was triggered on March 9, 2016, obligating District to offer an assessment plan at that time.  (*Cari Rae S., supra,* 158 F.Supp. 2d 1190 at p.1196).)  District should have prepared an assessment plan for Parents to sign and offered it to them in a timely manner.  District did not offer the assessment plan until May 13, 2016, after Mother requested an assessment in her letter of April 27, 2016.

34.     The delay in assessment significantly prejudiced Student and Parents.  The most significant result of the delay was that District did not complete its assessment of Student prior to the end of the 2015-2016 school year.  In fact, the majority of District's assessment was administered after the beginning of the 2016-2017 school year, when Student had already begun to attend school at Bridges.  If District had properly referred Student for assessment after receiving the information from Ms. Greene and Parents at the March 9, 2016 section 504 team meeting, it would have had 15 days, or until March 24, 2016, to present Parents with an assessment plan.  Parents would have had another 15 days, or until April 8, 2016, to sign the plan.  District would have had 60 days, by June 7, 2016, to complete the assessment and convene an IEP team meeting.  Therefore, had District timely referred Student for an assessment, the assessment would have been completed and an IEP team meeting convened prior to the end of the 2015-2016 school year.

35.     The timing of District's assessment is significant.  Parents were deprived of District's assessment information for four months because, once District did offer an assessment plan, the intervening summer break tolled the 60-day assessment timeline.  Parents, concerned about Student's anxiety, lack of school attendance, and his behaviors in class, withdrew Student from District because District had not responded timely to their concerns.  They were faced with either returning Student to District for another school year to await District's assessment results while watching Student's anxiety and school refusal increase, or finding a way to address Student's disabilities on their own, which they did by enrolling him in Bridges.

36.     The timing impeded Student's right to a FAPE, because, had District completed the assessment before the end of the 2015-2016 school year, Student's anxiety symptoms would have been ongoing and the fact that he missed 17 days of school during the third trimester even more apparent.  As discussed below, Ms. Laucis made her decision on Student's lack of eligibility as a child with an emotional disturbance and as other health impaired due to his attention deficit hyperactivity disorder, in the context of Student's progress at Bridges, which is not a general education school.  Student's lack of physical symptoms at Bridges, and the fact that his issues in class were being addressed by the staff at Bridges, diminished Ms. Laucis' ability to assess Student within the context of a public school.  Had her assessment taken place the previous spring, her conclusions would have been different.  For these reasons, Student met his burden of proof that District's failure to refer him for assessment on March 9, 2016, denied him a FAPE.

### ELIGIBILITY FOR SPECIAL EDUCATION UNDER EMOTIONAL DISTURBANCE

37.     As a result of her assessment, Ms. Laucis found that Student had an emotional disturbance because of his somatization.  That is, Student had experienced physical symptoms of stomach aches, headaches, vomiting, and diarrhea, over a long period of time and to a marked degree.  This corresponded to the criterion for emotional disturbance that Student had a tendency to develop physical symptoms or fears associated with personal or school problems.  This anxiety was exacerbated by Student's feelings of failure when he was unable to complete work and unable to participate in the GATE program,

38.    Ms. Laucis found, in spite of this, that Student did not qualify for special education because his educational performance was not affected. Ms. Laucis, and other District staff and IEP team members, incorrectly focused on Student's continued strong academic performances, totally discounting the affect his anxiety had on his ability to attend school. Their determination that Student was not eligible as a child with an emotional disturbance focused solely on "academic performance" rather than focusing on Student's overall "educational performance" as required by statute.

39.    Contrary to District's focus on Student's academic performance, a school district is required to broadly construe a pupil's educational needs as including his or her social, health, emotional, behavior, communicative, physical, and vocational needs, in addition to his or her academic needs. (*Seattle School Dist., No. 1 v. B.S.* (9th Cir. 1996) 82 F.3d 1493, 1501, abrogated in part on other grounds by *Schaffer v. Weast, supra*, 546 U.S. 49, 56-58, citing H.R. Rep. No. 410, 1983 U.S.C.C.A.N. 2088, 2106.) In addition, educational needs include functional performance. (Ed. Code § 56345, subd. (a)(1).) The "educational benefit" to be provided to a child requiring special education is not limited to addressing the child's academic needs, but also social and emotional needs that affect academic progress, school behavior, and socialization. (*County of San Diego v. California Special Education Hearing Office* (9th Cir. 1996) 93 F.3d 1458, 1467 (*San Diego*).) For these reasons, a pupil's IEP must target all of his or her unique educational needs, whether academic or non-academic. (*Lenn v. Portland School Committee* (1st Cir. 1993) 998 F.2d 1083, 1089.) A school district is required to provide educational instruction, specially designed to meet the unique needs of a child with a disability, supported by such services as are necessary to permit the child to benefit from the instruction. (*Rowley, supra,* 458 U.S. 176, 188-189; *San Diego, supra,* 93 F.3d at p. 1468.)

40.    District's conclusion that Student's emotional disturbance did not affect his access to his education as a whole is contradicted by the fact that Student missed almost 20 percent of classes during the second trimester of the 2015-2016 school year, and missed over 25 percent of classes during the third trimester, primarily because of his school refusal anxiety. It is incorrect to find that a child can miss school because of a disability but then conclude that his educational performance has not been affected. If such were the case, school would not be required of any child who could pass tests without attending.

41.    In addition to academic achievement and attendance at school, educational performance consists of a variety of other components. These include a pupil's ability to manage his or her time in class; completing assignments and projects; keeping school and homework materials organized; and completing homework. Student's anxiety interfered with all of these aspects of educational performance except his academic achievement.

42.    For these reasons, Student met his burden of persuasion that District should have found him eligible for special education as a child with an emotional disturbance by the end of the 2015-2016 school year.

T - 148

*ELIGIBILITY FOR SPECIAL EDUCATION UNDER OTHER HEALTH IMPAIRMENT*

43.    Student also met his burden of persuasion that District should have found him eligible under the category of other health impaired because of his attention deficit hyperactivity disorder and because of his anxiety.  District's failure to do so denied Student a FAPE.

44.    During the second and third trimesters of the 2015-2016 school year, Student had limited strength, vitality or alertness, due to his chronic attention deficit hyperactivity disorder and accompanying anxiety, which affected his educational performance.  Student required some type of special education intervention, in the form of some of his instruction being given in a smaller class environment than the 37-pupil general education classroom at Wilbur Charter.  Student also required counseling to address his anxiety, inattention, disruptive behaviors and lack of focus.  Ms. Greene acknowledged as much during the March 9, 2016 section 504 team meeting, when she stressed that Student's behavior was "off the charts," and that she was not able to address the behaviors in her classroom of 37 pupils.

45.    It is inconsequential that Student's behavior improved during the 2016-2017 school year while he was at Bridges.  First, District should have assessed Student and found him eligible for special education by the end of the 2015-2016 school year, while he still attended Wilbur Charter.  Second, Student's improvement the following school year may be attributable to the small class size at Bridges, the teachers and staff trained to address the needs of pupils with disabilities, and the counseling and psychological component of the instruction available at Bridges.

46.    Student's attention deficit and anxiety caused him to feel stupid, unable to finish work, and always got him "in trouble."  District's attempt to use the section 504 plan to address Student's anxiety and maladaptive behaviors in class were ultimately unsuccessful.  There is no evidence as to how the 504 accommodations were to be accomplished or how Ms. Greene was supposed to be taught to implement them.  There is no evidence that the accommodations were successful.  Dr. Kaler's opinion that general education interventions, modifications, and accommodations were appropriate when Student initially started Wilbur Charter, but were unsuccessful as of March 2016, was more persuasive than the opinion of District witnesses to the contrary, given the evidence at hearing.  The evidence supports a finding that Student's chronic attention deficit and accompanying anxiety interfered with Student's access to his education and made him eligible for special education under the category of other health impairment.  For the foregoing reasons, Student met his burden of persuasion that District should have found him eligible by the end of the 2015-2016 school year under the category of other health impairment, and that District's failure to do so denied Student a FAPE.

ISSUE 1(C):  APPROPRIATENESS OF DISTRICT'S INITIAL ASSESSMENT

47.    Student contends that District's psychoeducational assessment denied him a FAPE, because: 1) Ms. Laucis did not personally interview Ms. Greene or Mother; 2)

Ms. Laucis failed to obtain critical information about Student; 3) Ms. Laucis discounted Student's school refusal, anxiety about attending school, and his many absences; and 4) District did not fully assess Student's sensory-motor integration difficulties. District contends that its assessment met all legal standards.

### APPLICABLE LAW

48.    School Districts must ensure that "the child is assessed in all areas of suspected disability." (20 U.S.C. § 1414(b)(3)(B); Ed. Code, § 56320, subd. (f).) The determination of what tests are required is made based on information known at the time. (See *Vasheresse v. Laguna Salada Union School Dist.* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157-1158 [assessment adequate despite not including speech/language testing where concern prompting assessment was deficit in reading skills].) A school district is also required to ensure that the evaluation is sufficiently comprehensive to identify all of the child's needs for special education and related services whether or not commonly linked to the disability category in which the child has been classified. (34 C.F.R. § 300.304(c)(6).)

49.    A school district must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information to determine whether the child is eligible for special education services. (20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304 (b)(1).) The assessment must use technically sound instruments that assess the relative contribution of cognitive, behavioral, physical, and developmental factors. (20 U.S.C. § 1414(b)(2)(C); 34 C.F.R. § 300.304(b)(3).) Assessment materials must be used for purposes for which they are valid and reliable. (20 U.S.C. § 1414(b)(3(A)(iii)); 34 C.F.R. § 300.304(c)(1)(iii); Ed. Code, § 56320, subd. (b)(2).)

50.    Assessments must be administered by trained and knowledgeable personnel and in accordance with any instructions provided by the author of the assessment tools. (20 U.S.C. § 1414(b)(3)(A)(iv), (v); 34 C.F.R. § 300.304(c)(1)(iv), (v); Ed. Code, §§ 56320, subd. (b)(3).) Persons knowledgeable of the student's disability shall conduct assessments. (Ed. Code, § 56320, subd. (g).)

### ANALYSIS

51.    Student failed to meet his burden of proof on this issue. District's health assessment was conducted by the school nurse; there is no evidence that she was not qualified to do her portion of the assessment. Mr. Wise, a credentialed special education teacher, administered the academic section of the assessment. Ms. Kazandjian, also a credentialed special education teacher, wrote the academic assessment report. There is no evidence that they were not qualified to assess Student or interpret the academic assessment results. Student put on no evidence that either District's health assessment or its academic assessment failed to meet statutory standards or failed to assess Student thoroughly in those areas.

52.     Student's criticisms of Ms. Laucis' assessment are also not supported by the preponderance of the evidence.  Ms. Laucis was qualified to assess Student.  Her assessment met all statutory requirements.  She used a variety of assessment tools and strategies to assess Student.  The testing instruments she used were either standardized measures or other sound assessment strategies.  There is no evidence that the tests were biased.  There is no evidence that Ms. Laucis improperly scored the results.  The tests were administered in English, Student's native language.

53.     Student complains that Ms. Laucis did not know what occurred at the March 9, 2016 section 504 team meeting, did not know that he had to withdraw from the GATE program due to his anxiety, and did not know the extent of the problems Student had in Ms. Greene's classroom.  However, the lack of this information was not due to Ms. Laucis' lack of diligence but rather to the failure of those people she contacted, namely Mother and Ms. Greene, to provide Ms. Laucis with complete information.  Ms. Laucis provided Mother and Ms. Greene with an opportunity to provide written input on Student's needs, present levels, and deficits.  There was no reason for Ms. Laucis to believe that the information she received was incomplete.

54.     Student contends that because his score on the sensory-motor integration portion of the assessment was low, Ms. Laucis should have pursued additional testing to tease out any deficit.  Student's low score was the only indication of any sensory needs Student might have.  Neither of Dr. Kaler's assessments presented sensory-motor as an area of need for Student.  Dr. Kaler never commented upon it in her reports.  There is no evidence that Student demonstrated sensory-motor deficits in Ms. Greene's classroom.  Student's teachers at Bridges did not indicate any sensory-motor deficit needs in their responses to the rating scales they prepared or in any communications with District or with Parents.  Student put on no persuasive evidence that he had a sensory motor need either through independent assessment or the testimony of any expert in that area.  District's failure to further assess Student in the area of sensory-motor integration did not deny him a FAPE.

55.     Student's remaining criticism of Ms. Laucis' assessment report concerns her conclusions and recommendations and do not undermine the validity of the assessment itself.

56.     In his due process complaint and in his issues for hearing, Student also contended that District failed to conduct an appropriate initial assessment because the assessment did not adequately assess: 1) his intellectual functioning, including area of attention, concentration, executive functioning, and information processing; 2) language processing, including development and use of language; 3) academic functioning; 4) social-emotional functioning; and 5) behavior.

57.     Student presented no persuasive evidence in support of a finding that District's psychoeducational assessment was deficient in any of these five additional areas.  Dr. Kaler did not address any of these alleged inadequacies in the assessment and Student presented no additional witnesses in support of his contentions.  Student did not address these five additional areas in his closing brief.  As discussed above, Student met his burden of

39

persuasion that District's conclusion that he was not eligible for special education was incorrect. However, Student failed to show by a preponderance of the evidence that District's psychoeducational assessment itself did not meet all statutory requirements or failed to adequately assess him in all areas of unique need, only that District's ultimate determination that he was not eligible for special education was in error.

### ISSUE 2(A): FAILURE TO TIMELY REVIEW AND CONSIDER THIRD PARTY ASSESSMENTS

58.    Student's contention that District should have considered Dr. Kaler's 2013 assessment is outside the two-year statute of limitations. Even if the issue were considered on its merits, as stated above, Student failed to demonstrate that Parents' right to participate in his IEP process was significantly impeded, or that he lost educational benefit, or was denied a FAPE, by District's failure to review the assessment. Dr. Kaler did not find Student eligible for special education as a result of her 2013 assessment and did not recommend Parents request an assessment for Student. The assessment would not have informed District of any information that should have caused it to believe that Student might be a child with a disability and to have done anything more than what Dr. Kaler recommended at the time, which was that Student's attention deficit could be addressed through general education classroom accommodations.

59.    Student has also failed to meet his burden that District failed to timely review and consider Dr. Kaler's May 2016 assessment. It is unclear from the evidence when District received a copy of Dr. Kaler's report. Ms. Laucis reviewed the report as part of her assessment process. She referenced the report in her own assessment report. Dr. Kaler was a member of Student's IEP team in September and October 2016, when the team reviewed District's assessment and Dr. Kaler's assessment. A school district is not required to adopt an independent assessor's findings and recommendations; it is only required to consider the independent assessor's report and recommendations. The entirety of the evidence demonstrates that District met this obligation. Therefore, Student failed to meet his burden of persuasion as to this issue.

### ISSUE 2(D): FAILURE TO MAKE A FORMAL, SPECIFIC, WRITTEN OFFER OF FAPE

60.    It is unclear what Student contends with this issue. It appears to be derivative of his child find issue and his contention, which he has successfully proven, that District should have found him eligible for special education. Had District done so, it would have been required to develop an IEP for Student that included an educational program, necessary related services, and, if necessary, classroom accommodations and modifications to Student's curriculum.

### APPLICABLE LAW

61.    In *Union School Dist. v. Smith* (1994) 15 F.3d 1519, cert. den., 513 U.S. 965 (*Union*), the Ninth Circuit held that a district is required by the IDEA to make a clear, written IEP offer that parents can understand. The Court emphasized the need for rigorous

compliance with this requirement: "We find that this formal requirement has an important purpose that is not merely technical, and we therefore believe it should be enforced rigorously. The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any." (*Union, supra,* 15 F.3d at p. 1526 see also *Redding Elementary School Dist. v. Goyne* (E.D.Cal., March 6, 2001 (No. Civ. S001174)) 2001 WL 34098658, pp. 4-5.)

62.    A formal, specific offer from a school district (1) alerts the parents of the need to consider seriously whether the proposed placement is appropriate under the IDEA, (2) helps parents determine whether to reject or accept the placement with supplemental services, and (3) allows the district to be more prepared to introduce relevant evidence at hearing regarding the appropriateness of placement. (See *Union, supra,* 15 F.3d at p. 1526.)

*ANALYSIS*

63.    Student's IEP team convened on September 15, 2016 and October 17, 2016. District developed an IEP document as a result of those meetings. The document indicated Student's present levels of performance. It reviewed the results of his assessments. It indicated who attended the meetings. It memorialized the position of Parents and Dr. Kaler that Student qualified for special education and memorialized the fact that the District IEP team members did not believe that he did. The IEP document was clear and concise that District did not believe that Student was eligible for special education either as other health impaired or as a child with an emotional disturbance. Parents understood that District took that position. They understood that District was not offering Student a FAPE because it did not believe Student qualified for special education. There is no doubt as to those facts in the IEP document. Parents' testimony at hearing, as well as the fact that they thereafter filed a due process complaint because District did not find Student eligible, further demonstrate they had no doubt of District's position or what the IEP document stated. For these reasons, Student has failed to meet his burden of persuasion that the September 15, 2016 and October 17, 2016 IEP document was not concise or specific.

REMEDIES

1.    Student partially prevailed on Issues 1(a), 1(b), 2(b), 2(c), and 3, all of which allege the same thing: that District denied Student a FAPE by first failing to timely assess him and then failing to find him eligible for special education. Student is therefore entitled to a remedy for this violation. Parents timely notified District on May 27, 2016, that they intended to privately place Student at Bridges the next school year. Student seeks reimbursement to Parents for the cost of his tuition at Bridges for the 2016-2017 school year, in the amount of $42,990. He also seeks reimbursement for the cost of his individual counseling with Dr. Jessum during the same period of time, in the amount of $6,120, and

reimbursement for the cost of Dr. Kaler's Brief Psychoeducational Evaluation, in the amount of $1,800.

2.      ALJ's have broad latitude to fashion appropriate equitable remedies for the denial of a FAPE.  (*School Comm. of Burlington v. Department of Educ.* (1985) 471 U.S. 359, 370 [105 S.Ct. 1996, 85 L.Ed.2d 385 (*Burlington*)]; *Parents of Student W. v. Puyallup School Dist., No. 3* (9th Cir. 1994) 31 F.3d 1489, 1496 (*Puyallup*).)

3.      A parent may be entitled to reimbursement for placing a student in a private placement without the agreement of the local school district if the parents prove at a due process hearing that the district had not made a FAPE available to the student in a timely manner prior to the placement, and the private placement was appropriate.  (20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c); see also *Burlington, supra,* 471 U.S. at pp. 369-370 [reimbursement for unilateral placement may be awarded under the IDEA where the district's proposed placement does not provide a FAPE].)  The private school placement need not meet the state standards that apply to public agencies to be appropriate.  (34 C.F.R. § 300.148(c); *Florence County School Dist. Four v. Carter* (1993) 510 U.S. 7, 11, 14 [114 S.Ct. 361, 126 L.Ed.2d 284] [despite lacking state-credentialed instructors and not holding IEP team meetings, unilateral placement found to be reimbursable where it had substantially complied with the IDEA by conducting quarterly evaluations of the student, having a plan that permitted the student to progress from grade to grade, and where expert testimony showed that the student had made substantial progress].)

4.      District argues that, even if this Decision finds District denied Student a FAPE on any of the issues presented, Parents are not entitled to reimbursement for their costs for placing Student at Bridges because Student failed to prove that Bridges was an appropriate placement.  District argues that there is no evidence to support the placement at Bridges because no one from Bridges testified at the hearing about its program or the credentialing of its teachers, and because Bridges is not certified as a non-public school.  District contends that there is no evidence that Bridges follows Common Core, the instructional modality required by the California Department of District for public Schools.  District also contends that Parents had no intention of moving Student from Bridges back to a District placement even had District found him eligible for special education.

5.      District is incorrect that no persuasive evidence supports a finding that Bridges was an appropriate placement for Student.  Dr. Kaler, Dr. Jessum, and Mother each testified as to elements of Student's program at Bridges and each testified that he or she considered the placement appropriate.  District had an opportunity to rebut this testimony but failed to do so.

6.      District's argument that Bridges is not certified as a non-public school and does not follow the Common Core is equally unavailing.  The Ninth Circuit has specifically found that a private placement need not provide all services that disabled pupil needs as a prerequisite for reimbursement for the costs of the placement.  (*C.B. v. Garden Grove Unified Sch. Dist.* (9th Cir. 2011) 635 F.3d 1155.)  The Court reiterated this finding in

*S.L. v. Upland Unified Sch. Dist.* (9th Cir. 2014) 747 F.3d 1155, 1159, where it found that costs of parents' private placement at a parochial school was entitled to reimbursement even though the school was not certified, and even though the primary benefit obtained by the student was social rather than academic.

7.    Finally, District's argument that Parents had no intention of returning Student to a District school had District offered him an IEP is speculation. District did not ask Parents at hearing if that was indeed their plan, and District provided no documentary or testimonial evidence in support of this assertion.

8.    Student met his burden of proof that Parents are entitled to reimbursement for the cost of his tuition at Bridges for the 2016-2017 school year in the amount of $42,990. The documents submitted as evidence and Father's testimony at hearing is adequate proof of the costs Parents have incurred.

9.    Student has not, however, met his burden of proof that he is entitled to reimbursement for the individual counseling services Dr. Jessum provided during the 2016-2017 school year. Dr. Jessum's testified that Bridges had counselors and a psychologist on staff to meet the social, emotional, and psychological needs of its students. Student did not prove by a preponderance of the evidence that he needed more services than Bridges provided in order to access his education. District is not required to address Student's psychological or social needs applicable solely to his home environment.

10.    Student also failed to meet his burden of proof that he is entitled to reimbursement for Dr. Kaler's assessment. First, Student was not entitled to request an independent educational evaluation until after District completed its assessment. Dr. Kaler assessed Student over approximately the same time District was assessing Student, not after District finished its assessment. Second, Dr. Kaler did not do a complete assessment. She did not do an academic assessment. She did not observe Student at either of his school placements. She did not contact Student's teachers. Finally, Dr. Kaler's assessment did not assess any area that District failed to assess or add any information not covered by District's assessment. The fact that her conclusions were different than District's is not grounds for ordering reimbursement for an incomplete assessment. Therefore, even had District failed to properly assess Student ordering reimbursement for Dr. Kaler's incomplete assessment would not be a proper remedy.

11.    Finally, Student requests a bank of compensatory education hours in the areas of counseling, social skills, and behavioral intervention, with the number of hours "left to the equitable discretion" of the ALJ.

12.    It was Student's burden to prove the amount, type, and duration of any compensatory education he requested. Student was reminded of this obligation in the Order Following Prehearing Conference OAH issued on August 30, 2017. Student failed to produce any evidence whatsoever in support of his request for compensatory education hours. Additionally, reimbursement to Parents for Student's placement for a year at Bridges

43

is sufficient compensation for District's violation of its child find obligation, particularly given that Student has only partially prevailed on those issues, and as the denial of FAPE only pertains to the time period after March 9, 2016, rather than for the full two years prior to the filing of Student's complaint.  For these reasons, Student's request for additional compensatory education is denied.

## ORDER

1.      Student is eligible for special education placement and services, under the eligibility categories of other health impairment and emotional disturbance.

2.      Within 45 calendar days of the date of this decision, District shall reimburse Parents for the cost of Student's attendance at Bridges Academy for the 2016-2017 school year, in the amount of $42,990.  Documents submitted in this hearing constitute adequate proof of payment by Parents to Bridges Academy.

3.      All of Student's further requests for remedy are denied.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires that this Decision indicate the extent to which each party prevailed on each issue heard and decided in this due process matter.  Student partially prevailed on Issues 1(a), 1(b), 2(b), 2(c), and 3.  District partially prevailed on issues 1(a), 1(b), 2(b), 2(c), and 3.  District fully prevailed on issues 1(c), 2(a) and 2(d).

## RIGHT TO APPEAL THIS DECISION

This was a final administrative Decision, and all parties are bound by it.  Pursuant to Education Code section 56506, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within ninety (90) days of receipt.

DATED:  November 8, 2017

DocuSigned by:

*Darrell Lepkowsky*

DARRELL LEPKOWSKY
Administrative Law Judge
Office of Administrative Hearing

44

T - 156

**EXHIBIT "6"**

# LAW OFFICES OF HENRY TOVMASSIAN
14001 Ventura Boulevard
Sherman Oaks, California 91423
tovmassian@att.net
(818) 990-7722
(818) 450-3722

March 11, 2019

Invoice submitted to:

Los Angeles Unified School District
Charlotte Sewell
333 South Beaudry Avenue, 24th Floor
Los Angeles, CA 90017

In Reference To:  Elijah Gordon v. LAUSD
                  Our file number 117122-16-5

Invoice #11555

Professional Services

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 6/20/2016 HT | Review e-mail from client regarding dispute with the District. | 0.10<br>650.00/hr | 65.00 |
| 8/3/2016 HT | Review e-mail from client regarding dispute with the District. | 0.10<br>650.00/hr | 65.00 |
| 8/9/2016 HT | Review e-mail from client regarding dispute with the District. | 0.10<br>650.00/hr | 65.00 |
| 8/16/2016 HT | Telephone conference with clients regarding dispute with the District. | 0.30<br>650.00/hr | 195.00 |
| 8/17/2016 HT | Review and analyze e-mail from client regarding requests for assessment (.1); review and analyze 2016 Kaler assessment (1.0); review and analyze letters from client to District regarding assessments (.1). | 1.20<br>650.00/hr | 780.00 |
| 8/22/2016 HT | Review e-mail from client regarding case. | 0.10<br>650.00/hr | 65.00 |
| 12/15/2016 HT | Review e-mail from client regarding case. | 0.10<br>650.00/hr | 65.00 |
| 2/8/2017 HT | Review list of expenses from client. | 0.10<br>650.00/hr | 65.00 |

T - 158

Los Angeles Unified School District

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 2/9/2017 HT | Prepare e-mail to clients regarding case. | 0.10<br>650.00/hr | 65.00 |
| 4/3/2017 HT | Prepare letter to District requesting student records. | 0.10<br>650.00/hr | 65.00 |
| 4/21/2017 HT | Exchange of e-mails with clients regarding dispute with the District. | 0.20<br>650.00/hr | 130.00 |
| 4/22/2017 HT | Review e-mail from client regarding case. | 0.10<br>650.00/hr | 65.00 |
| 4/23/2017 HT | Review and analyze student documents (2.9); prepare complaint for due process (6.4); exchange of e-mails with client regarding same (.3). | 9.60<br>650.00/hr | 6,240.00 |
| 4/26/2017 HT | Review OAH scheduling order (.1); exchange of e-mails with clients regarding same (.1). | 0.20<br>650.00/hr | 130.00 |
| 4/27/2017 HT | Exchange of e-mails with client regarding resolution meeting cancellation (.1); review e-mail from District regarding same (.1). | 0.20<br>650.00/hr | 130.00 |
| 5/27/2017 HT | Exchange of e-mails with client regarding cancellation of mediation. | 0.10<br>650.00/hr | 65.00 |
| 6/5/2017 HT | Review e-mail from District regarding continuance of mediation and hearing dates. | 0.10<br>650.00/hr | 65.00 |
| 6/7/2017 HT | Review OAH order granting continuance. | 0.10<br>650.00/hr | 65.00 |
| 6/9/2017 HT | Prepare e-mail to clients regarding continuance of mediation and hearing dates. | 0.10<br>650.00/hr | 65.00 |
| 8/6/2017 HT | Prepare for mediation. | 1.40<br>650.00/hr | 910.00 |
| 8/7/2017 HT | Exchange of e-mails with District regarding settlement issues. | 0.20<br>650.00/hr | 130.00 |
| 8/8/2017 HT | Exchange of e-mails with District regarding mediation (.1); telephone conferences with District regarding same and settlement issues (.2). | 0.30<br>650.00/hr | 195.00 |
| 8/21/2017 HT | Exchange of e-mails with clients regarding invoices and proof of payment (.2); exchange of e-mails with Dr. Kaler regarding trial (.1). | 0.30<br>650.00/hr | 195.00 |
| 8/22/2017 HT | Review and analyze invoices and other financial documents regarding reimbursements (.2); exchange of e-mails with clients regarding same and preparation of prehearing conference statement (.4); prepare prehearing conference statement (4.8). | 5.40<br>650.00/hr | 3,510.00 |

Los Angeles Unified School District                                                    Page      3

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 8/23/2017 HT | Review e-mail from client regarding expenses. | 0.10<br>650.00/hr | 65.00 |
| 8/24/2017 HT | Review and analyze financial documents from clients (.2); exchange of e-mails with client regarding same (.2); review e-mail and letter from counsel for the District regarding notice of representation (.1); review and analyze amended PHC statement from counsel for the District (.2). | 0.70<br>650.00/hr | 455.00 |
| 8/25/2017 HT | Review and analyze additional financial documents from clients (.4); exchange of e-mails with clients regarding same (.2); review and analyze District's exhibit and witness disclosures (.2). | 0.80<br>650.00/hr | 520.00 |
| 8/28/2017 HT | Exchange of e-mails with counsel for the District regarding District's exhibits (.1); prepare list of witnesses and exhibits and exhibits (2.4); exchange of e-mails with clients regarding same (.2); prepare e-mail to counsel for the District regarding same (.1); compare two versions of the District's assessment report (.8); prepare e-mail to Dr. Kaler regarding same (.1). | 3.70<br>650.00/hr | 2,405.00 |
| 8/29/2017 HT | Exchange of e-mails with client regarding missing expense documents (.1); develop order of witnesses (.3); exchange of e-mails with counsel for the District regarding same and missing student documents (2); review stipulation to add a District witness (.1); exchange of e-mails with counsel for the District regarding same (.1). | 0.80<br>650.00/hr | 520.00 |
| 8/30/2017 HT | Commence review and analysis of exhibits (1.1); commence preparation of trial outline (1.4); research regarding eligibility issues (5.1); prepare e-mail to client regarding school recommendations to Bridges (.1); review and analyze amended witness schedule and accompanying e-mail from counsel for the District (.2). | 7.90<br>650.00/hr | 5,135.00 |
| 8/31/2017 HT | Extended telephone conference with Dr. Kaler regarding her opinions (.7); commence review and analysis of District's psychoeducational assessments (3.4); continue preparation of trial outline (2.1); commence preparation of examination questions for Laucis (2.4); telephone conference with client regarding documents from Bridges (.1); prepare e-mail to client regarding same (.1); exchange of e-mails with counsel for the District regarding witness schedules (.1); review and analyze OAH PHC order (.2). | 9.10<br>650.00/hr | 5,915.00 |
| 9/1/2017 HT | Continue review and analysis of District's psychoeducational assessments (2.0); continue preparation of examination questions for Laucis (1.9); meeting with Mr. and Mrs. Gordon to prepare them for their testimony (4.0); telephone conference with Dr. Kaler regarding her opinions (.4); exchange of e-mails with colleagues regarding Judge assigned to the case (.2); review and analyze additional exhibits and amended exhibit list from counsel for the District (.2). | 8.70<br>650.00/hr | 5,655.00 |
| 9/2/2017 HT | Continue review and analysis of District's psychoeducational assessments (1.6); continue preparation of examination questions for Laucis (2.1); commence preparation of examination questions for Kaler (4.2); preparation of examination questions for Platt (.5); exchange of e-mails | 8.90<br>650.00/hr | 5,785.00 |

Los Angeles Unified School District                                                      Page      4

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|

|  |  | with clients regarding upcoming hearing, discovery of new documents and audiotape of the 504 meeting (.5). |  |  |
| 9/3/2017 | HT | Complete preparation of examination questions for Ms. Laucis (3.9); continue review and analysis of trial exhibits (2.1); review e-mail from clients regarding check for latest payment to Bridges (.1); review and analyze C.B. decision (.4); exchange of e-mails with GDC regarding same (.1); select certain exhibits for Dr. Kaler (.3); complete preparation of examination questions for Dr. Kaler (2.1); prepare e-mail to Dr. Kaler regarding exhibits and her testimony (.1). | 9.10 650.00/hr | 5,915.00 |
|  | GDC | Research regarding eligibility and requirements for reimbursement for private school. | 4.50 700.00/hr | 3,150.00 |
| 9/4/2017 | HT | Telephone conference with Dr. Kaler regarding her opinions (.7); revise questions for Dr. Kaler (.5); review and analyze 2014 Kaler assessment report (.6); listen to audio recording of 2016 504 plan meeting and transcribe its relevant portions (5.6); continue to prepare examination questions for Deborah Platt (.3); prepare examination questions for Maeva Carter (1.4); prepare examination questions for Jodee Mensik (.5); prepare examination questions for Diane Schulte (.2); review and analyze cases sent by Mr. Crook (1.2); exchange of e-mails with Mr. Crook regarding same (.1) | 11.10 650.00/hr | 7,215.00 |
|  | GDC | Research regarding eligibility issues. | 6.00 700.00/hr | 4,200.00 |
| 9/5/2017 | GDC | Attend and participate in first day of hearing, and take notes of testimony (5.3); review and analyze Mr. I first circuit decision (.5). | 5.80 700.00/hr | 4,060.00 |
|  | HT | Review invoices from Dr. Kaler (.1); review and analyze e-mail from counsel for the District along with additional exhibit and amended exhibit list (.1); review e-mail from client along with check to Dr. Kaler (.1); prepare lengthy e-mail to Dr. Kaler regarding her testimony (.3); telephone conference with client regarding trial issues (.2); prepare for and attend and participate in first day of hearing (4.0); travel to and from hearing (1.8); prepare for the following days' testimony (3.2); analyze ADHD rating scale answered by Ms. Greene for errors (.2); research regarding proper administration of the ADHD rating scale (.9); prepare e-mail to Dr. Kaler regarding Ms. Greene's ADHD rating scale (.1); telephone conference with Dr. Kaler regarding her opinions (.2). | 11.20 650.00/hr | 7,280.00 |
| 9/6/2017 | HT | Review e-mail from Dr. Kaler regarding Ms. Greene's ADHD rating scale error (.1); Prepare for and appear at hearing (8.5); travel to and from hearing (1.7); prepare for the next day's testimony (1.9); review e-mail from counsel for the District regarding recording of the 504 meeting (.1); review e-mail from counsel for the District regarding District's response to complaint (.1); prepare e-mail to counsel for the District regarding replacement of Dr. Kaler's invoice and payment by clients of same (.1); telephone conference with Dr. Kaler regarding her testimony (.7); prepare e-mail to Dr. Kaler regarding her testimony regarding Ms. Greene's ADHD rating form (.2); exchange of e-mails with counsel for the District | 14.60 650.00/hr | 9,490.00 |

Los Angeles Unified School District                                                                Page    5

|  |  | | Hrs/Rate | Amount |
|---|---|---|---|---|

regarding questionnaires Ms. Laucis sent to mother and Ms. Greene as part of her assessment (.1); review and analyze statutory definition of OHI eligibility (.3); exchange of e-mails with Dr. Kaler regarding same (.2); prepare e-mail to counsel for the District regarding use of updated version of Dr. Kaler's CV (.1); prepare order of witnesses and estimates of testimony (.4); exchange of e-mails with counsel for the District regarding same (.1).

| 9/6/2017 | GDC | Attend and participate in second day of hearing, and take notes of testimony. | 10.20 700.00/hr | 7,140.00 |
| 9/7/2017 | HT | Prepare for and appear and participate at hearing (6.5); travel to and from hearing (1.5); exchange of e-mails with client regarding Dr. Jessum's knowledge and opinions (.2); review and analyze e-mail from GDC regarding relevant language from CB decision (.2). | 8.40 650.00/hr | 5,460.00 |
|  | GDC | Attend and participate in third day of hearing, and take notes of testimony. | 8.00 700.00/hr | 5,600.00 |
| 9/8/2017 | HT | Telephone conference with GDC regarding CB decision (.3); telephone conference with Jeff Jessum regarding his opinions (1.0); analyze testimony from prior couple of days and its impact on the legal issues in the case (1.6); review and analyze Bridges' private school affidavit (.2); research regarding definition of special education (.6); prepare e-mail to Marcy Dann and testimony from Bridges (.5); exchange of e-mails with client and GDC regarding same (.3); telephone conference with GDC regarding same and research (.5); telephone conference with March Dann regarding Bridges testimony (.2); telephone conferences with client regarding same, testimony from yesterday and related issues (.5); listen to portions of testimony in preparation for the following week (1.4); research regarding eligibility issues (2.4). | 9.50 650.00/hr | 6,175.00 |
| 9/9/2017 | HT | Continued research regarding eligibility issues (3.6); exchange of e-mails with counsel for the District regarding questionnaires for the report (.1); exchange of e-mails with clients regarding same and related issues (.1); Commence preparation of examination questions for Victoria Greene (3.8). | 7.60 650.00/hr | 4,940.00 |
| 9/10/2017 | HT | Prepare examination questions for Melissa Gordon (5.0); meeting with Ms. Gordon to further prepare for her testimony (3.5); exchange of e-mails with client regarding her testimony (.3); prepare examination questions for Jeff Jessum (3.4); prepare e-mails to Dr. Jessum regarding same (.2). | 12.40 650.00/hr | 8,060.00 |
|  | GDC | Research regarding meaning of "specially designed instruction." | 5.50 700.00/hr | 3,850.00 |
| 9/11/2017 | HT | Continue to prepare examination questions for Victoria Greene (3.4); continue preparation of examination questions for Melissa Gordon (1.0); telephone conference with Mrs. Gordon regarding same (.7); exchange of texts with Mrs. Gordon regarding same (.1); exchange of e-mails with client regarding same and Kaler assessments (.1); continue preparation | 6.90 650.00/hr | 4,485.00 |

T - 162

Los Angeles Unified School District

Page    6

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| | | of examination questions for Dr. Jessum (.8); telephone conference with Dr. Jessum regarding his opinions (.2); exchange of e-mails with Dr Jessum regarding same (.1); telephone conferences with GDC regarding research he is conducting (.5). | | |
| 9/11/2017 | GDC | Continue research regarding meaning of "specially designed instruction." (6.0); research regarding special education services by private schools (1.3). | 7.30 700.00/hr | 5,110.00 |
| 9/12/2017 | HT | Attend hearing (6.8); travel to and from hearing (1.7); prepare for tomorrow's hearing and clients' testimonies (1.0); extended telephone conferences with clients regarding their testimony (1.0); telephone conference with GDC regarding same (.3). | 10.80 650.00/hr | 7,020.00 |
| | GDC | Attend due process hearing testimony of witnesses Dr. Jeff Jessum and Victoria Greene. | 8.50 700.00/hr | 5,950.00 |
| 9/13/2017 | HT | Attend hearing (6.0); travel to and from hearing (1.5); discussions with clients regarding hearing results and closing brief issues (1.0). | 8.50 650.00/hr | 5,525.00 |
| | GDC | Attend due process hearing testimony of witnesses Melissa Gordon and Rob Gordon (7.5); discussions with clients regarding hearing (1.0). | 8.50 700.00/hr | 5,950.00 |
| 9/14/2017 | GDC | Research regarding acceptable standards for private school unilateral parent placements. | 1.00 700.00/hr | 700.00 |
| | HT | Prepare e-mail to counsel for the District regarding settlement (.1); review and analyze Upland decision mentioned by Judge yesterday (.5); review and analyze MG v. District of Columbia decision (.4); review e-mail from GDC regarding Upland decision referenced in the Frank G decision (.1). | 1.10 650.00/hr | 715.00 |
| 9/19/2017 | GDC | Research regarding "non academic needs". | 0.70 700.00/hr | 490.00 |
| | HT | Exchange of e-mails with counsel for the District regarding settlement issues (.1); review and analyze Avila decision (.4). | 0.50 650.00/hr | 325.00 |
| 9/20/2017 | GDC | Research regarding authority of OSEP letters on eligibility. | 0.50 700.00/hr | 350.00 |
| 9/24/2017 | GDC | Draft portions of brief re OSEP and OCR letters related to eligibility and district court decisions regarding same. | 1.50 700.00/hr | 1,050.00 |
| 9/26/2017 | HT | Prepare e-mail to GDC regarding District assessments (.1). | 0.10 650.00/hr | 65.00 |
| 10/7/2017 | GDC | Continue to draft portions of brief regarding OSEP letters on eligibility. | 0.40 700.00/hr | 280.00 |
| 10/9/2017 | GDC | Research regarding California Education Code section 56329. | 0.20 700.00/hr | 140.00 |

Los Angeles Unified School District

| Date | | Description | Hrs/Rate | Amount |
|---|---|---|---|---|
| 10/10/2017 | HT | Commence preparation of closing brief (4.5); research and analysis regarding same (3.4); listen to portions of audio of testimony regarding same (2.3). | 10.20<br>650.00/hr | 6,630.00 |
| 10/11/2017 | GDC | Continue research regarding emotional disturbance and ADHD eligibility and draft portions of brief regarding same. | 3.00<br>700.00/hr | 2,100.00 |
| | HT | Review and analyze draft of closing brief from GDC (.9); continue preparation of closing brief, incorporating portions from GDC brief (6.8); research and analysis regarding same (4.0). | 11.70<br>650.00/hr | 7,605.00 |
| 10/12/2017 | HT | Continue preparation of closing brief (9.8); research and analysis regarding same (3.2). | 13.00<br>650.00/hr | 8,450.00 |
| 10/13/2017 | HT | Continue preparation of closing brief (11.2) research and analysis regarding same (1.7). | 12.90<br>650.00/hr | 8,385.00 |
| 10/14/2017 | HT | Continue preparation of closing brief (11.7); research and analysis regarding same (1.5). | 13.20<br>650.00/hr | 8,580.00 |
| 10/15/2017 | GDC | Find San Francisco USD decision and email key excerpt to Mr. Tovmassian. | 0.30<br>700.00/hr | 210.00 |
| | HT | Continue preparation of closing brief (14.3); review and analyze e-mail from GDC regarding language from a case (.2); prepare e-mail to GDC regarding latest draft of closing brief. | 14.50<br>650.00/hr | 9,425.00 |
| 10/16/2017 | GDC | Review and edit final brief with Mr. Tovmassian. | 1.30<br>700.00/hr | 910.00 |
| | HT | Finalize closing brief (3.7); exchange of e-mails with GDC regarding last minute revisions (.2); prepare e-mail to counsel for the District regarding closing brief (.1); review and analyze the District's closing brief (2.1); prepare e-mails to clients regarding same (.1). | 6.20<br>650.00/hr | 4,030.00 |
| 10/17/2017 | HT | Review e-mail from client regarding closing briefs. | 0.10<br>650.00/hr | 65.00 |
| 11/9/2017 | HT | Review and analyze OAH decision (2.5); exchange of e-mails with clients regarding same (.2). | 2.70<br>650.00/hr | 1,755.00 |
| 11/11/2017 | HT | Exchange of e-mails with client regarding OAH decision and its impact. | 0.10<br>650.00/hr | 65.00 |
| | | For professional services rendered | 330.90 | $218,745.00 |
| | | Balance due | | $218,745.00 |

**EXHIBIT "7"**